IN THE UNITED STATES COURT OF APPEALS
FOR THE ELEVENTH CIRCUIT
_____

APPEAL NO. 22-14074-J
_____

PETER TARANTINO,

        Appellant,

  v.

UNITED STATES OF AMERICA,

        Appellee.
_____

ON APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF GEORGIA

District Court Criminal Case Number: 1:19-CR-00297-ELR-JSA
_____

BRIEF OF APPELLANT
_____

THIS IS A DIRECT APPEAL FROM A FINAL JUDGMENT IN A CRIMINAL
CASE PURSUANT TO 28 U.S.C. §1291
_____

DONALD F. SAMUEL, ESQ.
GARLAND, SAMUEL & LOEB, P.C.
3151 MAPLE DRIVE, N.E.
ATLANTA, GEORGIA 30305

IN THE UNITED STATES COURT OF APPEALS
FOR THE ELEVENTH CIRCUIT

| | | |
|---|---|---|
| PETER TARANTINO, | ) | |
| | ) | |
| Defendant -Appellant, | ) | |
| | ) | |
| v. | ) | Appeal No. 22-14074-J |
| | ) | |
| UNITED STATES OF AMERICA, | ) | |
| | ) | |
| Plaintiff -Appellee. | ) | |

## CERTIFICATE OF INTERESTED PERSONS

Pursuant to Eleventh Circuit Rule 28-1(b), counsel for appellant, Peter

Tarantino, certifies that the following persons may have an interest in the outcome

of this case:

1.    Honorable Justin S. Anand, U.S. Magistrate Court Judge

2.    Christopher S. Anulewicz, attorney for Defendants Todd and Julie Chrisley

3.    Todd Chrisley, Defendant

4.    Julie Chrisley, Defendant

5.    John Thomas Clarkson, attorney for Defendant Tarantino

6.    Stephen Michael Friedberg, attorney for Defendant Julie Chrisley

7.    Georgia Department of Revenue, Objector

8.    Daniel Patrick Griffin, attorney for Defendant Tarantino

9.    Julie Adams Jacobs, attorney for Objector

C-1

10.     Thomas J. Krepp, attorney for Plaintiff

11.     Vivieon K. Jones, attorney for Plaintiff

12.     Zachary C. Lawson, attorney for Defendants Todd and Julie Chrisley

13.     Arthur W. Leach, attorney for Defendants Todd and Julie Chrisley

14.     Joseph Alexander Little, IV; attorney for Defendants Todd and Julie
         Chrisley

15.     Bruce Howard Morris, attorney for Defendant Todd Chrisley

16.     Amy M. Palumbo, attorney for Plaintiff

17.     Annalise Kathleen Peters, attorney for Plaintiff

18.     Eddie Travis Ramey, attorney for Defendants Todd and Julie Chrisley

19.     Honorable Eleanor L. Ross, U.S. District Court Judge

20.     Donald Franklin Samuel, attorney for Defendant Tarantino

21.     Alex R. Sistla, attorney for Plaintiff

22.     Sekret T. Sneed, attorney for Plaintiff

23.     Alex F. Sponseller, attorney for Objector

24.     Peter Tarantino, Defendant

25.     United States of America, Plaintiff

26.     Alexander Collins Vey, attorney for Defendant Tarantino

27.     Laurabeth Wilson, attorney for Defendants Todd and Julie Chrisley

28.     John James Van Why, attorney for Defendant Tarantino

This 29th day of March, 2023.

RESPECTFULLY SUBMITTED,

**GARLAND, SAMUEL & LOEB, P.C.**

/s/ *Donald F. Samuel*
DONALD F. SAMUEL
Georgia Bar No. 624475
Attorney for Appellant

3151 Maple Drive, N.E.
Atlanta, GA  30305
Phone: 404-262-2225
Email: dfs@gsllaw.com

## STATEMENT REGARDING ORAL ARGUMENT

Counsel for Appellant respectfully requests oral argument in this case to enable further elaboration of the issue presented by this appeal.

## ADOPTION OF CO-APPELLANTS' ARGUMENT

Appellant, Peter Tarantino, pursuant to FRAP 28(i), adopts the arguments of co-Appellants, Julie and Michael Todd Chrisley, regarding the government's failure to comply with its obligations under *Brady v. Maryland*, 373 U.S. 83 (1963), *Giglio v. United States*, 405 U.S. 150 (1972), and *Napue v. Illinois*, 360 U.S. 264 (1959), to provide exculpatory information and to promptly correct erroneous testimony during trial, all of which relates to the IRS Revenue Officer's incorrect testimony that the Chrisleys still owed a substantial amount of unpaid taxes at the time of trial. This issue was raised in the Chrisleys' Motion for New Trial (Dkt. 258 and Dkt. 294) and adopted by Tarantino in the lower court, as well (Dkt. 296).

## CITATIONS TO THE RECORD

"Dkt." Refers to the documents in the district court docket.

"Tr." Refers to the page numbers of the trial transcript according to the court reporter's pagination (the transcripts are in the record at Dkt. #272 – #285).

Dkt #273 = Tr. pages 332-623

Dkt. #274 = pages 624 – 910.

Dkt. #275 = pages 911 – 1064.

Dkt. #276 = pages 1065 - 1336

"Gov Exh." Refers to the Government Exhibits which are in Dkt. #247 and Dkt. #263.

"T30" refers to Tarantino Exhibits which are catalogued in Dkt. #267.

# **TABLE OF CONTENTS**

| | |
|---|---|
| Certificate of Interested Parties | C-1 |
| Statement Regarding Oral Argument | i |
| Adoption Of Co-Appellants' Argument | i |
| Citations to the Record | i |
| Table of Contents | iii |
| Table of Citations | v |
| Statement of Jurisdiction | vii |
| Statement of the Issue on Appeal | 1 |
| Statement of the Case | 1 |
| Statement of the Facts | 3 |
| Standard of Review | 12 |
| Summary of the Argument | 12 |
| Argument | 14 |
| Conclusion | 38 |
| Certificate of Compliance | 40 |

| Certificate of Service | 41 |
|---|---|

## <u>TABLE OF CITATIONS</u>

| Cases | Pages |
|---|---|
| *Krulewitch v. United States,* 336 U.S. 440, 454, 69 S.Ct., 716, 723, 93 L.Ed. 790 (1949) | 23 |
| *United States v. Arbane*, 446 F.3d 1223, 1229 (11th Cir. 2006) | 15 |
| *United States v. Atkinson*, 158 F.3d 1147, 1154 (11th Cir. 1998) | 15 |
| *United States v. Bertolotti,* 529 F.2d 149, 157 (2d Cir.1975). | 24 |
| *United States v. Cambindo Valencia*, 609 F.2d 603, 629 (2d Cir. 1979) | 26 |
| *United States v. Cassano*, 132 F.3d 646, 651 (11th Cir. 1998) | 20 |
| *United States v. Castro*, 829 F.2d 1038 (11th Cir. 1987) | 22 |
| *United States v. Cortinas*, 142 F.3d 242 (5th Cir. 1998) | 26 |
| *United States v. Davidson*, 936 F.2d 856 (6th Cir. 1991) | 25 |
| *United States v. DiNome*, 954 F.2d 839 (2d Cir. 1992) | 26 |
| *United States v. Dockery*, 955 D.2d 50 (D.C. Cir. 1992) | 26 |
| *United States v. Fernandez*, 892 F.2d 976 (11th Cir. 1989) | 25 |
| *United States v. Innamorati*, 996 F.2d 456, 469 (1st Cir. 1993) | 22 |
| *United States v. Kelly*, 888 F.2d 732 (11th Cir. 1989) | 16 |

