No. 22-14074

# IN THE UNITED STATES COURT OF APPEALS
# FOR THE ELEVENTH CIRCUIT

————————————

UNITED STATES OF AMERICA,
*Plaintiff—Appellee,*

*v.*

MICHAEL "TODD" CHRISLEY,
*Defendant—Appellant.*

————————————

ON APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF GEORGIA
THE HONORABLE ELEANOR L. ROSS, DISTRICT JUDGE
CASE NO. 1:19-cr-00297-ELR-JSA

————————————

## APPELLANT TODD CHRISLEY'S OPENING BRIEF

————————————

J. ALEX LITTLE
ZACK C. LAWSON
BURR & FORMAN LLP
222 2nd Ave S, Suite 2000
Nashville, Tennessee 37201
(615) 724-3203
alex.little@burr.com

CHRISTOPHER S. ANULEWICZ
BALCH & BINGHAM LLP
30 Ivan Allen, Jr. Blvd NW # 700
Atlanta, Georgia 30308

*Counsel for Defendant-Appellant*

March 29, 2023

## CERTIFICATE OF INTERESTED PERSONS
## AND CORPORATE DISCLOSURE STATEMENT

Pursuant to 11th Cir. R. 26.1-2(a), the following people and entities

have an interest in the outcome of this appeal:

| | |
|---|---|
| Anand, Honorable Justin S. | Regions Bank (RF) |
| Anulewicz, Christopher S. | RES-GA (Integrity/Haven) |
| Buchanan, Ryan K. | Ross, Eleanor L. |
| Candence Bank (BCB) (CADE) | Samuel, Donald F. |
| Chrisley, Julie | Security Bank (SECB) |
| Chrisley, M. Todd | Sistla, Alex R. |
| Clarkson, John T. | Sneed, Sekret T. |
| Erskine, Kurt R. | Sommerfeld, Lawrence R. |
| Georgia Department of Revenue | SouthState (Midtown) (SSB) |
| Griffin, Daniel P. | Sponseller, Alex F. |
| Jacobs, Julie A. | Stearns Bank (ABT) (SFSI) |
| Jones, Vivieon K. | Synovus, Bank (AFBT) (SNV) |
| Krepp, Thomas J. | Tarantino, Peter |
| Lawson, Zachary C. | Thompson, Brenton |
| Leach, Arthur W. | Truist (Haven) (TFC) |
| Little, J. Alex | United Community Bank (UCBI) |
| Morris, Bruce H. | United States of America |
| Pak, Byung J. | Vey, Alexander C. |
| Peters, Annalise K. | Why, John J. V. |
| Ramey, E. Travis | Wilson, Laurabeth |

## STATEMENT REGARDING ORAL ARGUMENT

Appellant requests oral argument under Federal Rule of Appellate Procedure 34(a).

Because this case involves complex legal and factual issues, including those that arose after trial, the Appellant believes that oral argument will assist the Court in deciding this appeal.

# TABLE OF CONTENTS

Page(s)

CERTIFICATE OF INTERESTED PERSONS AND
CORPORATE DISCLOSURE STATEMENT ................................... i

STATEMENT REGARDING ORAL ARGUMENT ................................. ii

TABLE OF CONTENTS ........................................................... iii

TABLE OF AUTHORITIES ...................................................... vi

STATEMENT REGARDING ADOPTION OF BRIEFS
OF OTHER PARTIES ...................................................... 1

STATEMENT OF JURISDICTION ........................................... 2

STATEMENT OF THE ISSUES ............................................... 3

STATEMENT OF THE CASE ................................................. 4

    A. Nature of the Case ...................................................... 4

    B. Course of Proceedings .................................................. 4

    C. Statement of Facts ...................................................... 6

        1. Facts Relevant to the *Giglio* Violation ................................... 8

        2. Facts Relevant to Fourth Amendment Violation ................ 18

        3. Facts Relevant to the Tax Evasion Charges ....................... 24

    D. Defendant's Bail Status .................................................. 30

SUMMARY OF THE ARGUMENT ........................................ 31

## TABLE OF CONTENTS
## cont.

Page(s)

ARGUMENT ............................................................................. 35

I.  THE COURT ERRED WHEN IT DENIED DEFENDANT'S NEW TRIAL MOTION WITHOUT AN EVIDENTIARY HEARING ON THE *GIGLIO* CLAIM............ 35

    A.  The New Trial Motion Sufficiently Alleged a Valid *Giglio* Claim ................................................. 35

        1.  The government knowingly used Officer Carter's false testimony and failed to correct it .... 36

        2.  Officer Carter's false testimony "could have" affected the verdict.................................. 37

    B.  Given the Motion's Facial Validity, the District Court Erred by Refusing to Hold a Hearing............... 42

    C.  There Was No Other Reason to Deny the Motion ........ 45

        1.  The Court's Determination That Officer Carter Testified Truthfully Is Belied by the Record. ........ 45

        2.  The Defendant Did Not Procedurally Default His *Giglio* Claim..................................... 48

II.  THE COURT ERRED WHEN IT ADMITTED EVIDENCE IN VIOLATION OF THE FOURTH AMENDMENT ............... 49

# TABLE OF CONTENTS
## cont.

Page(s)

III.  THE EVIDENCE AT TRIAL WAS INSUFFICIENT TO CONVICT THE DEFENDANT OF TAX EVASION ................ 52

    A.  The Evidence Introduced at Trial as to Count 9 (Tax Evasion) Was Insufficient to Convict ................. 52

        1.  7C's Income Is Not Todd Chrisley's Income .......... 54

        2.  The Government Proved No Affirmative Act Related to 7C's Support a Conviction ................... 56

        3.  Nor Was There Evidence That The Chrisleys Provided False Information to the IRS ................ 59

    B.  The Evidence Introduced at Trial as to Count 8 (Tax Conspiracy) Was Insufficient to Convict ............ 60

CONCLUSION ........................................................ 65

CERTIFICATE OF COMPLIANCE ....................................... 67

CERTIFICATE OF SERVICE .............................................. 68

# TABLE OF AUTHORITIES

<u>CASES</u>                                                                            <u>Page No.</u>

*Giglio v. United States,
    405 U.S. 150 (1972) ..................................................................passim

*Guzman v. Sec'y, Dep't of Corr.,
    663 F.3d 1336 (11th Cir. 2011) .......................................... 36, 39-40

*Hesser v. United States (Hesser II),
    40 4th 1221 (11th Cir. 2022) ..................................................... 57-58

Ingram v. United States,
    360 U.S. 672 (1959) ........................................................................ 62

Kyles v. Whitley,
    514 U.S. 419 (1995) ........................................................................ 37

Murray v. United States,
    487 U.S. 533 (1988) ........................................................................ 51

Richardson v. United States,
    360 F.2d 366 (5th Cir. 1966) ................................................... 35, 42

Rodriquez v. Sec'y, Fla. Dep't of Corr.,
    756 F.3d 1277 (11th Cir. 2014) ..................................................... 35

Solano v. A Navas Party Prod., Inc.,
    2010 WL 11505479 (S.D. Fla. July 12, 2010)........................... 38-39

*Smith v. Sec'y, Dep't of Corr.,
    572 F.3d 1327 (11th Cir. 2009) ................................................ 36, 39

Spies v. United States,
    317 U.S. 492 (1943) .......................................................................... 5

Trepal v. Sec'y, Fla. Dep't of Corr.,
    684 F.3d 1088 (11th Cir. 2012) ..................................................... 39

*United States v. Adkinson,
    158 F.3d at 1154 (11th Cir. 1998)....................................... 61, 63-64

# TABLE OF AUTHORITIES
## cont.

CASES                                                                    Page No.

*United States v. Barton,*
    834 F. App'x 529 (11th Cir. 2020) .................................................... 43

*United States v. Culliver,*
    17 F.3d 349 (11th Cir. 1994) ........................................................... 43

*United States v. Duenas,*
    891 F.3d 1330 (11th Cir. 2018) ....................................................... 30

**United States v. Espinosa-Hernandez,*
    918 F.2d 911 (11th Circ. 1990) .......................................... 18, 43-44

*United States v. Hamilton,*
    559 F.2d 1370 (5th Cir. 1977) ......................................................... 42

*United States v. Horner,*
    853 F.3d 1201 (11th Cir. 2017) .................................................... 42-43

*United States v. Hough,*
    803 F.3d 1181 (11th Cir. 2015) ....................................................... 60

*United States v. Masat,*
    896 F.2d 88 (5th Cir. 1990) ............................................................ 53

*United States v. Philidor,*
    717 F.3d 883 (11th Cir. 2013) ......................................................... 46

*United States v. Reid,*
    69 F.3d 1109 (11th Cir. 1995) ......................................................... 24

*United States v. Scrushy,*
    721 F.3d 1288 (11th Cir. 2013) ....................................................... 42

*United States v. Shayota,*
    2016 WL 6093237 (N.D. Cal. Oct. 19, 2016) ................................. 39

*United States v. Vallejo,*
    297 F.3d 1154 (11th Cir. 2002) ....................................................... 17

# TABLE OF AUTHORITIES
## cont.

CASES                                                                Page No.

*Wong Sun v. United States*,
    371 U.S. 471 (1963) ........................................................................ 50


FEDERAL STATUTES

18 U.S.C. § 371 ........................................................................... 60, 63-64

18 U.S.C. § 3231 ...................................................................................... 2

18 U.S.C. § 3742 ...................................................................................... 2

26 U.S.C. § 7201 ........................................................................... 53, 57-59

28 U.S.C. § 1291 ...................................................................................... 2


FEDERAL REGULATIONS AND RULES

Fed. R. App. P. 34(a) ............................................................................... ii


OTHER AUTHORITIES

Aaron J. Moss & Kenneth Basin, *Copyright Termination and*
    *Loan-Out Corporations: Reconciling Practice and*
    *Policy*, 3 Harv. J. Sports & Ent. L. 55, 72 (2012) .................... 26-27

## STATEMENT REGARDING ADOPTION OF BRIEFS
## OF OTHER PARTIES

Todd Chrisley specifically adopts by reference—and requests that this Court treat as his own—the following arguments, legal citations, and factual references made in the Opening Brief filed by his wife, Julie Chrisley, related to the following issues she raised:

1.     Whether the government offered sufficient evidence at trial to convict the Defendant on the substantive bank fraud counts (as to Counts 3, 5, and 6);

3.     Whether the district court committed procedural error at sentencing when it ordered restitution and forfeiture without providing the reasons for rejecting the Defendant's arguments and without an opportunity for the Defendant to be heard.