| | |
|---|---|
| *United States v. Lane,* 474 U.S. 438, 106 S.Ct. 725, 732, 88 L.Ed.2d 814 (1986) | 23 |
| *United States v. Martínez*, 994 F.3d 1, 15–16 (1st Cir. 2021) | 22 |
| *United States v. Pedrick*, 181 F.3d 1264 (11th Cir. 1999) | 12, 14, 15, 24 |
| *United States v. Schlei,* 122 F.3d 944, 984 (11th Cir. 1997) | 21 |
| *United States v. Shankman*, 13 F.Supp.2d 1358 (S.D. Ga. 1998) | 14, 15, 21, 22 |
| *United States v. Tarango*, 396 F.3d 666 (5th Cir. 2005) | 26 |
| USA v. Chrisley et al., 1:19-cr-297 (N.D.Ga. 2019) | 1 |
| *Zafiro v. United States*, 506 U.S. 534, 535, 113 S.Ct. 933, 938, 122 L.Ed. 2d 317 (1993) | 20 |

| Statutes | Pages |
|---|---|
| 28 U.S.C. § 1291 | vii |

## **STATEMENT OF JURISDICTION**

This Court has jurisdiction of this appeal, as it is a direct appeal of a final

judgment in a criminal case pursuant to 28 U.S.C. § 1291.

IN THE UNITED STATES COURT OF APPEALS
FOR THE ELEVENTH CIRCUIT

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | |
| | ) | |
|     Plaintiff -Appellee, | ) | |
| | ) | |
|     v. | ) | Appeal No. 22-14074-J |
| | ) | |
| PETER TARANTINO, | ) | |
| | ) | |
|     Defendant-Appellant. | ) | |

BRIEF OF APPELLANT

**Statement of the Issue on Appeal**

WHETHER THE TRIAL COURT ERRED IN DECLINING TO SEVER APPELLANT'S CASE FROM THE TRIAL OF HIS CO-DEFENDANTS AND IN DENYING APPELLANT'S MOTION FOR NEW TRIAL BASED ON THE PREJUDICE SUFFERED AS A RESULT OF A JOINT TRIAL WITH THE CO-DEFENDANTS?

**Statement of the Case**

Appellant, Peter Tarantino, was indicted in the Northern District of Georgia on August 13, 2019 (*USA v. Chrisley et al.,* 1:19-cr-297 (N.D.Ga. 2019)). A superseding indictment was returned on February 15, 2022 (Dkt. 130). Tarantino was charged in three counts of the indictment: Count 7 alleged that Tarantino was a

member of a conspiracy (commonly known as a *Klein* conspiracy) the object of which was to defraud the United States for the purpose of impeding and obstructing the lawful functions of the IRS in the computation and collection of income taxes of the two co-defendants (Michael Todd Chrisley and Julie Chrisley). Dkt 130, ¶43 - ¶45, ¶47, ¶50(c) and (f).  Counts 10 and 11 alleged that Tarantino filed two false tax returns for a corporation.

Trial was held in the Northern District of Georgia in May 2022. Tarantino was convicted of the three counts. He filed a timely Motion for New Trial pursuant to Rule 33, Fed.R.Crim.P. (Dkt. 259 and 293). The trial court denied the Motion (Dkt. 389).

Sentencing proceedings were held on November 21, 2022 (Dkt. 325). Tarantino was sentenced to serve 36 months in prison, followed by three years of supervised release (Dkt. 329).

A timely Notice of Appeal was filed on November 30, 2022 (Dkt. 333).

Tarantino is scheduled to voluntarily surrender to the designated BOP facility on May 1, 2023 (Dkt. 329).

**Statement of the Facts**

Peter Tarantino is a CPA located in Roswell, Georgia. Beginning in 2015, Tarantino provided accounting services to Julie and Todd Chrisley. He also had their power of attorney in connection with the Chrisleys' IRS matters (Dkt. 130, ¶2).

The Chrisleys were well-known TV personalities at the time they retained Tarantino. They had substantial past-due tax obligations dating back to 2009 and Todd Chrisley had been through bankruptcy. Several years of tax returns had not been filed (Dkt. #273; Tr. 604). Tarantino was tasked with filing past-due returns and determining how much money was due to the IRS for past-due taxes, as well as the current tax obligations. Tarantino initiated contact with the IRS and had several phone calls with different Revenue Officers (Dkt. #274; Tr. 641), exchanges of emails, and correspondence with the IRS in his capacity as Chrisleys' representative (*See, e.g.,* Exh. T30; Dkt. 267-9). His principal point of contact was Ms. Betty Carter, a revenue officer who was assigned to work on the Chrisleys' collection efforts beginning in 2017 (Dkt. #273; Tr. 603; Dkt. #274; Tr. 640).

The income that the Chrisleys earned through endorsements and their television show were paid through a production company, 7C's (the name reflects the 7 members of the Chrisley family). Julie Chrisley was the owner of 7C's. Dkt. 13, ¶ 4 – 5.

Ms. Carter, the IRS Revenue Officer, determined that Todd Chrisley owed in excess of $500,000 in past due taxes for tax year 2009 and lesser amounts for 2010 and 2011 (Dkt. #273; Tr. 595). Todd Chrisley had been in bankruptcy and collection efforts were suspended during those proceedings, but he emerged from bankruptcy and collection efforts then resumed (Dkt. #273; Tr. 585, 593).

When Tarantino and Ms. Carter first talked, Ms. Carter asked Tarantino several questions and requested that information be sent to her about the Chrisleys income and assets, as well as certain banking activity. When initially questioned on direct examination, Ms. Carter stated that she asked Tarantino where the Chrisleys banked (Dkt. #274; Tr. 645, 750). Tarantino responded that he did not know. During cross-examination, however, she acknowledged that she did not ask, "Where do the Chrisleys bank?" but rather, she asked, "Where does Todd Chrisley bank?" (Dkt. #274; Tr. 767-769), and Tarantino responded that he did not know. In fact, there was no evidence produced at trial where Todd Chrisley banked and his recent emergence from bankruptcy suggested that he may not have had a personal bank account. Moreover, Tarantino provided substantial documentation to Ms. Carter about the money that 7C's paid to both Julie and Todd Chrisley (Dkt. #274; Tr. 689-690); Exh. T30, Dkt., 267-9).