## STATEMENT OF JURISDICTION

The district court had original jurisdiction over this criminal prosecution under 18 U.S.C. § 3231, and it entered judgments against the appellant on December 5, 2022. (Doc. 337.)

Todd Chrisley filed a timely notice of appeal on December 5, 2022. (Doc. 339.)

This Court's appellate jurisdiction arises from 28 U.S.C. § 1291 and 18 U.S.C. § 3742.

## STATEMENT OF THE ISSUES

The Defendant raises the following issues on appeal:

1.    Whether the district court abused its discretion when it refused to hold a hearing on the Defendants' *Giglio* claims—specifically that the prosecutors knowingly presented and failed to correct false testimony from IRS Revenue Officer Betty Carter, who lied about the Defendants owing taxes for years when she knew no taxes were due;

2.    Whether the Defendants' Fourth Amendment rights were violated when the district court admitted volumes of excluded evidence at trial without requiring the government to prove it obtained the evidence through a source independent of its unlawful search; and

3.    Whether the government offered sufficient evidence at trial to convict for tax evasion and conspiracy (Counts 8 and 9) when it proved only that the Defendant lawfully received his acting income through a loan-out company, which is standard in the industry and did not alter or conceal his tax liability in any way.

## STATEMENT OF THE CASE

### A. Nature of the Case

This is a criminal case involving allegations of bank fraud and tax evasion against reality television personalities Todd and Julie Chrisley.[1] Todd appeals his convictions based on significant trial and post-trial errors, as well as insufficient evidence of tax evasion.

### B. Course of Proceedings

On August 13, 2019, a federal grand jury indicted Todd and Julie Chrisley for bank fraud, wire fraud, tax evasion, and various counts of conspiracy. (Doc. 1.) The indictment also charged their accountant, Peter Tarantino, with tax crimes. (*Id*.) Two and a half years later, on February 15, 2022, the grand jury issued a superseding indictment. (Doc. 130.) The new indictment charged Todd with one count of conspiracy to commit bank fraud, five counts of substantive bank fraud, one count of conspiracy to defraud the United States, and one count of tax evasion. (*Id*.)

Prior to trial, the Chrisleys filed two motions to suppress evidence. (Docs. 36, 41, 52.) Following an evidentiary hearing, (Docs. 86-87), the

---

[1]    Because multiple members of the Chrisley family are mentioned, this brief sometimes will refer only to an individual's first name for the purposes of clarity and brevity.

Magistrate Judge recommended that the district court deny one, (Doc. 105), but grant the other, (Doc. 107). The government did not object to these recommendations, and the district court adopted them in their entirety. (Doc. 127.)

Prior to trial, after a dispute between the parties about the scope of the district court's order, the Chrisleys filed a motion to require the government to establish the admissibility of any evidence previously suppressed by prior motions before their introduction at trial. (Doc. 162.) The district court denied the motion in a brief paragraph of a longer order. (Doc. 183 at 3.)

Trial began on May 16, 2022, and ended on June 7, 2022. (Doc. 208; Doc. 229.) At the close of trial, the jury found Todd Chrisley guilty on all counts. (Doc. 228.)

Following the jury's verdict, the Chrisleys filed joint motions for a new trial, (Doc. 258), and judgments of acquittal, (Doc. 260). The trial court summarily denied the motions without explanation, promising to do so later. (Doc. 300 at 2.)

Shortly after the district court denied their motions, the Chrisleys moved for reconsideration, identifying new evidence of their claims that

they received three days after the court ruled. (Doc. 304.) The district court took no action on the motion—nor provided its reasons for denying the other post-trial motions—before this appeal began.

On November 21, 2022, the district court sentenced Todd to 144 months of imprisonment and three years of supervised release. (Doc. 325.) The court entered judgment on December 5, 2022. (Doc. 337.) That same day, Todd timely filed his notice of appeal. (Doc. 339.)

More than a month later, the district court issued an order stating its reasons for denying the post-trial motions. (Doc. 389.)

### C. Statement of Facts

In the superseding indictment, Todd and Julie Chrisley were charged with tax evasion and bank fraud, and Julie also was charged with wire fraud and obstruction of justice. (Doc. 130.)

For the bank fraud charges, the government alleged that the Chrisleys sent fraudulent documents to various banks to obtain or extend loans. (*Id.* at 5-10.) The government's bank fraud case rested largely on the testimony of the Chrisleys' former business partner, Mark Braddock, who was granted immunity for testifying that he facilitated the fraud. (Doc. 277 at 113–16.) The primary defense to the fraud charges was that

Braddock committed the crimes without the couple's knowledge. (Doc. 278 at 9–11, 25–26.)

### 1. Facts Relevant to the *Giglio* Violation

To make its case, the government relied heavily on the testimony of IRS Officer Betty Carter. Officer Carter was the first IRS investigator involved in the matter. (Doc. 273 at 244–45, 250, 253.) The government needed her testimony to establish an important aspect of the Chrisleys' criminal intent—specifically, that their use of a loan-out company was done for the purpose of evading taxes.

Officer Carter testified at length on the first and second days of trial. (Docs. 273-74) At that time, she testified that she prepared for her testimony by examining the relevant tax payment records in the IRS's internal systems. (Doc. 273 at 250.) Specifically, she said that she reviewed the IRS's "integrated data system," which, "show[s] returns that are filed, taxes that are due, payments that are made, basically the activity on the money side of the account." (*Id.* at 250-51.)

Purportedly based on her review of these records, Officer Carter testified that the Chrisleys failed to pay taxes for various years and still owed the IRS money for those years. For example, she said that, based

on her review of the IRS's records, which she claimed she completed the morning before her testimony, the Chrisleys still owed taxes for 2010, (Doc. 274 at 97), and 2014 (*id*. at 83-84, 105). Officer Carter also testified on cross-examination that the Chrisleys owed money for 2015 and 2016. (*Id*. at 152-53.) While she could not recall the exact amount, she told defense counsel that she would let them know what it was. (*Id*.)

That didn't happen. Officer Carter did not contact defense counsel with these alleged balances during the trial. Instead, after the government had obtained its convictions, she contacted the Chrisleys' accountant, Bruce Seckendorf, and admitted that the couple did not owe the IRS the money she claimed at trial that they did. (Doc. 258-1 at 3, ¶ 12.) Officer Carter told Seckendorf that the Chrisleys were current on their taxes for 2014, 2015, and 2016 but the IRS had failed to apply the payments to their account. (*Id*.) In later emails with Seckendorf, Officer Carter confirmed that the IRS's system showed that the Chrisleys had made payments for 2014, 2015, and 2016 that exceeded the amounts owed for those years. *(Id*. at 3–4, ¶¶ 12–13.) Yet her testimony left the misimpression that the Chrisleys still owed substantial sums to the IRS when in fact the IRS had been failing to apply payments that the

Chrisleys previously made. All told, the IRS owed the Chrisleys substantial refunds, not the other way around. (Doc. 238-1; Doc. 238-2.) Notably, at no time during or after trial did Officer Carter or the prosecutors attempt to correct the record on these questions.

Based on Officer Carter's false testimony and the government's failure to correct it, the Chrisleys jointly raised a *Giglio* claim in their motion for new trial and requested an evidentiary hearing on it. (Doc. 258.) The government's response admitted (albeit in a footnote) that the prosecution team knew during the trial that Officer Carter's testimony was false, and that they did nothing to correct it. (Doc. 292 at 8 n.4.) Even in the face of these admissions, the district court declined to hold a hearing. It summarily denied the new trial motion in one paragraph of a brief order without stating any reasons, (Doc. 300).

Three days after the court ruled, the Chrisleys received documents in response to a records request to the IRS that they had made many months prior. (*See* Docs. 304, 304-1, 304-2.) These records (internal IRS audit trails) substantiated the Chrisleys' *Giglio* claims and refuted the government's assertion that Officer Carter's false testimony was unintentional and that the prosecutors were unaware of the payments.

(*Id*.) Based in part on this evidence, the Chrisleys filed a motion for reconsideration. (Doc. 304.) The renewed motion alleged, among other things, that the prosecutors and Officer Carter had planned to mislead the jury and the court by basing Officer Carter's testimony about the tax payments on an IRS database that they knew to be incorrect. (*Id*.) The Chrisleys' motion provided factual support through affidavits and is largely corroborated by the government's explicit and implicit admissions in its response to the new trial motion. (*See id*.; Doc. 304-1)[2]

In relevant part, the renewed new trial motion alleged:

> Shortly after the criminal investigation began, in 2018, the prosecutors at trial (AUSAs Peters and Krepp) knew that the Defendants had paid their tax liability for at least 2014 and 2015. (Doc. 304-2. at ¶¶ 20-21; Doc. 304-2 Add. A.) They did not want the jury to know this information, so shortly before trial they filed a motion *in limine* to exclude any evidence of the payments. (Doc. 196 at 7-13.)

> When AUSAs Peters and Krepp prepared the motion *in limine* to exclude evidence of the payments, they appeared to ask one of the IRS criminal investigators to review what payments might be at issue; that agent looked at the Chrisleys tax records, which contained these payments. (Doc. 304-1 at ¶ 37-40.)

---

[2]     Even at sentencing, the government claimed that Officer Carter's testimony was "literally tru[e]" based on the IRS's incorrect records and remained silent about Officer Carter's and the prosecutors' actual knowledge of the payments. (Doc. 363 at 24.)

After filing the motion *in limine*, AUSAs Peters and Krepp filed a "Notice" about it with the Court. (Doc. 201.) In this pleading, filed a week before Officer Carter's testimony, the prosecutors acknowledged that they were aware "that Todd and Julie Chrisley filed amended tax returns and *paid off their tax liabilities after February 2018*." (Doc. 201 at 2 (emphasis added).)