During the course of the communications between Tarantino and Ms. Carter, Tarantino acknowledged the Chrisleys had not filed returns for several years. Yet,

4

in connection with the Chrisleys purchase of a car, Tarantino had sent tax returns to a lending institution in Tennessee (Dkt. #274; Tr. 645-649). These tax returns were drafts of the returns that Tarantino intended to file on behalf of the Chrisleys when the necessary documentation was provided to him.

In early March 2017, in an effort to find information that would assist in collecting Todd Chrisley's back tax obligations, Ms. Carter asked that Tarantino supply bank statements not just for Todd Chrisley but for Julie Chrisley, as well. (Dkt. #274; Tr. 651, 653). A significant aspect of the tax conspiracy offense focused on this request. (Dkt. 130, ¶¶37 – 40).

Most of the Chrisleys' income from the television show and the endorsements were paid to the Chrisleys' production company, 7C's. Todd Chrisley did not have signature authority for the 7C's bank account, and he was not listed as a corporate officer or owner of 7C's. Julie Chrisley, however, did have signature authority over that 7C's bank account and was listed as a corporate officer. When Tarantino was asked to provide information to the IRS about bank accounts for which Julie Chrisley had banking authority, he promptly informed the Chrisleys about this request and the need to supply this banking information to the IRS expeditiously.

Within a day, the Chrisleys made arrangements to remove Julie Chrisley from the bank account (Dkt. #274; Tr. 654), and directed that all future payments for their television show and endorsements be made to a different bank account (Dkt. #274;

5

Tr. 658). Julie Chrisley was replaced in the 7C's corporate structure by Todd Chrisley's mother, who was given signature authority over the new bank account (Dkt. #274; Tr. 665; Dkt. #273; Tr. 477, *et seq.*) The government argued that this was an obvious attempt to shield their assets and income from the IRS (Dkt. #274; Tr. 659-660). In fact, substantial income was deposited into the new account over the following months (Dkt. #274; Tr. 651 – 663) and the IRS was never informed that this account existed. The government theorized that failing to disclose the new bank account into which substantial income was deposited, effectively limited the assets that the IRS could seize to pay the past due taxes.

But there was no evidence whatsoever that Tarantino had any involvement (or knowledge) that the Chrisleys changed the structure of 7C's or its banking activities after he relayed the IRS request for information to the Chrisleys. In fact, he did send to the IRS the bank statements through February 28 for 7C's, which is precisely what the agent asked for (Dkt. #274; Tr. 657-658; 679; 685; Exh. T30, Dkt. 267-9) and she never asked for any bank accounts after that time (Dkt. #274; Tr. 679). The agent acknowledged that Tarantino did not conceal anything from her regarding the 7C's bank transfer (Dkt. #274; Tr. 680).  In fact, when Tarantino and Ms. Carter first

talked, he told her that 7C's was owned 100% by Julie Chrisley (Tr. 681).[1] She knew that all their income from their acting career was deposited into the 7C's account (Dkt. #274; Tr. 685 – 686; 698).

Ms. Carter concluded her direct examination by telling the prosecuting attorney that her dealings with Tarantino were "fine." (Dkt. #274; Tr. 676).

In its response to Tarantino's New Trial Motion, the government cited an email in which Tarantino was instructed by Chrisley not to share family members' salary with anybody (Dkt. #276; Tr. 1096-97, Gov. Exh. 640), but the government failed to explain, as the case agent, FBI Agent Ryskoski revealed, what the reference to "*Omerta*" in the email response from Tarantino meant:  Agent Ryskoski acknowledged that Tarantino's response – using the Italian phrase "oath of Omerta" – meant that the children should not know about the Chrisley's income – they should not be told.  (Dkt. #276; Tr. 1223-24). Tarantino understood, in other words,

---

[1] A revenue officer who preceded Ms. Carter in collection activities testified that when she first talked to Tarantino in 2016, he told her that Julie Chrisley did not own 7C's and it was entirely controlled by one of the Chrisleys' daughters (Dkt. #274; Tr. 786). Yet, Tarantino had filed corporate tax returns that clearly and accurately recited who were the owners of 7C's prior to the conversation that the earlier revenue officer described and the revenue officer acknowledged that she had not reviewed those tax returns when she spoke to Tarantino that listed Julie Chrisley as the owner (Dkt. #274; Tr. 800-801; 907).

that the parents' income should not be a topic shared with the children. This had nothing to do with discussing the tax issues with the IRS.

The government's *Klein* conspiracy also addressed a conversation that Tarantino had with two FBI agents, Agent Ryskoski and Agent Arrow, who taped their conversation with him in 2018 (Dkt. #275; Tr. 1041; 1055, *et seq*.).

In fact, just weeks before the meeting with the IRS agents (which was unplanned), Tarantino had urged the Chrisleys to comply with his requests to supply more information and complete the process of finalizing and filing the tax returns for the 2014, 2015 and 2016 tax years for both the personal and corporate returns (Exh. T60; Dkt. #267-30, pages 1-53). This was not a correspondence designed to falsely (and belatedly) forestall a criminal investigation. This correspondence reflected the persistent efforts of Tarantino to obtain information from the Chrisleys so proper tax returns could be filed. This was the antithesis of tax evasion, tax avoidance, or tax fraud.

The government argued that the failure to issue 1099's from 7C's to Todd Chrisley furthered the *Klein* conspiracy, but there was no statement by Tarantino to the agents when they interviewed him that

enhanced the conspiracy's objects, because there was no evidence that there were payments made from 7C's to Todd Chrisley that should have been documented on a 1099 distribution record. But even more important, Tarantino had already sent records of Todd Chrisley's income and pay stubs to Revenue Agent Ms. Carter long before he was interviewed by the FBI agents and the Revenue Agent had sent all of the information she received from Tarantino to the same IRS agent that was conducting the interview. (Dkt. #276; Tr. 1213-1214, 1245, 1267). There was no foundation for the government's contention at trial that Tarantino was hiding, concealing, or falsifying the Chrisleys' income.

Finally, with regard to the two substantive tax fraud counts (Counts 10 and 11), the government's argument that Tarantino had the intent to provide materially false information in order to deceive the IRS by filing tax returns with all 0's failed to note that similar tax returns were previously filed by others who were handling a bankruptcy matter for the Chrisleys. In short, there was conflicting evidence presented regarding the propriety of filing corporate tax returns showing zero revenue and expenses because of a tax preparer's uncertainty about the proper figures. The United States Trustee filed returns with zeros for a number of years

with respect to the Chrisley Asset Management corporate returns which was in bankruptcy at a time prior to Tarantino's corporate filings for 2016 and 2017 for the same reason that Tarantino filed returns with all 0's: uncertainty about the corporate income and expenses. (Tr. 2978 – 2979; Exh. T7; Dkt. #267-1, page 22 [Bates #Tarantino1578]; Gov. Exh. 703). Whether this was sound practice or not, it was not compelling evidence that Tarantino conspired with the Chrisleys to obstruct and impair the IRS in its computation and collection of taxes.