The Court denied the government's motion *in limine* on May 10, 2022. (Doc. 204.) As a result, AUSAs Peters and Krepp knew that the Defendants' tax payments from 2018 to the present, in the so-called "post-conspiracy" period, would be admissible at trial and were likely to be introduced by the Defendants in their case.

A few days later, AUSAs Peters and Krepp met with Officer Carter to prepare her for her testimony. (Doc. 304-1 at ¶ 24-29.) During that meeting, both prosecutors and Officer Carter knew that the Defendants made the necessary payments to extinguish much, if not all, of their tax liability for all tax years before trial. (Doc. 304-1 at ¶ 24-29; Doc. 304-2 at Addendum A; Doc. 201 at 2.)

Consistent with their motion *in limine*, however, AUSAs Peters and Krepp did not want to leave the jury with the impression that the Defendants had paid their outstanding tax liability, even though the prosecutors knew that they had. . . .

Based on all of this, it appears that, at some point in their trial prep conversations, AUSAs Peters and Krepp and Officer Carter discussed the fact that the IRS Employee User Portal ("EUP") failed to reflect the payments the Defendants had made after 2018 and incorrectly showed outstanding tax balances. (Doc. 292 at 13-15.) But the prosecutors and Officer Carter knew from their prior conversations and Officer Carter's extensive research of the Chrisleys' tax records that

11

the balances reflected in the EUP were incorrect. (Doc. 304-1 at ¶ 10-41.)

Nonetheless, AUSAs Peters and Krepp told Officer Carter that she could "rel[y] upon the IRS account transcripts from EUP," (Doc. 292 at 19), rather than the other knowledge she possessed from her review of the Defendants' tax records, which showed conclusively that the payments made exceeded the balances that the EUP incorrectly claimed were due, (*see generally* Doc. 304-1).

To be clear, AUSAs Peters and Krepp told Officer Carter her testimony would be "truthful[] and accurate[]" so long as she testified to "what the EUP database reflected regarding the untimely filed 2014, 2015, and 2016 joint returns for the Chrisley Defendants." (Doc. 292 at 15.) And this is what Officer Carter tried to do, testifying on cross-examination that the Defendants owed taxes for (at least) 2014 and 2015. (Doc. 258 at 4-6). And she did so even though she knew that her answers were misleading; she knew from her hundreds of searches through the Defendants' tax records that they had made payments in excess of what the EUP incorrectly said they owed. (*See generally* Doc. 304-1.)

After cross-examination by defense counsel, when Officer Carter lied about the Defendants' outstanding tax liability, AUSA Krepp returned to the issue in his redirect examination of her. The following exchange occurred:

Q. Now, you also said something about you checked yesterday morning. And I believe there was a back and forth about what you were checking and all of that. I want to give you an opportunity to complete your thoughts on that.

A.   Yes. I just went and checked on all outstanding balances. And there are additional tax and penalties owed.

Q.   To this day?

A.   Yes.

(Doc. 274: Trial Tr. Vol. 3 at 142.)

This testimony was intentionally misleading, as detailed above, and both AUSA Krepp and Officer Carter knew that it was. This testimony was intended to reinforce the false testimony that Officer Carter had provided the day before during cross-examination about (at least) the 2014 and 2015 tax years. It was also false because Officer Carter had not "checked on all outstanding balances," as she claimed. (Doc. 304-1 at ¶ 30-33.) AUSA Krepp's motive for returning to the issue and asking the question on re-direct was clear; he wanted to undermine any argument that the Defendants might have had about demonstrating their lack of intent by showing that they had fully paid their tax obligations.

When the Defendants presented evidence of the tax payments in their case, which began on June 1, 2022, AUSAs Peters and Krepp did not contest it—because they knew the Defendants had made the payments at issue. We know this not only from their conversations with Officer Carter, and her MOI, as documented above, but also because Agent Kinsler called the prosecutors on the morning of June 1, 2022, to raise the issue again. (Doc. 292 at 8 n.4.)[3]

---

[3]    Although AUSAs Peters and Krepp claim to have forgotten Agent Kinsler's call, (Doc. 292 at 8 n.4), this assertion is belied by the fact that Kinsler was telling them about the very aspect of Officer Carter's disputed testimony that the defense witness Bill Salinkski was scheduled to testify about (and did testify about) that very same day.

. . .

At no time during trial, even after Agent Kinsler flagged the issue for them, did AUSAs Peters or Krepp comply with their *Giglio* obligations and notify the Court about Officer Carter's false testimony or attempt to correct it.

(Doc. 304 at 12-17 (citations cleaned up)).

In response to these allegations, the government chose to remain silent. It did not even file an affidavit to refute these claims. Nor did the district court direct the government to respond. In fact, the court took no steps whatsoever to determine the truth of these accusations, refusing to hold a hearing on the issue. The court simply ignored the motion until after the Chrisleys filed their notice of appeal.

More than a month after losing jurisdiction over the substantive issues in this appeal, the district court issued a 78-page order to "set forth" the "reasoning and analysis" for its decision to deny all post-trial motions nearly three months prior. (Doc. 389.) The order did not address the district court's jurisdiction or grounds for issuing a substantive decision while this appeal was pending, instead stating that, "for the [] reasons" described in the order, the trial was "ADHER[ING] to the rulings set forth in its [prior] Order." (*Id*. at 78.)

14

On its own terms, the district court's order contained multiple factual errors. As an initial matter, in the order, the court found that the Chrisleys owed taxes that even the government did not claim were due. The government has acknowledged that much of Officer Carter's testimony about the taxes was "mistaken." (Doc. 363 at 24-25.) And its sole written response to the new trial motion did not assert that the Chrisleys *really* owed taxes for 2009 through 2016;[4] it made other arguments instead. (*See* Doc. 292 at 13, 15.)

Against this backdrop, the trial court's findings were head-scratching. It concluded that the Chrisleys owed taxes for 2010, 2011, and 2016, (Doc. 389 at 30), and that they "might" even have owed for 2014 and 2015, (*id.* at 27). It reached these conclusions not based off the parties' arguments but only because Officer Carter's affidavit said that she provided "payoff amounts" to the Chrisleys' accountant after trial and that their accountant sent checks for those amounts. (Doc. 389 at 21.) The court assumed—despite witness statements and arguments to the

---

[4]    The government *did* claim that the Chrisleys still owed a residual balance for 2016, (Doc. 292 at 17 n.7), but the Chrisleys disputed this claim, (Doc. 258-1 at 5, ¶ 18).

contrary—that these post-trial payments amounted to an admission that the money was owed. (*Id*.) They did not. The post-trial payments were meant to help the IRS clean up existing balances in their system so that the Chrisleys' outstanding tax credit could be applied to the larger sums going forward. This is why Officer Carter's affidavit references outstanding *credit* balances. (Doc. 292-3 at 4, ¶ 10.)

The district court's speculation is even more confounding because its order also acknowledges elsewhere that Officer Carter's testimony about 2014 and 2015 was false. (Doc. 389 at 32.) In other places, it concluded that her testimony was "an unintentional error." (*Id*. at 29.) In doing so, the court assumed that Officer Carter's testimony was "reasonably based" on "information she accessed via the IRS' internal EUP system." (*Id*. at 26.) The court did not explain why it disregarded the Defendants' expert's affidavit and the IRS audit trails showing that Officer Carter knew the payments had been made contrary to what anything in the "system" might have said. (*See id*.)

As this example showed, the district court simply assumed the government's witness was right and the Chrisleys' accountant was wrong. Even more bizarrely, the court speculated that the Chrisleys *may*

have owed taxes for 2014 and 2015. (Doc. 389 at 27.) Again, this was not a theory the government ever advanced. For those years, the government admitted that the Chrisleys paid the balances due for 2014 and 2015 but claimed that the IRS database did not recognize the payments. (Doc. 292 at 12.) Yet, even in the face of this admission, the court theorized that "[e]ven if the Chrisley Defendants had zero balances for tax years 2014 and 2015 at times prior to May 2022, this does not necessarily mean that their balances were zero as of May 2022 [when trial occurred]." (Doc. 389 at 27.) What this appears to mean is that, even though the Chrisleys paid off their taxes for 2014 and 2015 before trial and there is no argument that they owe them now, the district court believed it was possible that they might have owed them during the small window of time when trial took place—which would have made Officer Carter's testimony true. There was <u>zero</u> evidence in the record to support the court's conjecture.

On appeal, this Court reviews the district court's denial of a new trial motion asserting a *Giglio* claim for abuse of discretion. *United States v. Vallejo*, 297 F.3d 1154, 1163 (11th Cir. 2002). The same standard applies to the question whether the district court erred by "denying the

motion . . . without first conducting an evidentiary hearing." *United States v. Espinosa-Hernandez*, 918 F.2d 911, 913 (11th Cir. 1990).

### 2. Facts Relevant to the Fourth Amendment Violation

The second issue on appeal relates to the admission of evidence at trial that derived from documents the Georgia Department of Revenue ("DOR") unlawfully seized and turned over to federal investigators.

In 2014, the then-chief criminal investigator of the DOR, Josh Waites, began taking an "unusual" interest in Todd Chrisley. (Doc. 107 at 4.) Waites, who had a picture of Todd on a dartboard in his office, (*id.*), initiated and led a warrantless search of a locked warehouse where the Chrisleys stored personal items, (*id.* at 8-9). Waites arrived at the warehouse with his police lights flashing, although he later told fellow DOR officers to lie by "tell[ing] people he had not been there." (*Id.* at 8.) With no warrant, the rogue group displayed a piece of paper to the manager at the warehouse and demanded entry. (*Id.* at 8-9.) When the manager initially refused, they threated the manager with arrest. (*Id.* at 9.) Based on these threats, the DOR forced their way into the Chrisleys' warehouse and hauled off its contents. The seized items included massive amounts of furniture, personal property, and about 20 boxes containing

documents, including financial records that the agents believed to be fraudulent. (*Id*. at 9-10.)