The defense argued in its New Trial Motion that a severance was necessary to cure the inevitable result of being held responsible for the Chrisleys' own financial misconduct. As explained below, the Chrisleys were charged with an assortment of crimes, including mail fraud, wire fraud and tax evasion that had no connection to Tarantino.  But equally important is the fact that there was no evidence to support the allegation that the Chrisleys conspired with Tarantino to defraud the IRS. There was no documentation of any agreement to share in the objective of defrauding the IRS. There was no communication between the Chrisleys and Tarantino that amounted to a "nod and a wink" to conceal information from the IRS.  Tarantino was never paid a bonus and received no gifts or

anything of value from the Chrisleys other than his normal hourly fee for accounting services.

The most blatant effort on the part of the Chrisleys to defraud the IRS (the sudden change in the 7C's ownership and the bank account transfer) was never even suggested to be an event for which Tarantino had any culpability. Nobody testified that the Chrisleys and Tarantino jointly pursued this effort (Dkt. #276; Tr. 1217-1218). In fact, while the Chrisleys were engaged in this fraudulent conduct, Tarantino was simultaneously gathering records to respond to every request made by Revenue Agent Carter to pursue her collection efforts.

While the government will argue that the evidence was sufficient to support a conviction, the defense is not urging this Court to find otherwise. The focus of this appeal is the prejudice suffered by Tarantino by virtue of being jointly tried with the Chrisleys. This appeal focuses on the fairness of the trial – the fairness of being tried with the Chrisleys – not the sufficiency of the evidence.

## Standard of Review

A district court's decision to grant or deny a new trial based upon prejudicial spillover is reviewed for clear abuse of discretion. *United States v. Pedrick*, 181 F.3d 1264, 1266-67 (11th Cir. 1999).

## Summary of the Argument

Appellant was substantially prejudiced by being tried along with his clients, Julie and Michael Todd Chrisley. Their bank fraud, wire fraud and tax evasion offenses dominated the evidence and testimony at trial. Tarantino did, in fact, engage in certain conduct that had the effect of facilitating some of their fraudulent conduct, but he was not shown to be a culpable conspirator and no evidence that he did anything for the purpose of facilitating the Chrisleys' fraudulent conduct.

For example, he informed the Chrisleys that the IRS had requested all bank statements for which either Michael Todd Chrisley and Julie Chrisley had signature authority. This was a truthful statement (because the IRS agent did, in fact, make that request). The Chrisleys immediately – and fraudulently – changed the bank accounts and the authorized individuals who could sign on the account and instructed that future payments to their company go to a different account. Tarantino properly communicated to the Chrisleys what the IRS demanded that he produce. Armed with

that information, the Chrisleys perpetrated further fraudulent activity that defeated the collection of their taxes. Tarantino was obviously, yet unfairly, and inaccurately prejudiced by his innocent role in this aspect of the Chrisleys' fraudulent effort to defeat the collection of their tax obligation.

Tarantino was a CPA who was slow in filing returns. That is not a crime. But the beneficiaries of the procrastination were the Chrisleys, and he suffered prejudice by being tried with them.

Not one scintilla of evidence proved that he ever conspired with the Chrisleys. Nobody testified (or produced any evidence) that the three of them had an agreement – explicit or implicit – to defraud the IRS. There was no evidence that he received any gifts from the Chrisleys or a "bonus" to reward him for committing any fraudulent activity on their behalf. He was their CPA who was actively engaged in advocating for them with the IRS and striving to minimize their tax obligations. That is not a crime, even though his legitimate efforts had the collateral consequence of facilitating their fraud.

Appellant is not challenging the sufficiency of the evidence in this case. But the paucity of evidence, the multiple inferences that must be drawn to envelope Tarantino in the conspiracy, are the foundation for the argument on appeal that he was prejudiced by the joint trial that placed him geographically in the courtroom on the side of the tax evaders.

Precedent in this Circuit warns that a joint trial may unduly prejudice a defendant whose role in an alleged conspiracy is minimal and for whom the evidence was barely enough to convict. *United States v. Shankman*, 13 F.Supp.2d 1358 (S.D. Ga. 1998), *aff'd sub nom. United States v. Pedrick*, 181 F.3d 1264 (11th Cir. 1999).

In this case, Tarantino meets virtually all the *Pedrick* tests for proving that he was prejudiced by requiring him to stand trial with the Chrisleys. He is entitled to a new trial at which he can focus the jury's attention on the absence of evidence to link his conduct with the crimes of the Chrisleys and to show that there was no evidence to show the existence of a conspiracy or that he was a knowing participant in any illegal scheme.

**Argument**

**TARANTINO WAS PREJUDICED BY HAVING
TO DEFEND HIMSELF AT A JOINT TRIAL WITH
THE CHRISLEYS WHOSE CRIMES WERE WIDESPREAD,
MOST OF WHICH WERE UNRELATED TO TARANTINO,
AND A CONSPIRACY CHARGE THAT HAD NO
FOUNDATION IN THE EVIDENCE**

This Court should reverse the conviction of Peter Tarantino because he suffered compelling prejudicial spillover from a joint trial with Todd and Julie Chrisley given the overwhelming evidence against those

defendants and the prejudicial nature of the evidence that applied to only those defendants. *United States v. Shankman*, 13 F.Supp.2d 1358 (S.D. Ga. 1998), *aff'd sub nom. United States v. Pedrick*, 181 F.3d 1264 (11th Cir. 1999). Moreover, there was a paucity of evidence that even hinted that there was a conspiratorial agreement between the Chrisleys and Tarantino to achieve the illegal objective of defrauding the IRS. *United States v. Arbane*, 446 F.3d 1223, 1229 (11th Cir. 2006) ("the crux of the agreement element in a conspiracy case is that the government must prove a "meeting of the minds" to achieve the unlawful result"); *United States v. Atkinson*, 158 F.3d 1147, 1154 (11th Cir. 1998). Tarantino provided back-up documents to the IRS Revenue Agents on a regular basis and answered the Revenue Agents' questions to the best of his ability. There was not a single item of evidence or testimony that was offered by the government that Tarantino was in league with the Chrisleys in their quest to defeat – through fraud – the collection of their taxes.  Even if Tarantino answered a revenue officer's question inaccurately, the fact that he repeatedly sent documents that verified the status of the Chrisleys' financial status and their role in the 7C's company, refutes any suggestion that he was a knowing member of a conspiracy to defraud the IRS.