Before a court could order the return of the Chrisleys belongings, the FBI and the U.S. Attorney's Office met with the DOR to discuss how best to transfer the illegally-obtained records to federal agents. (*Id*. at 12.) They decided to obtain federal search warrants allowing them to seize the family's property (including the forged bank records) from the DOR's possession. (*Id*; *see also* Docs. 36-1, 36-2, 36-3, and 36-4.) IRS Special Agent Larry Arrow then reviewed the materials seized from the illegal warehouse search, including the forged bank records and documents. (Doc. 36-5.) Shortly after, Arrow sought and obtained a federal search warrant for the Chrisleys' personal emails held by America Online ("AOL") and Google. (Docs. 52 at 3-4.) Federal agents also issued subpoenas for various other records based on what they had seen in those documents. (Doc. 162 at 4. n.2.)

Long before trial, the Chrisleys filed two motions to suppress evidence relating to the warehouse documents and the emails obtained from AOL and Google, each raising separate and distinct grounds for relief. The first motion asked the Court to suppress the documents and

records seized at the warehouse along with all evidence derived from them ("Warehouse Motion"). (Doc. 36.) Specifically, the Warehouse Motion requested the following relief: that "all evidence obtained from the subject search warrants [for the illegal warehouse search] and all fruits derived therefrom" be excluded from trial. (*Id.* at 13.) A few months later, the Chrisleys filed a second motion to suppress on alternative grounds. This motion challenged the admissibility of the documents Agent Arrow obtained from Google and AOL pursuant to search warrants ("ESI Motion"), arguing that the warrants were fatally overbroad. (Doc. 52 at 2.) This raised a separate attack on a subset of the evidence derived from the warehouse seizure; if the first motion failed, it provided an independent basis to exclude at least this narrower category of evidence.

After a two-day evidentiary hearing on the separate motions, Magistrate Judge Justin Anand entered a Report and Recommendation on each motion, determining first that the ESI motion should be denied, (Doc. 105), and then holding the next day that the Warehouse Motion should be granted, (Doc. 107). In the first R&R, the Magistrate Judge declined to suppress the Google and AOL evidence because he found that the warrant was not overbroad. Nothing about this ruling, however,

impacted or narrowed the court's ruling on the separate Warehouse Motion, which it recommended be granted.

In the second R&R, the Magistrate Judge determined that the district court should exclude all documents and materials seized at the warehouse *and* all documents and materials derived from the illegal search. (Doc. 107 at 25.). As a result, the second R&R recommended that the district court grant the motion to suppress. The government did not object to the second R&R, so the district court adopted it in its entirety. (Doc. 127.) Thus, the court's ultimate suppression ruling on the Warehouse Motion extended beyond the physical documents seized from the warehouse: It suppressed *all* information, documents, and records the government obtained that flowed from information it learned because of the illegal search.

At the final pretrial hearing before the Magistrate Judge, the government suggested that it might have "independent sources" for some evidence linked to the warehouse search, including specifically digital copies of some of the documents found there. (*See* Doc. 161; Doc. 252 at 22–23.) In response, the Chrisleys filed a "Motion to Require the United States to Establish Admissibility of Suppressed Evidence." (Doc. 162.)

This motion specified five categories of evidence that derived from information the DOR illegally obtained at the warehouse. (*Id.* at 2-6.) These categories included not only the results of the AOL and Google search warrants, (*id.* at 2-4), but also all information the FBI and IRS obtained after looking at the warehouse documents, (*id.* at 4-5), and documents related to the charge against Julie for wire fraud involving a rental property application, (*id.* at 6).

The question this motion posed to the district court was straightforward: Did the government have a valid legal basis (such as an independent source or an exception to the exclusionary rule) to admit this evidence even though it was a fruit of the illegal warehouse search. The government understood the issue perfectly, arguing that it had such a basis. (Doc. 178.) Namely, the government claimed that the evidence it sought to use at trial met two exceptions to the exclusionary rule: (1) it came from an independent source untainted by the illegal warehouse searches, (*id.* at 15-21); or (2) the government would have inevitably discovered it, (*id.* at 21-26). It also argued that the Chrisleys' motion was akin to a stand-alone motion to suppress and therefore untimely. (*Id.* at 12-15.) At oral argument, however, the government withdrew its

timeliness argument. (Doc. 193 at 24.) In the end, it asked the court for an evidentiary hearing so that it could "perfect the record" to establish an exception to the exclusionary rule. (Doc. 178 at 29.)

Despite the government joining the defendants' request for an evidentiary hearing, the trial court declined to hold one. It took the matter under advisement, (Doc. 193 at 51), later issuing a very short ruling. The following is the entirety of the court's order on this issue:

> Motion [Doc. 162] to require proof of admissibility is **DENIED**. After taking this matter under advisement at the pretrial conference, the Court further reviewed the pleadings, R&R and Order on this issue and determined that the emails at issue here were previously allowed into evidence at trial pursuant to the Court's denial of Defendants' motion to suppress search warrants for emails and electronically stored information. [Docs. 52, 105, 127.] Thus, the motion currently before the Court is untimely.

(Doc. 183 at 3.)

By its own terms, the order only addressed one category of evidence in the Chrisleys' motion—the evidence obtained from AOL and Google. It does not address or explain the district court's admission of the other categories of evidence at issue. Nor does the order make sense; the district court's prior order denying the ESI Motion did not "allow [the

emails] into evidence." It simply denied the grounds for relief asserted in that motion.

As a result, the district court admitted much of the previously suppressed evidence without requiring the government to prove that this contested evidence had been obtained from an "independent source" or was otherwise admissible. The previously suppressed evidence made up much more than half of the government's case and related to each of the charges in the indictment. (Doc. 258-3 (summarizing this evidence).)

On appeal, this Court reviews whether the district court properly admitted evidence for an abuse of discretion. *United States v. Reid*, 69 F.3d 1109, 1114 (11th Cir. 1995).

### 3. Facts Relevant to the Tax Evasion Charges

The third issue on appeal raises the insufficiency of the evidence supporting the convictions on Counts 8 and 9.

The superseding indictment alleged that the Chrisleys committed tax evasion, and conspired to evade taxes, by receiving income through the family's loan-out company, 7C's Productions, Inc. (Doc. 130 at 13-23.) The government also alleged that (i) the mere creation and use of 7C's and (ii) making Faye Chrisley a signatory of the company's bank account

were acts of tax evasion. (*Id*.) Faye is Todd's mother, she appears on television with him, and she also received her income from such appearances on the show through 7C's.

At trial and in its post-trial motions, the government took the position that Todd used 7C's—the family's loan-out company—to evade paying his 2009 taxes. Specifically, it asserted that Todd should have paid taxes on the gross income 7C's received for his services, rather than only paying taxes on what he received from 7C's pursuant to the talent agreement between him and the company. (*See, e.g.*, Doc. 292 at 18-19.)

The evidence at trial dismantled the government's theory, and it demonstrated that the Chrisleys' creation and operation of 7C's was legitimate and standard in the entertainment industry. The corporation operated exactly how loan-out companies are designed to work and continue to work for countless people in the entertainment industry today. (*See, e.g.*, Doc. 281 at 183-86.) In addition, there was no evidence that Todd failed to report any income he received from the company. The government simply offered no evidence that the creation and use of 7C's was unlawful in any way.

*Loan-out Corporations, Generally*

As the indictment acknowledges, loan-out companies are "a common way for actors and entertainers to be paid for their services." (Doc. 130 at ¶ 5.) "A loan-out corporation is a legal fiction employed for the financial benefit of successful artists and entertainers. It is a duly organized corporation, typically wholly owned by an artist, the sole function of which is to 'loan out' the services of the artist-owner to producers and other potential employers. The form offers limited personal liability and beneficial tax treatment." *Bozzio v. EMI Group Ltd.*, 811 F.3d 1144, 1147 (9th Cir. 2016) (quoting Aaron J. Moss & Kenneth Basin, Copyright Termination and Loan-Out Corporations: Reconciling Practice and Policy, 3 HARV. J. SPORTS & ENT. L. 55, 72 (2012)) (cleaned up).

Loan-out arrangements usually involve two contractual relationships: "(1) an agreement between the artist and his wholly owned corporation by which the artist agrees to provide services to that corporation, often exclusively, in exchange for a fixed or contingent salary; and (2) an agreement between the loan-out corporation and a

26

producer or other employer to furnish the artist's services to said producer for a given project." 3 HARV. J. SPORTS & ENT. L. at 72.

The tax advantages are well-established: "Artists who pass their income through loan-out corporations may enjoy better liquidity/cash flow, can coordinate their income distribution by fiscal year, enjoy lower corporate tax rates, and can further shield themselves from taxes by using qualified pension, profit-sharing, and employer medical reimbursement plans." *Id*. at 73.

### The Creation and Operation of 7C's

The Chrisleys did not come up with the idea to create a loan-out company to evade taxes; they did not come up with the idea to create the company at all. The attorney who formed 7C's, Leron Rogers, testified that the studio *required* the Chrisleys to create the loan-out company. (Doc. 281 at 183–84.) This was not surprising—it was standard. And Mr. Rogers had created many loan-out companies for other entertainers. (*Id*. at 189-90.) As was standard, he named one of the "artists" receiving income through the corporation as the owner. (*Id*. at 192, 200.) Here, that was Julie. (*Id*. at 189, 200.) There was nothing unusual about this. (*Id*. at 189-90.)

27

For tax purposes, 7C's was an S-Corp and a pass-through entity, meaning it paid no taxes. (Doc. 276 at 136-37, 178.) It would receive income for furnishing the talent, pay expenses, and disperse the remaining profit in accordance with its agreements with the talent. (Doc. 281 at 183–86.)