15

The substantial prejudice suffered by Tarantino in this case reflected, at least in part, the fact that he was an advocate for the Chrisleys; his job was not to assist the IRS in the collection of taxes, or to maximize the taxes paid, or to expedite the payment of past-due taxes. He performed his role as an advocate which had the natural consequence of delaying the payment of past due taxes and minimized the debt that was owed. Thus, the Chrisleys, through illegal means, and Tarantino, through legal means, were striving to achieve the same result. The Chrisleys were guilty of fraud. Tarantino was not shown to have purposely joined their *illegal* efforts, though he shared their goal. The jury, overwhelmed with the proof that the Chrisleys were involved in various crimes and illegal ventures were hard-pressed to separate Tarantino's legal methods of avoiding tax liability, with the Chrisleys' criminal schemes. Analogous is the case of *United States v. Kelly*, 888 F.2d 732 (11th Cir. 1989), a case in which a criminal defense attorney was improperly charged and convicted of being in a drug conspiracy with one of his clients. While the attorney's professional conduct may have furthered the goal of the conspirators, he was not shown to have joined the illegal conspiracy: "On the question whether Kelly knowingly joined a criminal conspiracy to possess and distribute cocaine, the

evidence, where it is not completely silent, supports little more than speculation and conjecture." *Id.*, at 741. This Court reversed the attorneys' conviction.[2]

Prior to trial, Tarantino filed a Motion to Sever under Federal Rule of Criminal Procedure 14(a). In his motion, Tarantino pointed to the disparity of evidence applicable to the alleged co-conspirators versus himself and the likely admission of evidence that would not be admissible in a separate trial as yielding a sufficiently high danger of prejudicial spillover as to warrant a separate trial. In a Report and Recommendation dated August 31, 2021, Magistrate Judge Anand recommended that Tarantino be severed from the Chrisley defendants "to prevent a potential unfairness to Tarantino." (Dkt. 103 at 6). The Report and Recommendation noted references to a "crooked accountant," the fact that "Tarantino is not 'in the same league' as the Chrisleys in terms of the extent of the allegedly fraudulent conduct," and Judge Anand's finding that "the scale is tipped in favor of severance when some of [the unequal

---

[2] Tarantino's role as an advocate was intentionally distorted and exploited by the government when it introduced during the testimony of its primary FBI case agent proof that Tarantino had attended a continuing professional education seminar that included a lecture on "Stand Up To The IRS" (Dkt. #276; Tr. 1088, 1211-1212).

quantum of evidence] unfairly prejudices one of the defendants," thus warranting a severance. (Dkt. 103 at 4-6).

The District Court declined to adopt the Magistrate's Report and Recommendation, reasoning that limiting instructions would contain the risk of prejudicial spillover during the course of the trial. (Dkt. #127). Based on the Government's presentation of its case, however, the limiting instructions proved insufficient, and Tarantino suffered prejudicial spillover.

The trial lasted just under three calendar weeks and encompassed three separate schemes—bank fraud, wire fraud, and tax fraud. The underlying period in which these schemes were alleged to have occurred spanned over a decade. Tarantino, however, was alleged to have been involved in only the tax scheme and for only 23 months (Dkt. #276; Tr. 1079). During its case-in-chief, which ran from May 17 until May 26, the Government called twenty-nine witnesses and entered 348 exhibits into evidence.[3] The overwhelming majority of this evidence did not pertain to

---

[3] This total was supplemented by an additional seventy-one exhibits the Government entered into evidence via cross examination and its rebuttal case. Roughly 60 of the 419 total exhibits entered into evidence by the Government pertained to records or communications for which Tarantino had any personal involvement.

Tarantino at all. Indeed, there were several days of trial in which Tarantino's name was never mentioned. (Tr. 1618-2175).[4]  Towards the end of its case-in-chief, the Government interspersed four witnesses called for the sole purpose of offering other acts evidence under Federal Rule of Evidence 404(b). All of that 404(b) evidence was in relation to the bank fraud and wire fraud schemes in which Tarantino was not charged. None of the Government's 404(b) evidence would have been admissible in a trial of Tarantino alone.

From the afternoon of May 26 until June 2, 2022, the Chrisleys called witnesses of their own. The majority of these witnesses were called in reference to the obstruction and bank and wire fraud schemes and had little to do with Tarantino. None of these witnesses would have been called by Tarantino in a trial of his own.

On Friday June 3, 2022, the jury heard closing arguments and began its deliberations that afternoon equipped with 418 Government exhibits. Almost immediately, the jury sent word that it was having difficulty sifting through the thousands of pages of Government exhibits and even

---

[4] There were also several days in which Tarantino garnered less than three mentions during the entire day's testimony. (Tr. 1343-1613 and Tr. 2181-2463).

requested that the Court dispatch the Government's paralegal for assistance.

On Tuesday June 7, 2022, all three defendants were convicted of all charges in the indictment.

A. Prejudicial Spillover in Joint Trials

In a joint trial, when the majority of the evidence presented is directed at the crimes committed by one defendant, there is a heightened risk that the co-defendant will suffer compelling "spillover" prejudice. *Zafiro v. United States*, 506 U.S. 534, 535, 113 S.Ct. 933, 938, 122 L.Ed. 2d 317 (1993) ("[E]vidence of a codefendant's wrongdoing in some circumstances erroneously could lead a jury to conclude that a defendant was guilty. When many defendants are tried together in a complex case and they have markedly different degrees of culpability, this risk of prejudice is heightened."). Compelling prejudice is shown when the jury "was unable to sift through the evidence and make an individualized determination as to each defendant." *United States v. Cassano*, 132 F.3d 646, 651 (11th Cir. 1998).

Considering the test's focus upon what the jury was able (or unable) to do, the Court should look to the jury's verdict "to determine whether a particular defendant suffered compelling prejudice from spillover

evidence." *United States v. Shankman*, 13 F.Supp.2d 1358, 1368 (S.D.Ga. 1998); *see also United States v. Schlei,* 122 F.3d 944, 984 (11th Cir. 1997) ("It is readily apparent that the jury followed these instructions as it acquitted Schlei on eight counts. Reedy was acquitted on all counts. The verdict demonstrates the jury's ability to sift through the evidence and make individualized determinations as to each defendant"). If the verdict demonstrates that the jury meticulously sifted the evidence—such as when the jury acquits on various counts and convicts on others—it is unlikely that spillover prejudice occurred. *Id.* On the other hand, if the jury returns a guilty verdict for all defendants on all counts, "the Court may conclude that the jury did not sort the evidence appropriately, and separate trials are warranted." *Shankman*, 13 F.Supp.2d at 1368.

In all joint trials, there will be evidence introduced against one defendant that does not apply to another defendant. That is inevitable. Yet, there are a variety of circumstances in which appellate courts have held that the risk of unfair prejudice necessitates that the cases of the defendants be severed to avoid the risk that the evidence properly presented against one defendant affects the jury's evaluation of the sufficiency of the evidence against another defendant. As the First Circuit

observed, "[prejudice from being tried jointly] can come in various forms, including jury confusion, the impact of evidence that is admissible against only some defendants, and 'spillover' effects where the crimes of some defendants are more horrific or better documented than the crimes of others." *United States v. Innamorati*, 996 F.2d 456, 469 (1st Cir. 1993); *United States v. Martínez*, 994 F.3d 1, 15–16 (1st Cir. 2021). In this case, the risk of a prejudicial spillover resulted not only from the abundant evidence of the Chrisleys' other unrelated crimes, but also based on evidence of the Chrisleys' efforts fraudulently to avoid paying their taxes at the same time that Tarantino was engaged in efforts to advocate on their behalf with the IRS to minimize their taxes and to prepare accurate tax returns for previous years.