In addition, Mr. Rogers testified that it was standard for there to be additional agreements between the loan-out company and the talent whose services were being furnished by the company. (*Id.* at 192-93.) The same was true here. Mr. Rogers drafted a series of talent agreements related to 7C's and members of the Chrisley family appearing on the show. (*Id.* at 194, 200.) These agreements outlined how 7C's net profits would be distributed. (*See, e.g.*, Def. Ex. 300.) As the years went by and the Chrisleys' show was renewed for more seasons, the Chrisleys would amend their individual talent agreements with 7C's. (*See, e.g.*, Gov. Ex. 446.) In later seasons, some family members were paid a set amount for appearing in an episode and Todd and Julie Chrisley would split the remainder of 7C's profit. (Doc. 275 at 108–09.)

As a result of this structure, neither Todd nor Julie Chrisley could ever receive—and never did receive—money from the production

company directly; the producers wrote checks to 7C's pursuant to their agreement with the loan-out company. (Doc. 276 at 119-20.) And while the production company might note on a check that it was paying 7C's for furnishing the services of a particular family member, the production company had no control over how much each family member received from 7C's. (Doc. 275 at 95.) That was determined by the talent agreements with 7C's. (*Id*. at 110.) A representative of the production company confirmed that it could not, for example, have paid Todd directly even if he requested it because their compensation agreement was with 7C's—not with individual family members. (*Id*.)

Nothing about any of this was improper. For example, the government offered no testimony or evidence of any kind that any of 7C's expenses were illegitimate. Its case agent, Special Agent Steve Ryskoski, presented a chart of 7C's gross receipts but admitted he did not account for 7C's expenses at all. (Doc. 276 at 121–23.) The government's witnesses similarly conceded that they did not bother to sort through 7C's expenses to determine which were business expenses and which were personal expenses. (*Id*. at 123.) For her part, Officer Carter testified about nominee bank accounts. (Doc. 273 at 252.) She testified that "the

Chrisleys were living off of the 7C's account," (Doc. 274 at 63), but she admitted that she never tried to determine whether certain expenses were personal or business expenses, (*id*. at 64-65). Officer Carter also acknowledged that it is "okay" to pay personal expenses out of a business account so long as the expenses are accounted for in the person's personal tax return. (*Id*. at 108–09.) In the end, while the government offered conclusory testimony that some personal expenses were paid out of 7C's account, (Doc. 276 at 199–200), it offered no evidence that the Chrisleys did not pay taxes on that income.

On appeal, this Court reviews the sufficiency of the evidence on these counts "*de novo*, taking the evidence in the light most favorable to the government and drawing all reasonable inferences in favor of the jury's verdict." *United States v. Duenas*, 891 F.3d 1330, 1333 (11th Cir. 2018). But a jury can only infer facts reasonably supported by the evidence; it may not resort to "mere speculation." *Id*. at 1334.

### D. Defendant's Bail Status

Todd Chrisley is currently incarcerated pending this appeal.

## SUMMARY OF THE ARGUMENT

1.    The prosecutors knowingly presented and failed to correct false testimony from IRS Revenue Officer Betty Carter, who lied about the Defendants owing taxes for years when she knew no taxes were due. This *Giglio* violation had the effect of falsely painting the Defendants as untruthful and greedy, likely to commit other forms of fraud, and evading the tax payments alleged in the indictment. Moreover, if the prosecutors' willingness to encourage a witness to mislead the jury were revealed at trial, jurors would have had good reason to doubt the testimony of other witnesses the same prosecutors put on the stand. Although the district court recognized that the false testimony reasonably could have led the jurors to convict, it denied the motion anyway. It refused to even hold a hearing on the motion and failed to provide the reasons for its decision until after the Defendants filed this appeal.

This was error. The district court should have held a hearing on the motion. This Court's case law requires one when the allegations involve matters outside the record, as they did here. Remand is required so that the district court can hold a hearing on the motion, determine if the allegations are true, and order a new trial if they are.

31

2.    The district court admitted substantial volumes of evidence at trial that were fruits of an unlawful search, despite its prior order suppressing such evidence, without requiring the government to show that the evidence was obtained from a source independent of the unconstitutional search. When Defendants raised the issue and requested a hearing to determine the admissibility of the evidence, the court denied their motion, finding that the question was mooted by a prior motion and therefore untimely. This decision was both illogical (the prior motion had no effect on this one) and inexplicable, particularly because the government had joined in the request for the hearing.

As a result, volumes of evidence obtained in violation of the Defendants' Fourth Amendment rights were admitted against them. The contested evidence was central to the government's case, evidenced by the fact that it amounted to a substantial majority of its trial exhibits. Remand is required so that the district court can hold the "independent source" hearing both sides requested. If there was no such source, a new trial is necessary.

3.    This Court must enter judgments of acquittal on Counts 8 and 9 because the government failed to prove that the Defendants took affirmative steps to evade taxes.

The Defendants are reality television stars who, like similar entertainers, contract with producers through a loan-out company. Their family's company was called 7C's Productions. The evidence at trial showed that 7C's operated lawfully, and there was no evidence Todd Chrisley's income was not properly reported. Nonetheless, the government's tax evasion case rested on the creation and use of the company, and it alleged that all the company's income was actually Todd's income. But there was no factual basis for this, let alone a legal one; the government's theory of the crime ignored the corporate form and basic tenets of corporate law. Because (i) the Defendant had no legal interest in 7C's income outside of his contracts with it, (ii) the entity did not affect his tax liability, and (iii) its assets were not subject to any tax liens or other levies, its creation was not an affirmative act of tax evasion as a matter of law.

In addition, the government presented no evidence that the Defendants provided false information to the IRS sufficient to constitute actual or attempted evasion of tax payments.

As a result, these convictions must be reversed, and judgments of acquittal entered.

## ARGUMENT

### I.    THE COURT ERRED WHEN IT DENIED THE NEW TRIAL MOTION WITHOUT A HEARING ON THE *GIGLIO* CLAIM.

After trial, the Chrisleys filed a Rule 33 motion seeking a new trial because the government violated *Giglio* when it failed to correct Officer Carter's false testimony. (Doc. 258 at 8-16.) They requested a hearing to support this motion and establish the breadth of the government's misconduct. (*Id*. at 24; Doc. 304 at 1, 24.) But the trial court denied the motion without a hearing, (Doc. 300), in a manner contrary to this Court's precedent, *see, e.g.*, *Richardson v. United States*, 360 F.2d 366, 369 (5th Cir. 1966) (explaining that hearings are necessary when new trial motions raise issues based on evidence outside the record). Remand is necessary.

### A.    The New Trial Motion Sufficiently Alleged a Valid *Giglio* Claim.

A *Giglio* violation occurs "when [1] the prosecution solicits or fails to correct false or perjured testimony" and [2] this testimony could "in any reasonable likelihood have affected the judgment of the jury." *Rodriquez v. Sec'y, Fla. Dep't of Corr.*, 756 F.3d 1277, 1302 (11th Cir. 2014).

When the government fails to correct false testimony, a new trial is necessary "unless the prosecution persuades the court that the false testimony was 'harmless beyond a reasonable doubt.'" *Smith v. Sec'y, Dep't of Corr.*, 572 F.3d 1327, 1333 (11th Cir. 2009) (citations omitted). "This standard favors granting relief," *id.*, in large part because (to save its conviction) the government must eliminate *all* "real doubt[s]" about the false testimony's impact on the verdict that are based on "reason and common sense." (Reasonable Doubt, 11th Cir. Pattern Jury Instructions, Criminal.)

>       1.    *The government knowingly used Officer Carter's false testimony and failed to correct it.*

Officer Carter's testimony that the Chrisleys did not pay their taxes for 2014, 2015, and 2016 was false. (Doc. 258-1 at 3-4.) She admitted that her testimony was wrong when she spoke with the Chrisley's accountant after trial, (*id.*), and the detailed IRS audit trail records—particularly when placed in context with the surrounding events—show that she must have known that her testimony was false when she gave it, (*see* Docs. 304, 304-1, 304-2). Because Officer Carter is a government agent, her knowledge is imputed to the prosecutors. *See, e.g., Guzman v. Sec'y, Dep't*

*of Corr.*, 663 F.3d 1336, 1349 (11th Cir. 2011) (citing *Kyles v. Whitley*, 514 U.S. 419, 437-38 (1995).

Even if this were not the standard, however, there is ample evidence to show that the prosecutors themselves knew that Officer Carter intended to mislead the jury, condoned such testimony, and then failed to correct it. (Doc. 304 at 12-17.) Worse still, when confronted with the Motion for New Trial, the prosecutors attempted to mislead the Court about their knowledge of the matters at issue, specifically failing to inform the Court that they knew the testimony Officer Carter provided was intentionally misleading. (Doc. 304 at 18-22.) As a result, the first prong of *Giglio* is met.

> 2.    *Officer Carter's false testimony "could have" affected the verdict.*

Officer Carter's false testimony—and the prosecutors' involvement procuring it—could have influenced the jurors in multiple ways. This is because the tax payments at issue, Officer Carter's false testimony about them, and the prosecutors' role in her testimony were all directly relevant to the jurors' consideration of (i) the Defendants' intent to pay taxes and their character for truthfulness, (ii) the credibility of their defense, and

(iii) the credibility of Officer Carter and the entire prosecution. (*See* Doc. 258 at 11-16).

On this point, the district court agreed. Its memorandum confirms how Officer Carter's testimony alleging unpaid taxes was important to the verdicts—and therefore why the failure to correct it would justify a new trial. (Doc. 389 at 31.) Specifically, in the memorandum explaining its prior order, the court determined that "a jury could reasonably conclude that the Chrisley Defendants' failure to be totally current on their taxes more than five (5) years after those taxes were due was evidence of their intent to evade the payment of taxes or untruthfulness." (*Id.*) (quotations omitted). Because Officer Carter testified that the Chrisleys were *not* "totally current on their taxes more than five (5) years after those taxes were due," as the court described it, and because that testimony was *false*, her testimony "could have" led the jury to believe that the couple had an intent to evade taxes.