The Eleventh Circuit explored the reasons why severance in certain situations is necessary in *United States v. Castro*, 829 F.2d 1038 (11th Cir. 1987). The Court considered whether a defendant who was involved in one conspiracy with the lead defendant was prejudiced by being tried with the lead defendant who was charged with conduct in a separate conspiracy, as well. The Court held that the indictment failed to properly allege that there were separate conspiracies as opposed to the alleged one over-arching conspiracy (which was not a problem in this case). In *Castro*

the lead defendant was the principal culprit in what was referred to as the "inventory conspiracy;" the minor defendant, Castro, was only involved in what was referred to as the "CD" conspiracy.  Though the Court began the discussion by holding that the indictment improperly alleged the existence of only one conspiracy, the court's analysis of the prejudice mirrors the analysis that this court should undertake in  considering  the extent  to  which  the  evidence  of  the  Chrisleys'  various  criminal adventures prejudiced Tarantino in a joint trial:

> Having decided that joinder was improper, we must address whether that error was harmless. *See United States v. Lane,* 474 U.S. 438, 106 S.Ct. 725, 732, 88 L.Ed.2d 814 (1986) ("an error involving misjoinder ... requires reversal only if the misjoinder results in actual prejudice because it 'had substantial and injurious effect or influence in determining the jury's verdict.'" (quoting *Kotteakos,* 328 U.S. at 776, 66 S.Ct. at 1253)). We cannot conclude, on these facts, that the error was harmless.
>
> Castro maintains that he was prejudiced by the spillover effect of being tried jointly with the inventory conspirators. Put differently, the jurors tended to associate Castro with the illegal acts of the inventory conspirators; in doing so they transferred guilt to him. *See Krulewitch v. United States,* 336 U.S. 440, 454, 69 S.Ct., 716, 723, 93 L.Ed. 790 (1949) (Jackson, J., concurring) (referring to fact that jurors "are ready to believe that birds of a feather flock together"); … In a six and one-half month trial, the portion of the trial concerning the CD conspiracy consumed only 10 trial days. Moreover, one month passed between Castro's opening argument and the appearance of the first witness relevant to

his charges; and it was two full months after that before the next witness relevant to Castro's charges testified.

Given the imponderables of trials, it is difficult to evaluate the specific impact a joint trial has on various defendants. In this case a single conspiracy was charged, yet two conspiracies involving disparate activities were proved; the effect was to subject Castro to extensive evidence—several months worth—relating to crimes in which Castro took no part and of which he had no knowledge. *See United States v. Bertolotti,* 529 F.2d 149, 157 (2d Cir.1975).

Voluminous evidence adduced at trial demonstrated that the inventory conspiracy involved patent, shameless fraud. It is beyond cavil that the evidence overwhelmingly showed a massive, widespread inventory scam designed to bilk lenders when the borrowers had no realistic chance of repayment. The inventory swindlers even had the arrogance to label some of the fictitious inventory documents "MM", which stood for "Mickey Mouse." To make bad matters worse, the single conspiracy theory precluded the trial judge from giving the kind of limiting instruction that is appropriate when related but separate conspiracies are tried jointly. *See Kotteakos,* 328 U.S. at 769–70, 66 S.Ct. at 1250.

Most importantly, the evidence of Castro's guilt was not overwhelming. *See Lane,* 106 S.Ct. at 732 (misjoinder error was harmless because evidence of guilt was overwhelming). The basis for concluding that Castro kept CNB in the dark regarding the pledged status of the Exterior CD revolved around certain records and telexes that were not available at trial and Bautista's rather weak testimony. The possibility that spillover prejudice affected the outcome increases as the proof of guilt decreases.

829 F.2d 1038, at 1046–47 (11th Cir. 1987). This test for prejudice is

exactly what the *Pedrick* decision necessitated, as well. *United States v.*

*Pedrick*, 181 F.3d 1264, 1266-67 (11th Cir. 1999). That is, unfair prejudice from a Rule 8 misjoinder is the same type of prejudice that unfairly affects a defendant's right to a fair trial when tried with co-defendants who have multiple other crimes and multiple other overt acts in the relevant conspiracy.

In *United States v. Fernandez*, 892 F.2d 976 (11th Cir. 1989), the Eleventh Circuit performed the same analysis the *Castro* Court pursued. Again, though considering the issue of prejudice in the context of a misjoined defendant under Rule 8 (because there were two separate conspiracies rather than one overarching conspiracy), the Court then moved on to the issue of the prejudice that infected the jury's consideration of the lesser defendant by virtue of being tried with the principal defendant.

In *United States v. Davidson*, 936 F.2d 856 (6th Cir. 1991), the Sixth Circuit reversed a conviction where the defendant, charged only with being a member of a drug conspiracy with the principal defendant, was tried jointly with the principal defendant who was charged with drug offenses and tax charges. The Court held that it was fundamentally unfair to try these cases in one trial, even if joinder pursuant to Rule 8 was

25

permissible, and even though the defendant was charged in the same count as the minor defendant who sought the severance.

Other cases in which the appellate court concluded that a joint trial – even for properly joined defendants – should have been severed include *United States v. DiNome*, 954 F.2d 839 (2d Cir. 1992); *United States v. Cortinas*, 142 F.3d 242 (5th Cir. 1998); *United States v. Tarango*, 396 F.3d 666 (5th Cir. 2005); *United States v. Dockery*, 955 D.2d 50 (D.C. Cir. 1992); *United States v. Cambindo Valencia*, 609 F.2d 603, 629 (2d Cir. 1979).

These cases each have their unique characteristics. But in each case, the appellate court held that trying defendants together in a joint trial where the minor defendant was substantially less involved with the criminal behavior of the principal defendant who was charged with additional—and more serious—offenses, requires the trial court to assess the likelihood that the defendant suffered from the type of prejudice identified by Justice Jackson in his concurring opinion in *Krulewitch*, and by the First Circuit as being unfair: jury confusion, the impact of evidence that is admissible against only some defendants, and "spillover" effects where the crimes of some defendants are more horrific or better documented than the crimes of others.

26

And added to that is the unique role of a professional advocate – an attorney or a CPA – who is charged with his or her client in pursuing an objective that is shared by both the professional and the client. The client's pursuit is fraudulent; the professional's pursuit of the same objective is legal.

B. *Shankman / Pedrick* Precedent

This case falls squarely in line with those situations in which courts have granted new trials due to prejudicial spillover accruing to a non-severed defendant. In *Shankman*, for example, the district court granted a defendant's motion for a new trial after it had declined to sever that defendant from her co-defendants. 13 F.Supp.2d at 1368. In that case, Mary Jane Pedrick was charged in a wide-ranging false medical billing conspiracy in which she was a comparatively minor participant. Prior to trial, Pedrick moved to sever her case alleging that she would suffer compelling prejudice if tried with her co-defendants. Pedrick cited evidentiary disparities and forthcoming testimony about conduct in which she had no role as warranting her severance. Pedrick's motion was denied, and she stood trial with her only remaining co-defendant, Shankman.