The district court also recognized that Officer Carter's testimony could have led the jury to conclude that the Chrisleys were untruthful in their dealings with others—a key issue in the fraud case. (Doc. 389 at 31.) Courts across the country have recognized that a defendant's failure

38

to pay taxes is probative of the defendant's truthfulness and credibility. *See, e.g.*, *Solano v. A Navas Party Prod., Inc.*, 2010 WL 11505479, at *2 (S.D. Fla. July 12, 2010) ("If Plaintiff never paid taxes, that too, may be probative of his truthfulness."). Based on Officer Carter's false testimony about the Chrisleys not paying taxes for the years at issue, the jury was more likely to conclude that they might commit other forms of fraud—including those charged in this case. *Cf. United States v. Shayota*, No. 15-CR-00264-LHK, 2016 WL 6093237, at *5 (N.D. Cal. Oct. 19, 2016) (excluding evidence of prior alleged tax fraud because "[a] jury is likely to draw the conclusion that [the defendant], who was indicted for tax fraud, has a character for fraud and is therefore more likely to have committed other frauds").

Given this impact, the government cannot carry its burden to show that Officer Carter's false testimony was harmless beyond a reasonable doubt. *Guzman*, 663 F.3d at 1348. While *Giglio* error is a species of *Brady* error, "the *Giglio* materiality standard is different and more defense friendly than the *Brady* materiality standard." *Trepal v. Sec'y, Fla. Dep't of Corr.*, 684 F.3d 1088, 1108 (11th Cir. 2012) (cleaned up). And it favors granting a defendant relief. *Smith*, 572 F.3d at 1333.

This more defense-friendly standard was met not only because the jury could have used the false testimony to decide to convict, but also because the misconduct here involved actions by the prosecutors that would have undermined their entire case. If the jury knew that the prosecutors encouraged Officer Carter to mislead them by telling her to rely on a faulty IRS database rather than her actual knowledge of the Chrisleys' tax payments, this information would have impugned the integrity of the entire prosecution. *See Guzman,* 663 F.3d at 1353. Had defense counsel known this information, it is easy to imagine the closing argument to the jury: "If prosecutors were willing to trick you about the Chrisleys' current tax liability, why should you believe anything else they presented to you, much less believe it beyond a reasonable doubt?"

This Court has endorsed similar theories for relief under *Giglio*. In *Guzman*, for example, a prosecution witness (Martha Cronin) was paid $500 for her testimony. *Id.* at 1342-43. At trial, Cronin and a detective falsely testified that the witness received nothing in return for her testimony. *Id.* Defendant's counsel cross-examined Cronin at length and impeached her testimony on other grounds. *Id.* at 1350. In addition, there was independent evidence of the defendant's guilt beyond Cronin's

testimony. *Id.* at 1350-51. Yet, on review, this Court granted a new trial based on Cronin's false testimony alone. Although the Court acknowledged that her testimony about the defendant's guilt was independently corroborated and supported by other evidence, the panel noted that it "must consider the cumulative effect of the false evidence for the purposes of materiality." *Id.* at 1350-51. To do this, it looked to the corrupting and corrosive effect the prosecutor's use of false testimony had on the fact-finding process at trial. *Id.* at 1353. Had the defense been able to present evidence of the government's misconduct to the jury, the Court concluded, it would have "impugned . . . the character of the entire investigation." *Id.* So, too, here.

### B. Given the Motion's Facial Validity, the District Court Erred by Refusing to Hold a Hearing.

Some new trial motions require a hearing; others do not. The Defendant's motion—because it established a valid *Giglio* claim—falls in the first category. A hearing was necessary.

The rules for deciding whether a hearing is necessary are long-standing. More than forty years ago, the predecessor Circuit of this Court explained that, while "a motion for new trial may ordinarily be decided

upon affidavits without an evidentiary hearing," some "unique situations" require one, such as allegations "involving . . . jury tampering, prosecutorial misconduct, or third party confession." *United States v. Hamilton*, 559 F.2d 1370, 1373 (5th Cir. 1977).[5]

The distinction between these categories and other claims comes from whether the evidence necessary to decide the issue already resides in the record. When "all the evidence needed to dispose of each of the grounds asserted as a basis for a new trial" is contained in the record, a hearing is not required. *United States v. Scrushy*, 721 F.3d 1288, 1305 n.30 (11th Cir. 2013). On the other hand, in situations like jury tampering and prosecutorial misconduct, the evidence at issue lies outside the record, and the district court cannot decide the motion without gathering the relevant facts at an evidentiary hearing. *See, e.g., Richardson*, 360 F.2d at 369 (holding that facts alleged by the defendant that reside outside the record "must stand as confessed since no hearing was conducted"). *Giglio* violations like those alleged here are a form of

---

[5]    *See Bonner v. City of Prichard*, 661 F.2d 1206 (11th Cir. 1981) (en banc) (adopting as binding precedent all published cases of the former Fifth Circuit decided on or before September 30, 1981)

prosecutorial misconduct. *See, e.g., United States v. Horner*, 853 F.3d 1201, 1206 (11th Cir. 2017).

In such cases, an evidentiary hearing is required to fully explore the allegations and to build a complete record for review. *United States v. Barton*, 834 F. App'x 529, 530 (11th Cir. 2020) ("Generally, the district court should conduct an evidentiary hearing before deciding a motion for a new trial."); *United States v. Culliver*, 17 F.3d 349, 350 (11th Cir. 1994) ("[T]he district court in this case should have conducted an evidentiary hearing to more thoroughly ascertain the degree of merit in the [defendant's] motion for a new trial.").

The reason for the rule is obvious; a court generally cannot resolve factual disputes without a hearing. In addition, when some of the relevant facts are outside the record, the actual facts may be even worse than the defendant alleges, because in many cases the defendant cannot learn the full extent of the government's out-of-court misconduct without the benefit of a hearing. *See Espinosa-Hernandez*, 918 F.2d at 913–14.

This Court confronted such a scenario in *Espinosa-Hernandez*. There, the defendant moved for a new trial because a government witness was indicted for making false statements on his federal job application

and was under investigation for two other crimes. *Id.* at 913. The trial court denied the motion, along with the defendant's request for discovery and an evidentiary hearing, holding that the evidence would merely be impeaching and unlikely to lead to a new trial. *Id.* This Court reversed, explaining that a hearing was necessary and that discovery into the investigation might show that the government's witness had "committed perjury in a proceeding similar to the defendant's trial," which might make "a new trial necessary to 'remove the taint' from [the defendant's] conviction." *Id.* at 914 (citations omitted). This Court also concluded that "[d]iscovery might also enlighten the District Court as to when the United States Attorney's office first learned of the disturbing allegations[,]" which might result in a new trial "based upon the government's failure to disclose evidence that could have been used to impeach a government witness." *Id.*

The same issues and concerns are present here. As detailed above, the Chrisleys' motion for a new trial raised specific factual allegations about prosecutorial misconduct—in particular, that the prosecutors encouraged Officer Carter to testify in a manner that was intentionally misleading, failed to correct that testimony once she gave it, and then

reinforced the false information through re-direct examination. Because these *Giglio* claims arose from government conduct that was not part of the record, it was necessary for the district court to hold an evidentiary hearing. By refusing to do so, the district court erred.

### C.    There Was No Other Reason to Deny the Motion.

The district court tried to sidestep these issues. Its view of how the alleged nonpayment of taxes could have affected the verdict led to an obvious conclusion: If Officer Carter's testimony was false, a new trial was necessary. The trial court avoided that result, however, by finding the disputed testimony to be mostly true, and concluding that defense counsel had procedurally defaulted the claim. (Doc. 389 at 22-33.) But its factual conclusions—that the Chrisleys owed taxes for 2010, 2011, and 2016 and possibly owed for 2014 and 2015—are clearly erroneous. And the record does not support the court's theory that defense counsel somehow permitted Officer Carter to testify falsely for strategic reasons.

### 1.    *The Court's Determination that Officer Carter Testified Truthfully Is Belied by the Record.*

As detailed above, the district court somehow found the Chrisleys to owe taxes that the government never alleged, ignored the

government's admission that Officer Carter's testimony was "mistaken," and constructed an argument that deemed her testimony true by simply assuming that, during the three-week window of trial, the Chrisleys owed taxes that they had not owed before and did not owe after. (*Id.* at 27.) These are the sorts of problems that, taken together, should leave the court "with the definite and firm conviction that a mistake has been committed." *United States v. Philidor*, 717 F.3d 883, 885 (11th Cir. 2013).

The district court's factual errors did not end with what taxes were due. It made similar mistakes when determining whether the government knew that Officer Carter's testimony was false and failed to correct it. On this point, again inexplicably, the trial court said there was "no evidence" that either Officer Carter or the government's lawyers knew that any of Carter's testimony was false at any point during trial. (Doc. 389 at 22.) This is demonstrably untrue. Defendants presented abundant evidence in their renewed motion for new trial that both Officer Carter and the prosecutors knew that her testimony was false. (Doc. 304 at 12-18.) In the face of over twenty paragraphs and supporting affidavits, the district court nonetheless concluded that there was "no evidence" the government knew that Officer Carter's testimony was

wrong. (Doc. 389 at 22.) This statement cannot be squared with the record.

Finally, the district court's conclusion that "there is no evidence to support the Chrisley Defendants' accusation that AUSAs Krepp and Peters coached Officer Carter to testify falsely," (*id*. at 29), ignores again the pages and pages of factual assertions and affidavits submitted to it, which support exactly that inference, (Docs. 304, 304-1, 304-2). On this point, notably, the district court made no attempt to square its view of the prosecutors' knowledge with the prosecutors' own pleadings demonstrating their knowledge, (Doc. 292 at 8 n.4), or their silence in the face of the specific allegations about their conduct—which they did not even submit an affidavit to dispute. Instead, the court misreads the record to suggest that the claim of prosecutorial misconduct was based on speculation about meetings between AUSAs Krepp and Peters and Officer Carter "of which the Chrisley Defendants' counsel admit they have no evidence. *See* 1/10/2023 Hr'g Tr. at 12:23-13:2 [Doc. 381]." Of course, the Chrisleys' counsel admitted no such thing, and the court's citation does not support its assertion. Nor does the argument stand on its own logic. The *Giglio* motions detailed the facts known to the defense,

explained the basis for the reasonable inferences it made, and requested that Defendants be permitted to ask Officer Carter and Agent Kinsler about their communications with the prosecutors at an evidentiary hearing. It would be a perversion of due process to prohibit Defendants from asking these questions and then deny their *Giglio* motion because the court wanted the answers it barred them from eliciting.