During the ensuing four-day joint trial, the Government presented fifty-five witnesses and introduced thousands of documents. This

27

evidence was primarily directed at Shankman and included "overwhelming" and "substantial" evidence as to Shankman's knowledge and participation on the counts in which both Shankman and Pedrick were charged. *Pedrick*, 181 F.3d at 1267-1268. Moreover, the joint trial included "significant evidence" as to the counts related to Shankman's dispensation of controlled substances in which Pedrick had no involvement. *Id*. at 1268. This evidence included "graphic testimony" from several former patients about "both the ease with which they could obtain prescriptions from Shankman and the disastrous results[.]" *Id*. The Government also offered "equally powerful" evidence of Shankman's use of the ill-gotten gains, which included loan payments for two airplanes, flights to the U.S. Open in New York, trips to the Bahamas, and the purchase of a boat. *Id*. at 1269. The Government, on the other hand, offered comparatively little against Pedrick. As a therapist, Pedrick was primarily involved on the clinical side of seeing patients. The evidence as to her conduct furthering the false billing conspiracy in which she was charged "was minimal and not like the overwhelming and vivid evidence against Shankman." *Id*. at 1271. *See also Shankman*, 13 F.Supp.2d at 1368 n. 11 ("The overwhelming majority of the evidence

presented by the Government was directed at Shankman," and "[i]n fact, excluding Pedrick's testimony, the Official Court Reporter's Transcript of this case filled over eight hundred and fifty pages, and Pedrick's name is found on fewer than fifty pages."). After the close of evidence, the jury returned a verdict of guilty as to all defendants for all counts of the indictment.

Following her conviction, Pedrick moved for a new trial based upon compelling prejudicial spillover and the weight of the evidence not supporting the jury's verdict. The Court granted her motion and emphasized its duty to correct prejudice that resulted from the joint trial. *Shankman*, 13 F.Supp.2d at 1369. On appeal, the Eleventh Circuit affirmed the district court's order granting a new trial and pointed to the following circumstances as constituting prejudicial spillover:

- "the overwhelming majority of the evidence presented by the Government was directed at [Pedrick's co-defendant]";

- significant evidence introduced by the Government, including the "graphic testimony" and evidence about "planes, cars, and other lavish expenditures" that "could

have caused undue prejudice to Pedrick";

- the jury returned guilty verdicts on all counts against all defendants, as this tended to indicate that "the jury had not heeded the court's instructions that '[e]ach offense and the evidence pertaining to it must be considered separately'"; and "there was little evidence directed at Pedrick, but also that the great weight of the evidence did not support her guilty verdicts."

*Pedrick*, 181 F.3d at 1268-1273.

This case is nearly identical to that confronting the district court and Eleventh Circuit in *Shankman* and *Pedrick*. As was true for Ms. Pedrick, Tarantino's joint trial included numerous instances of highly prejudicial spillover that could not have been and were not sufficiently cured by limiting instructions.

*First*, the overwhelming majority of the evidence presented by the Government was directed at Todd and Julie Chrisley. According to the Government's evidence, the Chrisleys were alleged to have defrauded dozens of banks, credit unions, and individuals out of over $30 million in

various bank fraud, wire fraud, and uncharged 404(b) schemes that occurred before Tarantino began working for them.

Only four of the Government's twenty-nine witnesses—Revenue Officers Betty Carter, Agnes Jagellia, and Camishe Golden and FBI Special Agent Stephen Ryskoski—could be fairly characterized as "Tarantino witnesses." All four of these witnesses completed their testimony within the first three days of trial.

The Government presented evidence of Julie Chrisley's alleged obstruction during the same three-day period as the tax charges. The obstruction and tax charges shared a common factual link—the ownership of the Chrisleys' Bank of America account. Namely both counts required proving efforts by Todd and Julie Chrisley to change the account's ownership from Julie Chrisley (who was facing the prospect of having bank accounts in her name levied by the IRS) to Elizabeth "Faye" Chrisley – Todd Chrisley's mother (who was not facing any IRS levy efforts). According to the Government, changing the account's ownership structure was the key step taken in furtherance of the charged conspiracy to obstruct the IRS's collection efforts. (Tr. 380). Given its importance, the Government offered evidence of the many well-

documented measures the Chrisley defendants took to effectuate the change. Significantly, the Government was unable to offer a single exhibit or witness that in any way demonstrated Tarantino's involvement with or knowledge of Faye Chrisley becoming the account's owner. Given the total lack of evidence tying Tarantino to the account change, it is likely none of the testimony about the change of ownership would have been relevant in a Tarantino-only trial. However, as a result of the joint trial, the jury heard several witnesses discuss this "key" act in the conspiracy in which Tarantino had no involvement nor knowledge. (Dkt. #273; Tr. 380). Yet, the jury was told that it was Tarantino who told the Chrisleys that the IRS wanted to know about the bank accounts for which Julie Chrisley had signature authority. Tarantino was *required* to inform the Chrisley about the IRS demand that the information be furnished to the IRS. Tarantino's completely innocent act of passing on this information amounted to lighting the fuse that resulted in the most dramatic effort by the Chrisleys to defraud the IRS collection activity.

The next phase of the Government's order of proof, Julie Chrisley's wire fraud scheme, had nothing to do with Tarantino. This relatively brief

segment of trial lasted half a day and included three out-of-state witnesses, a dozen exhibits, and no mention of Tarantino. (Tr. 1364-1412).

Tarantino's name was similarly absent from the trial's main event—the $30 million dollar bank fraud portion of trial. Indeed, this scheme ended years before Tarantino ever met the Chrisleys. He was, therefore, a non-factor during the ensuing week of trial. During that period, from May 23 to May 26, the Government called fourteen witnesses and introduced 155 exhibits to prove the Chrisleys' alleged efforts to defraud FDIC-insured banks out of staggering sums of money.

The Government closed its case-in-chief with 404(b) evidence of document altering or "scrapbooking" done by the Chrisleys on other occasions. For this, the Government called several business owners for whom the Chrisleys allegedly created fake invoices for reimbursement by the production company of *Chrisley Knows Best*. The stated purpose of this evidence was to prove that the Chrisleys played an active role altering the documents that were used to mislead banks for loans. Tarantino, of course, was not mentioned by any of the Government's 404(b) witnesses.

The prejudicial spillover did not end once the Government rested its case. Many of the witnesses called by the Chrisleys contributed to and exacerbated the prejudicial spillover. For example, the Chrisley's

33

daughter testified. Lindsie Chrisley's conduct on the stand elicited a visceral, negative reaction from several members of the jury. Chrisley witness Donna Cash testified as to the Chrisleys' innocence and curiously admitted to committing wire fraud (California rental home) and most of the 404(b) uncharged acts the Chrisleys were accused of committing. Her testimony drew similar negative reactions from members of the jury. The Foreperson informed the District Court that he noticed Cash looked at Julie Chrisley every time she answered a question (Tr. 2811). Beyond these specific instances, the mere fact that a significant portion of the Chrisleys' witnesses had previously appeared on their show also prejudiced Tarantino. There is no universe where Peter Tarantino would have called any of these witnesses in a trial of his own. Yet, as a result of being tried jointly with the Chrisleys, there was nothing he could do to keep the Chrisley witnesses from testifying.