      2.    *The Defendants Did Not Procedurally Default the* Giglio *Claim.*

The trial court raised one final bar to the *Giglio* claim: It found that defense counsel had procedurally defaulted it. (Doc. 389 at 32.) To do so, the court determined that defense counsel knew Officer Carter's testimony was false but did not object to it. (*Id.*) But this is not what happened. As the transcript makes plain, defense counsel *did* challenge Officer Carter's false testimony and did so repeatedly. The false testimony came on cross examination and re-cross examination. (*See* Doc. 389 at 7-14). Officer Carter was challenged repeatedly on it, including through attempted impeachment using tax returns and IRS Tax Account Transcripts. (*See, e.g.*, Doc. 389 at 7-14; Doc. 274 at 122-23, 154-55.) When challenged, however, she repeatedly doubled down on her false testimony. (*Id.*) Then, on re-direct examination, the prosecutors asked

her to reaffirm the false claims of outstanding tax liability, and she did. (Doc. 274 at 142.)

As a result, the district court erred when it denied the *Giglio* claim without a hearing. Remand is necessary.

## II. THE COURT ERRED WHEN IT ADMITTED EVIDENCE IN VIOLATION OF THE FOURTH AMENDMENT.

The *Giglio* violation is not the only error that requires a new trial.

At the government's insistence, the district court admitted substantial volumes of evidence at trial that were obtained in violation of the Fourth Amendment, even though the evidence had been suppressed by a prior ruling that the government did not appeal. Specifically, the court admitted copies of documents illegally seized from the Chrisleys warehouse and other evidence derived from the unlawful warehouse search. When it did so, the court did not require the government to make any showing that this evidence qualified for an exception to the exclusionary rule that would permit its admission. This was error.

The facts already in the record established that nearly all the investigative steps federal agents took after March 2017 were prompted

by what was found in the illegal search. (Doc. 258 at 31-35.) As a result, much of the evidence the government collected should have been inadmissible at trial. But prosecutors sought to admit some of it anyway. And, when the Chrisleys raised the issue, the district court declined to decide the question on its merits. (Doc. 183 at 3.)

The effect of the court's procedural ruling was to permit the government to introduce fruits of the illegal warehouse search without showing that they met an exception to the exclusionary rule. Under the fruit of the poisonous tree doctrine, evidence later found in a subsequent search should be suppressed if the search was prompted by what investigators found in the prior unconstitutional search. *Wong Sun v. United States*, 371 U.S. 471 (1963). As a result, the government has an onerous burden requiring it to convince the Court that "no information gained from the illegal entry affected the law enforcement officers' decision to seek a warrant or the magistrate's decision to grant it." *Murray v. United States*, 487 U.S. 533, 539 (1988). To meet its burden, the government must show, among other things, that "the lawful means which made discovery inevitable were being actively pursued prior to the occurrence of the illegal conduct." *See id.*

Here, as detailed above, and in the Defendants' new trial motion, (Doc. 258), the criminal investigation began because of the illegal warehouse search. (Doc. 258 at 31-35.) But rather than reach the merits of this dispute, the trial court issued an order denying the Chrisleys' request for an independent source hearing, holding that the request was untimely because the evidence at issue was "previously allowed into evidence" when it denied the ESI Motion. (Doc. 183 at 3.) This holding mistook both the law and the record. The denial of the ESI Motion did not render the contested evidence admissible; it simply denied relief based on the grounds asserted in that specific motion. And the district court's denial of the ESI Motion had no impact on whether evidence obtained by that warrant—and certainly not the *other* four disputed categories of evidence—was fruit of the unlawful warehouse search and therefore subject to the trial court's prior suppression order.

In sum, the district court erred in admitting the challenged evidence without requiring the government to prove its alleged independent source. The contested evidence was central to the government's case, evidenced by the fact that it amounted to a majority of its trial exhibits. (*See* Doc. 258-3.) As a result, a new trial is necessary.

Alternatively, the Court should remand for the evidentiary hearing that the government previously requested. (Doc. 178 at 29.)

## III.  THE EVIDENCE AT TRIAL WAS INSUFFICIENT TO PROVE TAX EVASION.

The errors above demonstrate why a new trial is necessary. When the court remands for such a trial, however, it also should remand for the entry of judgments of acquittal as to both Counts 8 and 9; the evidence on those counts was insufficient to support a conviction.

### A.    The Evidence Introduced at Trial as to Count 9 (Tax Evasion) Was Insufficient.

The government failed to prove Count 9 because no reasonable jury could find beyond a reasonable doubt that any of the conduct alleged in the superseding indictment affected Todd or Julie Chrisley's tax liability, their ability to pay taxes, or that the Chrisleys made any false statement to an IRS official.

The elements of federal tax evasion are: (1) willfulness; (2) the existence of a tax deficiency; and (3) an affirmative act constituting an evasion or attempted evasion of tax. *See* 26 U.S.C. § 7201. The affirmative act required for a conviction under the tax evasion statute must go beyond a failure to file a return or pay taxes owed, even if the failure is

willful. *United States v. Masat*, 896 F.2d 88, 97-98 (5th Cir. 1990). The defendant must instead take some other affirmative step to prevent either the lawful assessment of a tax or the IRS's collection of the defendant's delinquent tax obligations. *Id*.; *see also Spies v. United States*, 317 U.S. 492, 499 (1943) (concluding that the statute requires affirmative conduct "apart from the default in filing the return and paying the tax").

In Count 9, the government identified three affirmative acts that allegedly constituted actual or attempted tax evasion. First, the government alleged that the Chrisleys "us[ed] a nominee business entity to conceal income." (Doc. 130 at 22-23.) Second, the government alleged that the Chrisleys "us[ed] nominee bank accounts to conceal income and pay expenses." (*Id*.) And third, the government alleged that the Chrisleys "provid[ed] false information to IRS employees." (*Id*.)

But the government offered no evidence of any of these allegations. It simply offered the conclusion that the Chrisley family's loan-out company—7C's Productions, Inc.—was a "nominee business entity" with "nominee bank accounts." But the trial evidence proved that 7C's was a legal entity created and used lawfully. (*See, e.g.*, Doc. 281 at 183-200; Doc.

53

276 at 119-20, 136-37, 178.) The government failed to prove that anything about 7C's was illegal, and the entity's existence did not alter either Todd or Julie's tax liability in any way. In addition, the government failed to offer evidence that the Chrisleys provided false information to the IRS sufficient to constitute actual or attempted evasion.

### 1.  7C's Income Is Not Todd Chrisley's Income.

The government's tax evasion case ignores 7C's corporate form. In its response to the Rule 29 motion, the government relied on the false premise that 7C's income is indistinguishable from Todd's income. It argued that "[t]he money paid to Todd Chrisley for his work was deposited into a 7C's Production bank account[,]" and "[t]he money paid out for his services was his income, regardless of what bank account he directed it into." (Doc. 289 at 23.) In making this claim, the government wholly disregarded the recognized legal structure and significance of loan-out companies. The money "paid to Todd Chrisley" was not "deposited into a 7C's Production bank account." As explained above and at trial, money paid to 7C's was *the company's* income. Todd earned income from 7C's, which loaned out his services, in accordance with his agreement with 7C's. (Doc. 281 at 183-200.) As the government's own

witnesses established, Todd Chrisley had no right to 7C's income just because it was paid for furnishing his acting services. (Doc. 275 at 110.) After all, the company's income is not *his* income.

This principle applies in all sorts of industries that use various corporate forms. Consider how lawyers are paid by clients through law firms. Although a law firm may bill and receive a million dollars from a client specifically for the work of a given lawyer, that money does not belong to that lawyer and that lawyer does not pay taxes on it. Nor is the creation of a law firm an act of tax evasion meant to conceal the income lawyers make from their work. Rather, a lawyer is paid in accordance with her agreement with her law firm and pays taxes on the income she receives from the firm, as that agreement directs. So, too, here. The government's theory in this case would transform nearly every law firm—not to mention every loan-out company used in the entertainment industry—into an illegal tax shelter.

2.    *The Government Proved No Affirmative Act of Tax Evasion Related to 7C's Creation or Use.*

The government's primary argument that the Chrisleys engaged in an affirmative act to evade taxes involves the ownership of 7C's. The government argued to the jury that the fact that Julie Chrisley was the

owner of 7C's is by itself tax evasion. (Doc. 284 at 49.) In other words, the government's position is that Todd (rather than his wife) was required to be listed as the owner of 7C's. But it points to no authority for its position. Nor does it explain how the identity of the company's owner affected the IRS's ability to collect Todd's past-due taxes. It does not explain this, of course, because the ownership status would not have had any affect. As explained above, the money paid to 7C's by third-parties went into a bank account owned by 7C's. This money was not Todd's income whether Julie, Todd, Faye, or anyone else was listed as the owner of 7C's.

For the same reason, the government's complaint that Julie transferred or tried to transfer 7C's ownership to Faye is irrelevant. Any such change would not have had any effect on Todd's tax liability or ability to pay the IRS. The government nonetheless claims that the change from Julie to Faye was done to evade taxes because the change was made one day after the IRS requested bank statements from 7C's. For their part, the Chrisleys offered proof at trial explaining the change. (Doc. 284 at 104-05.) And the government never explained how the change could have, or did, accomplish tax evasion. Moreover, even if this Court accepted the government's suggestion that the Chrisleys had some

nefarious intent to evade taxes by transferring ownership of the pass-through company, this intent cannot sustain a conviction because the change did nothing to *actually* evade taxes. *See Hesser v. United States (Hesser II)*, 40 4th 1221, 1225-27 (11th Cir. 2022).