To summarize the evidentiary disparity, the vast majority of the evidence presented at trial did not pertain to Tarantino at all. Roughly 18% of the Government's exhibits and 13% of its witnesses related to his conduct. Evidence of conduct having nothing to do with Tarantino consumed weeks of a trial that could have been completed in two or three

days if he had been tried alone. Instead of standing trial before a jury singularly focused on the complex charges facing Tarantino, he received a jury tasked with sifting through evidence covering three distinct schemes spanning a period of over 10 years. Just like the defendant in *Pedrick*, the evidence against Tarantino was comparatively limited and "not like the overwhelming and vivid evidence" against his co-defendants. *Pedrick*, 181 F.3d at 1271. He was nonetheless tried with the Chrisleys and suffered compelling prejudice from the overwhelming evidence the Government presented against the Chrisleys.

In addition to the evidentiary disparities noted above, the *nature* of the evidence the Government presented about Tarantino's co-defendants' unrelated conduct prejudiced his case.

The non-Tarantino counts included evidence that almost certainly inflamed the jury, including wealth evidence of the luxurious life the fraudulent schemes allowed the Chrisleys to lead, testimony from individuals who the Chrisleys allegedly exploited, and testimony implying that the Chrisleys' fraud may well have contributed to the demise of several area community banks. (Tr. 2201-2202). As to wealth evidence, the Government offered evidence of Todd Chrisley's monthly

flights to California for the sole purpose of getting his hair cut (Tr. 1492); testimony that the Chrisleys spent $300,000 a year on clothes (Tr. 970) and $60,000 to $80,000 a month, just to get by (Tr. 1461); and photos of multimillion-dollar properties the Chrisleys lived in during the period covered by the indictment.

The testimony of Alina Clerie provides a clear example of inflammatory wealth evidence specifically elicited by the Government. "All right. Ms. Clerie, I'm going to change gears and talk about Mr. Chrisley's spending during the time that you worked at CAM. How would you describe his lifestyle while you worked there?" (Tr. 1943). Ms. Clerie testified that Mr. Chrisley's spending habits were "insane. It was excessive." (*Id*.). When pressed further, she spoke about stays at the Beverly Hills Hotel, extravagant Christmases, and the two Bentleys Todd Chrisley bought—"he needed an umbrella, so he bought a Bentley." (Tr. 1944). She also testified about Todd Chrisley demanding checks when the company did not have available funds. "Write the check you stupid f[---]ing Russian b[----]." (Tr. 1938) *Compare to Pedrick*, 181 F.3d at 1269 ("The evidence about how Shankman spent the money SDPM obtained from the government was equally powerful and again could have caused

undue prejudice to Pedrick.").[5]  Against the backdrop of this extreme
wealth, the unrelated counts and 404(b) evidence also included testimony
that the Chrisleys attempted to exploit bankruptcy and mortgage hardship
relief protections and failed to pay numerous affiliated independent
contractors and blue-collar laborers for services rendered.

The evidence in this case is thus similar to *Pedrick* in both its
inflammatory nature and vivid presentation of the evidence, for which
this Court made the following observation:

> The Government's brief accurately characterizes the evidence
> as being "in glorious testimonial color and documentary
> detail, the bizarre world of Shankman/Davidson." The
> Government's own statement acknowledges the inflammatory
> nature of the evidence against Shankman and serves as tacit
> admission of the resulting prejudice to Pedrick.

181 F.3d at 1273. Thus, as the "inflammatory" evidence of Shankman's
luxurious expenditures and drug distribution prejudiced Pedrick's case,

---

[5] Evidence of just *how* the Chrisleys spent their allegedly ill-gotten wealth
permeated the trial from start to finish. In fact, the very last thing the
Government did before resting its case was introduce a string of exhibits
that included standalone electronic receipts from Neiman Marcus (Exh.
141) and Louis Vuitton-Rodeo Drive (Exh. 150), a check for $53,000 for
"aesthetic dentistry" (Exh. 191), and purchase orders for a $69,347 2011
Range Rover Super Charged (Exh. 1002), $90,925 Jaguar X-11 (Exh. 1005),
$146,631 2017 Range Rover RR Supercharged (Exh. 1045). (Tr. 2317-18).

evidence of the Chrisleys' luxurious lifestyle and unrelated fraudulent conduct prejudiced Tarantino's case.

Finally, the jury returned guilty verdicts against all defendants on all counts. This supports a conclusion, like in *Pedrick*, that the jury simply aggregated the evidence and failed to meaningfully distinguish Tarantino's conduct (or lack thereof) from the Chrisleys. Hence, the record in this case would support a finding that the jury did not "adequately sift through the evidence and make an individualized determination as to [each defendant]." *Pedrick*, 181 F.3d at 1273.

In sum, as a result of being tried jointly with the Chrisleys, Tarantino suffered compelling prejudicial spillover. The joint trial opened the door for numerous examples of unrelated charged fraudulent schemes and 404(b) evidence to go before the jury. All of this contributed to a confused and biased jury, resulting in convictions for all defendants on all counts.

**Conclusion**

For the foregoing reasons, Appellant Peter Tarantino urges this Court to reverse his conviction and remand the case to the trial court for a new trial.

This the 29th day of March, 2023.

RESPECTFULLY SUBMITTED,

**GARLAND, SAMUEL & LOEB, P.C.**

*/s/ Donald F. Samuel*
DONALD F. SAMUEL
Georgia Bar No. 624475

Attorney for the Appellant.

3151 Maple Drive, N.E.
Atlanta, Georgia 30305
Tel: (404) 262-2225
Email: dfs@gsllaw.com

## <u>CERTIFICATE OF COMPLIANCE</u>

I hereby certify that this **BRIEF OF APPELLANT** is in 14-point Times

New Roman type and contains 7,999 words.

This the 29th day of March, 2023.

RESPECTFULLY SUBMITTED,

**GARLAND, SAMUEL & LOEB, P.C.**

<u>/s/ *Donald F. Samuel*</u>
DONALD F. SAMUEL
Georgia Bar No. 624475

Attorney for the Appellant.

3151 Maple Drive, N.E.
Atlanta, Georgia 30305
Tel: (404) 262-2225
Email: dfs@gsllaw.com

## **CERTIFICATE OF SERVICE**

I certify that on this day I electronically filed this BRIEF OF APPELLANT

with the Clerk of Court using the CM/ECF system which will automatically send

email notifications of such filing to all counsel of record in this matter:

> Annalise Kathleen Peters, AUSA
> Thomas J. Krepp, AUSA
> Alex R. Sistla, AUSA
> Amy M. Palumbo, AUSA
> Sekret T. Sneed, AUSA
> Vivieon K. Jones, AUSA
> Office of the United States Attorney
> 600 U.S. Courthouse
> 75 Ted Turner Drive, S.W.
> Atlanta, Georgia 30303

This the 29th day of March, 2023.

**GARLAND, SAMUEL & LOEB, P.C.**

*/s/ Donald F. Samuel*
DONALD F. SAMUEL
Georgia Bar No. 624475

Attorney for the Appellant.

3151 Maple Drive, N.E.
Atlanta, Georgia 30305
Tel: (404) 262-2225
Email: dfs@gsllaw.com

41