This Court has addressed similar circumstances. In *Hesser*, this Court held that affirmative acts by a defendant that do not affect his tax liability do not constitute evasion or attempted evasion under § 7201. *Id.* There, the indictment alleged that the defendant evaded taxes by converting certain assets into gold and hiding the gold in his home. *Id.* The converted assets, and the resulting gold, belonged to an irrevocable trust set up by the defendant's father. Uncontested testimony established that the defendant deliberately hid the gold around his house to conceal its existence from the IRS. *See United States v. Hesser* (*Hesser I*), 800 F.3d 1310, 1317 (11th Cir. 2015). Despite all that, the appellate court still held that buying the gold and hiding it was not actual or attempted evasion under § 7201 because the government failed to provide evidence that either the original funds or the resulting gold belonged to the defendant. *Hesser II*, 40 F.4th at 1226-28. Because the government had not proved the gold belonged to the defendant rather than the family

trust, and therefore it never showed that he owed any tax liability on it when he hid it, there was no proof he actually attempted to evade taxes, even if he believed he was. *Id.*

The government is guilty of the same failures here: It never established that 7C's income belonged to Todd Chrisley—because it didn't—or that Todd was entitled to its income—because he wasn't. The indictment alleged that the Chrisleys kept Todd's name off 7C's bank accounts and kept him formally separate from the corporation. (Doc. 130 at 14.) And it alleged that the Chrisleys opened a new 7C's account and gave sole signature authority to Todd's mother rather than Julie. (*Id.* at 15.) But *neither* of these facts transform 7C's income into Todd's income or affect his tax liability in any way.

### 3. Nor Was there Evidence that the Chrisleys Provided False Information to the IRS.

Count 9 also alleged that the Chrisleys violated section 7201 because the Chrisleys "provid[ed] false information to IRS employees." (Doc. 130, p. 23, ¶ 53.) The government failed to prove that, too.

At trial, the government introduced almost no evidence about the Chrisleys' communications with IRS agents or officials. FBI Special Agent Ryskoski testified that, on February 2, 2018, grand jury subpoenas

were issued to 7C's Productions, Inc. (Doc. 275 at 133.) In turn, 7C's responded to the subpoena with responsive documents (Doc. 276 at 18, 29, 64-65; Gov't Exs. 615, 748; *see also id*. at 1127; Gov't Ex. 108.) The company supplemented that production on June 7, 2019, (*id*. at 1166; Gov't Ex. 194), and Agent Ryskoski described the Chrisleys' production as "responsive," (Trial Tr. at 1127-28). Even Officer Carter admitted that the Chrisleys provided to her all information about 7C's bank accounts and the accounts' ownership and signature authority information that she sought. (Doc. 274 at 117-18.) She also testified that the IRS never resent any subsequent requests, demonstrating that it was satisfied with what it received. (*Id*.) All told, neither Agent Ryskowski nor Officer Carter testified that any of the information provided to them pursuant to any of these requests was false—because it was not.

For these reasons, the government failed to offer sufficient proof of an affirmative act of tax evasion, and the convictions on Count 9 should be reversed.

### B.    The Evidence Introduced at Trial as to Count 8 (Tax Conspiracy) Was Insufficient.

For Count 8, the superseding indictment alleges that Todd and Julie conspired, from 2010 to February 2, 2018, to defraud the IRS in

violation of 18 U.S.C. § 371. (Doc. 130 at 13, ¶ 35.) According to the indictment, the Chrisleys used 7C's to hide income from the IRS and made false statements to third parties about their personal tax filings. These allegations fail for similar reasons as those in Count 9.

To convict someone of conspiring to defraud the IRS in violation of section 371, the government must prove that (1) the defendant and at least one other person entered into a "common agreement" the specific purpose of which is to impede the functions of the IRS; (2) the defendant knowingly and voluntarily participated in that agreement; and (3) one of the conspirators committed an act in furtherance of the agreement. *United States v. Hough*, 803 F.3d 1181, 1187 (11th Cir. 2015).

It is not sufficient for the government to prove only that a defendant acted in a way that ***would have*** furthered the goals of a conspiracy if there were one. *United States v. Adkinson*, 158 F.3d 1147, 1155 (11th Cir. 1998). The government must prove by independent evidence that there was a tax conspiracy in progress, that a purpose of the conspiracy was to violate United States tax laws, and that two or more parties to that conspiracy knew about that purpose. *See id*. The collateral effects of jointly agreed-to activity, even if generally foreseeable, are not inherently

an object of the conspiracy. *Id*. at 1155 ("if impeding the IRS is only a collateral effect of an agreement, rather than one of its purposes, then a conviction for a *Klein* conspiracy cannot stand.").

The superseding indictment alleged that the Chrisleys used 7C's to conceal Todd's income from the IRS. As detailed above, none of the evidence presented at trial supports, in any way, a finding that the Chrisleys conspired to use 7C's to conceal income from the IRS or to impede its assessment or collection of taxes.

First, there was no "concealment" of Todd's income and therefore no impeding of lawful IRS activity. Like any pass-through company, profits were passed through to the talent. There was evidence that the talents' income was not properly reported on tax returns as personal income. As a result, there is no evidence the IRS was unable to properly assess and collect on any tax liability that passed through 7C's from 2010 to February 2, 2018.

But to the extent the government claims that 7C's very existence was some evidence of concealment of Mr. Chrisley's income, the evidence presented at trial was still insufficient. "[W]hen efforts at concealment are reasonably explainable in terms other than a motivation to evade

taxes, the government must offer independent proof that those who participated in the concealment intended to [impede the IRS]." *Id.* at 1158 (quoting *Ingram v. United States*, 360 U.S. 672, 679 (1959) (fact that professional gamblers hid their profits were insufficient to prove a *Klein* conspiracy because the illegality of their businesses standing alone was sufficient reason to conceal their incomes)).

Here, the undisputed evidence at trial showed that the Chrisleys established and received payments through 7C's because the studios producing *Chrisley Knows Best* required it. (Doc. 281 at 183-84.) All of this was done on the advice of counsel, primarily explained by reasons other than tax evasion. (*Id.*) The government failed to provide any—much less sufficient—evidence that the Chrisleys' created and used 7C's to impede the IRS.

That leaves Count 8's allegation that the Chrisleys conspired to impede lawful IRS activities by (1) making allegedly false statements to third parties regarding their tax filings and (2) filing incorrect or untimely individual and corporate tax returns. (Doc. 130 at 17-19.) But there was not proof sufficient for conviction on either ground.

1.

Making false statements to third parties about tax filings is insufficient as a matter of law to support a conviction under section 371. According to the superseding indictment, the Chrisleys made false statements to several banks about their tax status, filings, and liabilities as part of various loan and credit applications. (Doc. 130 at 18-19.) But statements *about* tax status, filings, and liabilities are not the sort of "tax related" purpose required to support a conviction under § 371. *Adkinson*, 158 F.3d at 1156-59. As alleged, the Chrisleys' false statements were made to induce banks and other lenders to issue loans and extend credit they otherwise would not have. And falsely inducing loan issuances and credit extensions cannot be explained, in any way, by a desire to evade taxes. *See id.* (recognizing that defendants pay taxes on wrongfully obtained funds and that doing so is a "convincing" argument against a conviction for a *Klein* conspiracy).

2.

All that remains, then, is the government's allegations that the Chrisleys violated section 371 by filing untimely and incorrect tax returns from 2010 to February 2, 2108. At trial, the government

63

presented evidence that the Chrisleys relied on Peter Tarantino to file their tax returns each year and that one or more returns from 2010 to 2018 was untimely or contained incorrect information. But that fact is sufficient only to establish the overt-act requirement of section 371. As above, the mere fact of untimely or incorrect tax returns does not mean that the Chrisleys willfully joined and participated in a conspiracy to impede the IRS. *Adkinson*, 158 F.3d at 1154. Without independent evidence that the Chrisleys did so, the conviction cannot stand.

Here, the government failed to provide such independent evidence. The government produced no communication between Todd and Julie or the Chrisleys and Tarantino that would allow a jury to find the existence of a tax conspiracy beyond a reasonable doubt. The only agreement established by the evidence at trial was for Tarantino to prepare the couple's tax returns. There was no evidence introduced at trial to suggest that the Chrisleys knew what information Tarantino included in their returns, and certainly no evidence that they knew the information included was false.

As a result, the government failed to offer sufficient proof to convict on Count 8, as well. This Court should direct entry of judgments of acquittal.

## CONCLUSION

For all these reasons, this Court should enter judgments of acquittal on Counts 8 and 9 and order a new trial on the remaining counts. In the alternative, this Court should remand for a hearing on the *Giglio* claims and to determine whether the government had a valid basis for admitting the previously suppressed evidence.

Respectfully submitted,

By: _____

J. ALEX LITTLE (TN BPR # 029858)
ZACK C. LAWSON (TN BPR # 036092)
Burr & Forman LLP
222 2nd Ave S, Suite 2000
Nashville, TN 37201
Telephone: 615-724-3203
Facsimile: 615-724-3303
Email: alex.little@burr.com

Christopher S. Anulewicz (GA Bar #020914)
Balch & Bingham LLP
30 Ivan Allen, Jr. Blvd, N.W., Suite 700
Atlanta, Georgia 30308
Telephone: (404) 261-6020
Facsimile: (404) 261-3656

*Attorneys for Todd Chrisley*

## CERTIFICATE OF COMPLIANCE WITH TYPE-VOLUME, TYPEFACE, AND STYLE REQUIREMENTS

This document contains complies with the type-volume limitation of Fed. R. App. P. 32(a)(7)(B), because it contains 12,986 words according to the Microsoft Word word processing program, excluding the parts of the brief exempted by Fed. R. App. P. 32(f).

This brief complies with the typeface requirements of Fed. R. App. P. 32(a)(5) and the typeface requirements of Fed. R. App. P. 32(a)(6), because it has been prepared in a proportionally spaced typeface, Century Schoolbook, at a font-size of 14.

By: _____

J. ALEX LITTLE
*Counsel for Appellant*

Dated: March 29, 2023

67

## CERTIFICATE OF SERVICE

I hereby certify that I served this brief on all counsel of record through

the Court's CM/ECF system on March 29, 2023.

By: _____

J. ALEX LITTLE
*Counsel for Appellant*