No. 22-14074-GG

# IN THE UNITED STATES COURT OF APPEALS
# FOR THE ELEVENTH CIRCUIT

UNITED STATES OF AMERICA,

*Plaintiff-Appellee,*

*v.*

PETER TARANTINO, TODD CHRISLEY, AND JULIE CHRISLEY,

*Defendants-Appellants.*

On appeal from the United States District Court
for the Northern District of Georgia
No. 1:19-CR-00297-ELR-JSA-3

## BRIEF OF APPELLEE
## THE UNITED STATES OF AMERICA

RYAN K. BUCHANAN
*United States Attorney*

THOMAS J. KREPP
ANNALISE K. PETERS
ALEX R. SISTLA
*Assistant United States Attorneys*

600 United States Courthouse
75 Ted Turner Drive S.W.
Atlanta, GA 30303
(404) 581-6000

No. 22-14074-GG

*United States of America v.*
*Peter Tarantino, Todd Chrisley, and Julie Chrisley*

## CERTIFICATE OF INTERESTED PERSONS
## AND CORPORATE DISCLOSURE STATEMENT

The United States agrees that the Certificate of Interested Persons and Corporate Disclosure Statements included with Appellants' briefs are a complete list of all people and entities known to have an interest in the outcome of this appeal.

## STATEMENT REGARDING ORAL ARGUMENT

Oral argument is unnecessary in this case. The issues and positions of the parties, as presented in the record and briefs, are sufficient to enable the Court to reach a just determination.

# TABLE OF CONTENTS

Certificate of Interested Persons and Corporate Disclosure
Statement..................................................................................C-1

Statement Regarding Oral Argument ............................................. i

Table of Contents............................................................................ ii

Table of Citations..........................................................................iv

Statement of Jurisdiction..............................................................xi

Statement of the Issues ................................................................. 1

Statement of the Case.................................................................... 2

    A. Course of Proceedings and Disposition Below.................... 2

    B. Statement of Facts.............................................................. 3

        1. The Bank Fraud Scheme ............................................... 4

        2. The Tax Charges ........................................................... 7

            a. The Chrisleys' income and tax filings ....................... 7

            b. IRS's Collection Efforts ............................................ 8

            c. Tarantino's role in the tax fraud................................ 9

        3. The Chrisleys' Suppression Motions ........................... 11

        4. The Chrisleys' Post-Trial *Giglio* Motions ...................... 15

        5. Julie Chrisley's Sentencing ......................................... 17

    C. Standards of Review............................................................ 18

Summary of the Argument............................................................ 20

Argument and Citations of Authority ......................................... 24

1. Sufficient evidence supports Julie's involvement in the bank
fraud and the materiality of the false statements made to the
banks....................................................................................... 24

A. Sufficient evidence supports that Julie Chrisley knowingly and intentionally participated in the bank fraud conspiracy from 2007 and is thus criminally liable for each of the substantive bank fraud charges, which were reasonably foreseeable consequences of the conspiracy......................... 26

B. Sufficient evidence establishes the materiality of misrepresentations in Counts Three, Five, and Six............ 29

2. Sufficient evidence supports the Chrisleys convictions for the tax crimes. ................................................................. 35

A. Sufficient evidence supports the Chrisleys' convictions of conspiring to defraud the IRS. ............................................ 35

B. Sufficient evidence supports the Chrisleys' convictions for tax evasion and conspiracy to defraud the IRS. ................. 38

3. The district court did not abuse its discretion in denying the Defendants' motion for an evidentiary hearing or a new trial on a purported *Giglio* violation. ..................................................... 43

4. The district court did not abuse its discretion in denying the Chrisleys' late filed motion to suppress the email evidence as untimely. ................................................................................... 53

5. The district court did not abuse its discretion in denying Tarantino's severance request. .................................................. 60

A. Overwhelming evidence supported the jury's verdicts. ...... 62

B. The jury was able to follow the district court's instructions and make an individualized determination of guilt or innocence as to each defendant. ......................................... 66

6. The district court did not clearly err in finding the loss amount attributable to Julie Chrisley. .................................................... 73

7. The district court did not err in imposing restitution and ordering forfeiture. .................................................................. 78

Conclusion..................................................................................... 81

Certificate of Compliance and Service ......................................... 82

# TABLE OF CITATIONS

**Federal Cases**

*Bonner v. City of Prichard,*
661 F.2d 1206 (11th Cir. 1981) (*en banc*) ....................................... 26

*Cheek v. United States,*
498 U.S. 192 (1991) ........................................................................ 38

*Commissioner v. Glenshaw Glass Co.,*
348 U.S. 426 (1955) ........................................................................ 40

*Commissioner v. Smith,*
324 U.S. 177 (1945) ........................................................................ 40

*Connor v. Commissioner,*
770 F.2d 17 (2d Cir. 1985)............................................................... 39

*Eisner v. Macomber,*
252 U.S. 189 (1920) ........................................................................ 39

*Guzman v. Sec'y. Dept't of Corr.,*
663 F.3d 1336 (11th Cir. 2011) ...................................................... 52

*Hesser v. United States,*
40 F.4th 1221 (11th Cir. 2022)................................................. 38, 42

*Johnson v. Zerbst,*
304 U.S. 458 (1938) ........................................................................ 60

*Neder v. United States,*
527 U.S. 1 (1999).................................................................... 30, 31

*Pinkerton v. United States,*
328 U.S. 640 (1946) ........................................................................ 26

*Spies v. United States,*
317 U.S. 492 (1943) ........................................................................ 38

*United States v. Adetona,*
251 F. App'x 610 (11th Cir. 2007) ...............................74, 77, 78, 80

*United States v. Alvarez,*
755 F.2d 830 (11th Cir. 1985).......................................................... 25

*United States v. Alzate,*
47 F.3d 1103 (11th Cir. 1995)......................................................... 44

*Citations primarily relied upon. 11th Cir. R. 28-1(e).

*United States v. Andres,*
  960 F.3d 1310 (11th Cir. 2020)................................................. 53, 54

*\*United States v. Bailey,*
  123 F.3d 1381 (11th Cir. 1997).......................................... 43, 44, 47

*United States v. Barton,*
  834 F. App'x 529 (11th Cir. 2020) ................................................. 48

*United States v. Beale,*
  921 F.2d 1412 (11th Cir. 1991) .................................................... 65

*United States v. Beall,*
  970 F.2d 343 (7th Cir. 1992) ....................................................... 41

*United States v. Blake,*
  868 F.3d 960 (11th Cir. 2017) ...................................................... 73

*United States v. Brown,*
  569 F.2d 236 (5th Cir. 1978) ....................................................... 59

*\*United States v. Calderon,*
  127 F.3d 1314 (11th Cir. 1997) .................................................... 27

*United States v. Capers,*
  708 F.3d 1286 (11th Cir. 2013)................................................ 18, 32

*United States v. Cassano,*
  132 F.3d 646 (11th Cir. 1998)...................................................... 69

*United States v. Clarke,*
  442 F. App'x 540 (11th Cir. 2011) ..................................... 44, 46, 47

*United States v. Conley,*
  826 F.2d 551 (7th Cir. 1987) ....................................................... 41

*United States v. Cooper,*
  203 F.3d 1279 (11th Cir. 2000).................................................... 56

*United States v. Cortinas,*
  142 F.3d 242 (5th Cir. 1998) ....................................................... 71

*United States v. Daniel,*
  956 F.2d 540 (6th Cir. 1992) ....................................................... 41

*United States v. Davidson,*
  936 F.2d 856 (6th Cir. 1991) ....................................................... 70

*United States v. Dennis,*
  237 F.3d 1295 (11th Cir. 2001).................................................... 25

*Citations primarily relied upon. 11th Cir. R. 28-1(e).

v

*United States v. Dinome,*
    954 F.2d 839 (2d Cir. 1992) ........................................................ 71

*United States v. Duke,*
    739 F. App'x 970 (11th Cir. 2018) ............................................ 60

*United States v. Echols,*
    577 F.2d 308 (5th Cir. 1978) ...................................................... 57

*United States v. Elledge,*
    723 F.2d 864 (11th Cir. 1984) .................................................... 76

*United States v. Espinoza-Hernandez,*
    918 F.2d 911 (11th Cir. 1990) .................................................... 52

*United States v. Fernandez,*
    892 F.2d 976 (11th Cir. 1989) .................................................... 70

*United States v. Fernetus,*
    838 F. App'x 426 (11th Cir. 2020) ............................................ 57

*United States v. Francis,*
    131 F.3d 1452 (11th Cir. 1997) .................................................. 62

*United States v. Friske,*
    640 F.3d) (11th Cir. 2011) .......................................................... 24

*United States v. Gari,*
    572 F.3d 1352 (11th Cir. 2009) ............................................ 67, 68

*United States v. Gregg,*
    179 F.3d 1312 (11th Cir. 1999) .................................................. 29

*United States v. Hamilton,*
    559 F.2d 1370 (5th Cir. 1977) .................................................... 49

*United States v. Hasson,*
    333 F.3d 1264 (11th Cir. 2003) ............................................ 19, 24

*United States v. Hesser,*
    800 F.3d 1310 (11th Cir. 2015) .................................................. 41

*United States v. Hoffman-Vaile,*
    568 F.3d 1335 (11th Cir. 2009) .................................................. 19

*United States v. Hoskins,*
    654 F.3d 1086 (11th Cir. 2011) .................................................. 41

*United States v. Hough,*
    803 F.3d 1181 (11th Cir. 2015) ...................................35, 36, 63, 72

*Citations primarily relied upon. 11th Cir. R. 28-1(e).

*United States v. Hunter,*
  323 F.3d 1314 (11th Cir. 2003) ................................................ 73, 74

*United States v. Jones,*
  241 F. App'x 676 (11th Cir. 2007) ........................................... 57, 58

*United States v. Kennard,*
  472 F.3d 851 (11th Cir. 2006) ...................................................... 62

*United States v. Knowles,*
  66 F.3d 1146 (11th Cir. 1995) .................................................. 27, 28

*United States v. Kottwitz,*
  614 F.3d 1241, *withdrawn in part on other grounds,*
  627 F.3d 1383 (11th Cir. 2010) ..................................................... 63

*United States v. Laines,*
  ___ F.4th ___ .............................................................................. 53

*United States v. Lopez,*
  649 F.3d 1222 (11th Cir. 2011) ................................................ 61, 66

*United States v. Lynsey,*
  850 F.3d 1009 (9th Cir. 2017) ...................................................... 34

*United States v. Machado,*
  886 F.3d 1070 (11th Cir. 2018) .................................................... 27

*United States v. Martin,*
  803 F.3d 581  (11th Cir. 2015) .................................................... 24

*United States v. Mateos,*
  623 F.3d 1350 (11th Cir. 2010) .................................................... 73

*United States v. Maxwell,*
  579 F.3d 1282 (11th Cir. 2009) .................................................... 19

*United States v. McGill,*
  964 F.2d 222 (3d Cir. 1992) ........................................................ 41

*United States v. Milian–Rodriguez,*
  828 F.2d 679 (11th Cir. 1987) ...................................................... 58

*United States v. Mothersill,*
  87 F.3d 1214 (11th Cir. 1996) ...................................................... 25

*United States v. Neder,*
  197 F.3d 1122 (11th Cir. 1999) ................................................ 30, 31

*United States v. Nosrati-Shamloo,*
  255 F.3d 1290 (11th Cir. 2001) ................................................ 74, 75

*Citations primarily relied upon. 11th Cir. R. 28-1(e).

*United States v. Oscar*,
  877 F.3d 1270 (11th Cir. 2017) ................................................... 61
*United States v. Pedrick*,
  181 F.3d 1264 (11th Cir. 1999) ........................................ 61, 69, 70
*United States v. Perez-Ceballos*,
  907 F.3d 863 (5th Cir. 2018) ...................................................... 33
*United States v. Petrie*,
  302 F.3d 1280 (11th Cir. 2002) ................................................... 74
*United States v. Ramirez*,
  426 F.3d 1344 (11th Cir. 2005) ................................................... 67
*United States v. Raza*,
  876 F.3d 604 (4th Cir. 2017) ...................................................... 34
*United States v. Rigas*,
  490 F.3d 208 (2d Cir. 2007) ................................................... 34, 35
*United States v. Rivera Pedin*,
  861 F.2d 1522 (11th Cir. 1988) ................................................... 43
*United States v. Salom*,
  349 F. App'x 409 (11th Cir. 2009) ............................................... 57
*United States v. Schlei*,
  122 F.3d 944 (11th Cir. 1997) .................................... 49, 50, 61, 62
*United States v. Shabazz*,
  887 F.3d 1204 (11th Cir. 2018) ................................................... 25
*United States v. Shankman*,
  13 F. Supp. 2d 1358 (S.D. Ga. 1998) ........................................... 69
*United States v. Silvestri*,
  409 F.3d 1311 (11th Cir. 2005) ................................................... 25
*United States v. Smith*,
  918 F.2d 1501 (11th Cir. 1990) ...................................... 18, 53, 56
*United States v. Stein*,
  846 F.3d 1135 (11th Cir. 2017) ...................................... 18, 44, 52
*United States v. Svete*,
  556 F.3d 1157 (11th Cir. 2009) (*en banc*) ...................................... 30
*United States v. Tarango*,
  396 F.3d 666 (5th Cir. 2005) ...................................................... 70

*Citations primarily relied upon. 11th Cir. R. 28-1(e).

*United States v. Taylor,*
  792 F.2d 1019 (11th Cir. 1986) .................................................... 58
*United States v. Tilton,*
  610 F.2d 302 (5th Cir. 1980) ........................................................ 26
*United States v. Walser,*
  3 F.3d 380 (11th Cir. 1993) ..................................................... 18, 60
*United States v. Williams,*
  390 F.3d 1319 (11th Cir. 2004) .................................................... 25
*Universal Health Servs. v. United States ex rel. Escobar,*
  579 U.S. 176, (2016) .................................................................. 34
*Zafiro v. United States,*
  506 U.S. 534 (1993) ................................................................... 61

## Federal Statutes

18 U.S.C. § 371 ............................................................... 2, 72
18 U.S.C. § 1343 .................................................................. 2
18 U.S.C. § 1344 .................................................................. 2
18 U.S.C. § 1349 .................................................................. 2
18 U.S.C. § 1512(c)(2) ........................................................... 2
18 U.S.C. § 3231 ................................................................. xi
18 U.S.C. § 3742 ................................................................. xi
26 U.S.C. § 61(a) ................................................................ 40
26 U.S.C. § 61(a)(1) ............................................................. 40
26 U.S.C. § 7201 ............................................................. 2, 42
26 U.S.C. § 7206(2) .......................................................... 2, 63
28 U.S.C. § 1291 ................................................................ xi

## Federal Rules

Fed. R. App. P. 4(b)(1)(A) ....................................................... xi
Fed. R. App. P. 32(a)(5) ......................................................... 82
Fed. R. App. P. 32(a)(6) ......................................................... 82
Fed. R. App. P. 32(a)(7)(B) ...................................................... 82
Fed. R. App. P. 32(f) ............................................................ 82
Fed R. Crim. P. Rule 12(b) ....................................................... 53
Fed. R. Crim. P. 12(b)(3)(C) ..................................................... 53

*Citations primarily relied upon. 11th Cir. R. 28-1(e).

Fed. R. Crim. P. 12(c)(1)-(3) ................................................... 60

Fed. R. Crim. P. 12(c)(3) ......................................................... 53

Fed. R. Crim. P. 33 ............................................................ 55, 59

Fed. R. Evid. 404(b) ......................................................... 6, 71, 72

**Sentencing Guidelines**

*U.S.S.G. § 2B1.1(b)(1)(K) ...................................................... 73

*Citations primarily relied upon. 11th Cir. R. 28-1(e).

No. 22-14074-GG

# IN THE UNITED STATES COURT OF APPEALS
# FOR THE ELEVENTH CIRCUIT

UNITED STATES OF AMERICA,

*Plaintiff-Appellee,*

*v.*

PETER TARANTINO, TODD CHRISLEY, AND JULIE CHRISLEY,

*Defendants-Appellants.*

## STATEMENT OF JURISDICTION

(A) The district court had subject matter jurisdiction over the underlying criminal case based on 18 U.S.C. § 3231.

(B) The court of appeals has jurisdiction over this direct appeal from the judgment and sentence of the district court, under 18 U.S.C. § 3742 and 28 U.S.C. § 1291.

(C) While not jurisdictional, Tarantino's notice of appeal was timely filed on November 30, 2022, and Todd and Julie Chrisley's notice of appeal were timely filed on December 5, 2022, within 14 days of the entry of the district court's judgment and commitment orders, on November 28, 2022, and December 5, 2022, respectively. Fed. R. App. P. 4(b)(1)(A).

(D) This appeal is from a final judgment and commitment order that disposes of all the parties' claims in this criminal case.

## STATEMENT OF THE ISSUES

1. Whether the evidence was sufficient to convict the defendants of bank fraud.

2. Whether the evidence was sufficient to convict the Chrisleys of conspiracy to defraud the IRS and tax evasion.

3. Whether the district court abused its discretion in concluding that Defendants were not entitled to an evidentiary hearing or new trial based upon purported *Giglio* violations.

4. Whether the district court abused its discretion in denying Tarantino's motion for severance.

5. Whether the district court abused its discretion in denying the Chrisleys' motion to suppress evidence as untimely.

6. Whether the district court clearly erred in determining Julie Chrisley's loss amount.

7. Whether the district court clearly erred in imposing restitution and forfeiture money judgements.

## STATEMENT OF THE CASE

### A. Course of Proceedings and Disposition Below

In February 2022, a grand jury returned a superseding indictment against Todd Chrisley, Julie Chrisley, and Peter Tarantino, charging them with conspiring to defraud the IRS, under 18 U.S.C. § 371. (Doc.130). Tarantino was also charged with two counts of aiding the filing of false tax returns under 26 U.S.C. § 7206(2). (*Id.*). The Chrisleys were charged with conspiracy to commit bank fraud under 18 U.S.C. § 1349, five counts of bank fraud under 18 U.S.C. § 1344, and one count of tax evasion under 26 U.S.C. § 7201. (*Id.*). Julie Chrisley[1] was also charged with one count of wire fraud under 18 U.S.C. § 1343, and one count of obstruction of justice under 18 U.S.C. § 1512(c)(2). (*Id.*).

In May 2022, following a nearly three-week trial, a jury convicted Defendants of all counts. (Doc.228). The district court sentenced Todd and Julie Chrisley to below-Guidelines sentences of 144 months' and 84 months' imprisonment, respectively. (Docs.325, 337, 338). The court also ordered restitution and a forfeiture money judgment of $17,270,741.57, jointly and severally. (Docs.337, 338,

---

[1] This brief may refer to the Chrisleys using their first names for ease of reference, without intending disrespect.

347). The district court sentenced Tarantino to a below-Guidelines sentence of 36 months' imprisonment and fined him $35,000. (Docs.325, 330). Defendants are currently incarcerated.

## B. Statement of Facts

At trial, the government presented testimony from twenty-nine witnesses, including IRS employees, an FBI agent, former or current employees of some of the defrauded banks, individuals affiliated with the production of the Chrisleys' reality television show, individuals who had business dealings with the Chrisleys, and an immunized co-conspirator. The jury concluded beyond a reasonable doubt that:

- The Chrisleys and their business partner, Mark Braddock, obtained tens of millions of dollars in fraudulent loans by submitting materially false documents to banks. (Counts One Through Six).

- Julie Chrisley engaged in a wire fraud scheme by providing fabricated documents to a California property owner when applying to rent a home. (Count Seven).

- The Chrisleys knowingly and voluntarily conspired to defraud the IRS by hiding their income and attempting to evade the payment of Todd's back taxes. (Counts Eight and Nine).

- Tarantino knowingly and voluntarily participated in the conspiracy to defraud the IRS and filed two false corporate tax returns that falsely claimed the Chrisleys' company earned no revenue. (Counts Eight, Ten, and Eleven).

- Julie Chrisley attempted to obstruct the grand jury investigation by transmitting a fabricated document to the grand jury. (Count Twelve).

## 1. The Bank Fraud Scheme

From the mid-2000s until 2012, the Chrisleys—primarily Todd—and an immunized co-conspirator, Mark Braddock, operated Chrisley Asset Management (CAM), a company that managed foreclosed properties. (Doc.277-110-12, 128-132). During this timeframe, Braddock helped the Chrisleys obtain fraudulent lines of credit and mortgages from dozens of banks by submitting various fraudulent documents, including falsified personal financial statements, audit reports of CAM, and tax returns. (Doc.277-111-12, 134-39, 159-85); (*see generally* Gov't Exs.802(a), 802(b), 807-10, 820, 830, 831, 839, 840, 843, 844, 883).

Todd repeatedly directed Braddock to send these false documents to banks. (*See, e.g.,* Doc.277-175-184). At one point, when Braddock emailed a falsified bank statement that was to be sent to one bank, Todd emailed back "you are a fucking genious [sic], just make it show

4

$4 million or more." (*Id*. at 178-79; Gov't Exs.832, 833). In another email, when Braddock warned Todd that he didn't have the necessary financial statements to send to a bank, Todd responded "stop telling me this shit, create them like you always have, if I don't get her these then they want [sic] renew the loans." (Doc.277-255-56; Gov't Ex.839). Julie also assisted in sending false documents to banks. In 2012, during a loan application process, Julie emailed a scanned image of a check and bank statement to Todd and Braddock, explaining that the "post date is the only thing that needed to be changed." (Doc.277-202-229; Gov't Ex.890).

The Chrisleys and Braddock referred to manufacturing fraudulent financial documents that were to be sent to banks as "scrapbooking." (Doc.277-198-99). Julie complimented Braddock on the quality of his "scrapbooking," once telling him that when she tried to do it, it did not line up and did not make sense. (*Id*.).

The Chrisleys used funds from CAM and the bank fraud scheme on personal expenses and maintaining their lifestyle, which included having two or three housekeepers working at their house, taking trips to California, and purchasing luxury automobiles. (Docs.277-201, 231-32, 280-35-46; Gov't Exs.1223-24). They were spending so much money that they needed new loans to pay back the older, fraudulently obtained ones. (Doc.277-157-58). And rather than paying CAM's

expenses, the Chrisleys drained the company's bank accounts. (Doc.279-41-42).

In July 2012, Braddock and the Chrisleys split acrimoniously. (Doc.277-251, 274). Afterward, the Chrisleys continued to "scrapbook" documents. (Docs.277-34-49, 79-92, 279-265-77, 280-80-92, 103-18; Gov't Exs.904, 905, 907-09, 909A, 924, 924A, 931, 933, 933-37, 940, 943, 944, 945, 947-49, 953-57, 963, 965, 967, 972). Julie sent a false credit report and fabricated banking documents to a leasing agent in 2014 when trying to rent a luxury home in California. (Docs.277-34-49, 280-59-75; Gov't Exs.904, 905, 907, 909, 911, 922, 924, 924A, 943-45, 953-57, 963, 965, 967, 972).[2] The government also introduced several instances of post-Braddock conduct under Federal Rule of Evidence 404(b) similar to the conspirators' conduct in the bank fraud scheme. (Docs.158, 170, 185, 280-79-92; Gov. Exs.901, 933-37, 940, 943, 947-49, 953-57). For instance, in 2014, and 2015, Julie submitted fabricated invoices to her production company for reimbursement that were like the "scrapbooked" documents submitted to banks during the bank fraud conspiracy. (Docs.277-79-92, 279-265-77, 280-115-18; Gov't Exs.931, 933-34, 943-45).

---

[2] This conduct underlies Count Seven, which Julie does not challenge.

### 2. The Tax Charges

#### a. The Chrisleys' income and tax filings

In 2010, Todd filed a personal income tax return for the 2009 tax year that reported he owed over $500,000 to the IRS. (Gov't Ex.22). Because he filed a married-filed-separately return, the IRS could only collect against Todd and not Julie. (Doc.273-251-53). After CAM closed in 2012, Todd declared bankruptcy. (*Id.*-253-63).

From 2013 through 2017, the Chrisleys earned millions of dollars from their reality television show *Chrisley Knows Best* and other media ventures. (Doc.275-138-43; Gov't Ex.1202). The Chrisleys' earnings from these ventures were sent to a "loan-out company" in Julie's name named 7C's Productions (7C's). (Docs.273-152-56, 275-137-43; Gov't Exs.103B, 1046, 1202). Even though Todd was not listed on 7C's paperwork, both Todd and Julie received millions of dollars through the company. (Docs.275-69-103, 137-43; Gov't Exs.303, 361, 402, 407, 410, 416, 429, 432, 434, 438, 444-46, 1202). Yet Todd failed to pay what he owed for the 2009 tax year, and the Chrisleys did not timely file their 2013-2016 tax returns, nor timely pay any taxes for those tax years. (Docs.274-210-11, 214, 275-144; Gov't Exs.1-6, 21-42, 78-82, 93, 94). After FBI and IRS-CI agents served a grand jury subpoena on 7C's and interviewed Tarantino (the Chrisleys'

accountant) in February 2018, the Chrisleys filed late returns and paid taxes for these years. (Docs.274-214, 275-132-33, 276-18).

### b. IRS's Collection Efforts

After Todd failed to timely pay the taxes he owed for 2009, IRS began collection efforts, which were paused when Todd declared bankruptcy. (Doc.273-253-63). Its collection efforts restarted in 2016 when he exited bankruptcy. (*Id.*). In the interim, Tarantino became the Chrisleys' accountant. (Doc.276-37).

Because the 2009 tax debt was from Todd's tax return, the IRS initially focused on bank accounts controlled by Todd. (Docs.273-274-75, 274-29-36). But on March 6, 2017, an IRS revenue officer requested records for any bank accounts controlled by either Todd or Julie to determine if Todd was using accounts in Julie's name. (Doc.274-29-36; Gov't Exs.108, 109, 128, 138). The next day, March 7th, Julie transferred ownership of 7C's corporate bank account to Todd's mother and opened a new 7C's corporate account in Todd's mother's name. (Doc.273-156-61, 168-78; Gov't Exs.100, 101, 102A, 103, 103A, 103B, 104, 104A, 105, 118). In an email sent that day, Todd falsely told his talent agent that their 7C's Bank of America account had been "compromised" and that he should refrain from sending any money to that account until a new account was opened. (Docs.273-116-21, 274-36-37; Gov't Ex.119). After that, the Chrisleys'

income was sent to the new accounts opened in Todd's mother's name and a personal account in Todd's mother's name. (Doc.275-137-43; Gov't Exs.104, 104A, 104B; 107, 107B, 1202).

The Chrisleys called Todd's mother at trial, and she testified that she had nothing to do with 7C's. (Doc.282-197). In fact, the Chrisleys caused a false document to be submitted to the grand jury, namely, a document that falsely purported to change the ownership of 7C's from Todd's mother back to Julie. (Docs.273-211, 276-101-117; Gov't Exs.194-99). But Bank of America had no record of this occurring, and Todd's mother remained the sole owner of the account. (Docs.273-184-95, 210-17, 276-116-17; Gov't Exs.100, 104, 104A, 194-97, 199).

When transmitting this information to the grand jury, an attorney from 7C's—acting at the behest of Julie—sent an email falsely claiming that this document had been transmitted to Bank of America in March 2017. (Doc.276-105-08; Gov't Ex.194-99).

### c. Tarantino's role in the tax fraud

Tarantino was the Chrisleys' accountant. (Doc.276-37; Gov't Exs.507, 509-11). In 2016 and 2017, three IRS revenue officers dealt with Tarantino, who exercised power of attorney for the Chrisleys. (Doc.274-18-19, 163-67, 264-74). Tarantino falsely claimed to one revenue officer that "Julie Chrisley had no interest" in 7C's and that

9

the Chrisleys' daughter owned the company. (Doc.274-164).

Tarantino falsely told another revenue officer that he did not know

where the Chrisleys banked. (*Id.*-23). But Tarantino knew that Julie

owned 7C's and knew that 7C's used a Bank of America account as

the Chrisleys had sent him the banking login credentials. (Doc.274-

165-66, 126; Gov't Exs.652, 668). Tarantino also updated the

Chrisleys on his efforts to hide information from revenue officers,

telling them, for example, "[t]he agent also asked me specific questions

about your current living arrangements, et cetera. I avoided answering

them." (Gov't Ex.748). In another email, Todd instructed Tarantino

never to share his family members' salary information with anyone, to

which Tarantino replied, "[y]ou know I've taken the oath of Omerta."

(Doc.276-33-34; Gov't Ex.640).

Tarantino filed two corporate tax returns for 7C's that falsely

claimed the company earned zero dollars and made no distributions

for the 2015 and 2016 tax years. (Doc.276-37-40; Gov't Exs.4, 6).

Various emails showed, however, that Tarantino knew 7C's earned

revenue those years and the Chrisleys were paid millions of dollars

through 7C's. (Doc.276-35-43; Gov't Exs.614, 615 at 27, 616, 639,

640, 668; 1202).

FBI and IRS-CI Special Agents interviewed Tarantino on February

2, 2018, and Tarantino claimed not to know how Todd received his

10

income. (Docs.276-28-36, 176-83; Gov't Ex.1102). This was untrue, as Tarantino had previously received numerous emails regarding payments Todd received from 7C's. (Docs.276-28-36, 183-85; Gov't Exs.614, 615 at 27, 616, 639, 640).

### 3. The Chrisleys' Suppression Motions

IRS-CI began criminally investigating the Chrisleys' federal tax evasion in 2017. (Docs.107-11-12, 178-2). The FBI, which had earlier opened an investigation into the Chrisleys for their role in the bank fraud scheme, joined the investigation as well. (Doc.178-3 n.3). In January 2018, federal prosecutors and agents met with the Georgia Department of Revenue (DOR), where the government learned that the DOR had earlier seized property belonging to the Chrisleys from a warehouse in an effort to satisfy state tax debts. (Docs.107-12, 178-3).

The next month, a federal grand jury issued subpoenas to the Chrisleys' production company and to Tarantino's firm, and IRS-CI and FBI agents later executed federal search warrants on some of the Chrisleys' property that the DOR had seized. (Docs.107-12, 178-3-4). Agents seized several boxes of documents from the DOR, in which they found some physically cut-and-glued financial documents, including two bank statements with altered balances and an altered credit report. (Docs.107-12, 178-4, 8).

Over a year later, agents obtained federal search warrants for the Chrisleys' email accounts. (*Id.*). The affidavits in support of these warrants quoted from or cited to at least a dozen emails that were obtained from records produced in response to federal grand jury subpoenas or provided to the government by other sources. (*Id.*-5-6). The evidence obtained from the DOR warrant was not cited in the affidavit. (*Id.*). In response to the email search warrants, Google produced numerous incriminating emails and attachments, including some scanned versions of cut-and-glued documents that were seized from DOR. (Doc.1 ¶¶ 26-33).

The original 2019 indictment included allegations describing three of the emails and attachments that the government obtained from one of the email warrants. (*Id.* ¶¶ 30-32). The physical, cut-and-glued versions of these three fraudulent documents attached to the emails (*i.e.*, two bank statements and a credit report) were among the DOR materials. (*Id.* ¶ 29).

The magistrate judge issued a pretrial order directing the Chrisleys to file any motions to suppress by December 20, 2019, but allowed them until February 28, 2020, to file any motions to suppress regarding the email search warrants. (Doc.31). On December 20, 2019, the Chrisleys filed motions to suppress the materials agents seized from the DOR through the federal search warrants. (Docs.36,

41). While their motions to suppress expressly referenced the two federal search warrants under which the government seized and searched the DOR materials (Doc.36-1 n.1), they made no mention of the email search warrants. (*Id.*).

On February 28, 2020, the Chrisleys filed motions to suppress the email warrants, arguing: (1) the warrants were not sufficiently particularized; (2) the government exceeded the scope of the warrants; (3) and the government acted unreasonably in its execution. (Docs.52, 58). Their motions did not argue that these emails should be otherwise suppressed as the fruits of the poisonous tree of the DOR search. *(See id.)*.

The government represented in litigating the suppression motions that it had independently recovered electronic versions of some of the physical, cut-and-pasted documents found among the DOR materials through the email search warrants. (*See* Doc.98-3 n.1). The Chrisleys did not challenge the government's representation. (Doc.99).

The magistrate judge held a two-day evidentiary hearing in April 2021 regarding the DOR seizure and the parties extensively briefed both suppression motions. (Docs.36, 41, 44, 48, 52, 57, 58, 61, 86, 96, 98, 99). On August 31st, the magistrate judge recommended denying the Chrisleys' motion to suppress the email search warrants (Doc.105), and the next day recommended granting their motion to

suppress the materials seized from DOR. (Doc.107). Neither R&R recommend that the emails be suppressed as the fruits of a poisonous tree. (*Id.*). The government did not object to the magistrate's R&Rs, but the Chrisleys did object to the email warrant R&R, arguing that the email warrants were not sufficiently particularized, that the government improperly executed the email warrants, and that a "taint team" should have been used. (Doc.116). At no point did they argue that the emails were suppressed by virtue of prevailing on their motion to suppress the DOR evidence or that the emails should be excluded as the fruits of a poisonous tree. (*Id.*).

On January 26, 2022, the district court overruled the Chrisleys' objections and adopted the magistrate judge's R&Rs. (Doc.127). The next month, a superseding indictment was returned, which included allegations relating to the same three emails and doctored up attachments that were alleged in the original indictment. (*Compare* Doc.1 ¶¶ 30-32 *with* Doc.130 ¶¶ 29-31).

The district court specially set trial to begin May 16, 2022, and ordered motions *in limine* be filed by March 21, 2022. (Docs.117, 140, 143). On March 21st, the Chrisleys filed an omnibus motion *in limine*. (Doc.158).

Ten days after the motion *in limine* deadline, the Chrisleys filed a new motion regarding the email evidence, arguing for the first time

the emails should be suppressed as fruit of the poisonous tree. (Doc.162). The Chrisleys asserted that the email evidence had been "already excluded by virtue of the uncontested Exclusion Order," but they were filing the late motion "in an abundance of caution." (*Id.*-7). The government responded that this motion should be denied as untimely, (Doc.178-12-15), but even if the court were to reach the merits, it should be denied because independent sources led to the discovery of the email evidence and the government would have inevitably discovered this evidence during the investigation. (*Id.*-15-28).

At an April 2022 pretrial conference, the district court heard argument and issued an order denying the motion as untimely:

> the emails at issue here were previously allowed into evidence at trial pursuant to the Court's denial of Defendants' motion to suppress search warrants for emails and electronically stored information. Thus, the motion currently before the Court is untimely.

(Doc.183-3).

### 4.  The Chrisleys' Post-Trial *Giglio* Motions

IRS revenue officer Betty Carter was called by the government to testify about her role as an IRS revenue officer, the tax collection process, and the IRS's efforts to collect the Chrisleys' unpaid taxes. (Docs.273-244-74, 274-18-161); (*see* Doc.389-8-20) (district court's

order summarizing Officer Carter's testimony). Beginning on cross examination, Officer Carter answered a series of questions about how much the Chrisleys owed the IRS as of trial. (*Id.*-9-15) (district court's order summarizing Officer Carter's testimony on this issue). Following trial, the Chrisleys filed a motion for a new trial, arguing, in part, that the government violated *Giglio* by knowingly offering false testimony from Officer Carter about how much money the Chrisleys owed the IRS as of trial. (Doc.258- 8-18). The Court denied the Chrisleys' motions, stating that it would "fully set[] forth its reasoning and analysis...at a later date. (Doc.300-1). The Chrisleys filed a motion for reconsideration of their motion for a new trial, as well as now seeking sanctions for the government's purported knowing use of false trial testimony. (Doc.304).

Two months later, the district court held a hearing on the Chrisleys' motion for bond pending appeal, during which counsel for the Chrisleys asserted that the government "encourage[d] [the witness] to give misleading testimony." (Doc.381-7-8). The district court noted it was "surprised to see an accusation that strong," that "to allege that the prosecutor coached a witness to [lie] goes into a totally different realm, which that is the type of accusation you have to make cautiously unless you have a lot of support for it, to attack someone's integrity as an attorney like that." (*Id.*-24). The district court found

16

there was "no evidence that the Government knew that testimony was incorrect, nor that Officer Carter even realized her answer in that regard was incorrect." (*Id.*-31).

On January 18, 2023, the district court issued a 78-page order explaining its reasons for denying the Chrisleys' various motions. (Doc.389). The district court found that the Chrisleys' *Giglio* claim was based upon "speculation," that there was nothing to suggest the witness lied or that the government encouraged the witness to lie, that any misstatements were immaterial, and regardless, the Chrisleys had waived any *Giglio* claim because they knew about the facts which they claimed Officer Carter lied about and failed to impeach her, recall her to testify, object during trial, or bring it to the attention of the court. (*Id.*-5-24).

### 5. Julie Chrisley's Sentencing

At sentencing, the government presented evidence in addition to that presented at trial regarding the loss resulting from the Chrisleys' bank fraud conspiracy and the amount of outstanding restitution. (Doc.363-35-69; Gov't Sent. Ex.3). Following several hours of testimony and the introduction of detailed records from the FDIC, the district court agreed with the government's calculations, finding that the loss amount from the bank fraud was more than $9,500,000 but less than and $25 million. (Doc.363-113). The district court also

ordered restitution and a forfeiture money judgment, both in the amount of $17,270,741.57. (*Id.*-113, 338).

### C. Standards of Review

1-2. This Court reviews "de novo a District Court's denial of judgment of acquittal on sufficiency of evidence grounds, considering the evidence in the light most favorable to the government, and drawing all reasonable inferences and credibility choices in the government's favor." *United States v. Capers*, 708 F.3d 1286, 1296-97 (11th Cir. 2013).

3. This Court reviews for an abuse of discretion the district court's denial of a motion for a new trial, or for an evidentiary hearing, based on an alleged *Brady* or *Giglio* violation. *United States v. Stein*, 846 F.3d 1135, 1145, 1151 (11th Cir. 2017).

4. This Court reviews the district court's denial of a motion to suppress as untimely for an abuse of discretion. *United States v. Smith*, 918 F.2d 1501, 1509 (11th Cir. 1990).

5. This Court reviews a district court's denial of a defendant's motion to sever for abuse of discretion. *United States v. Walser*, 3 F.3d 380, 385 (11th Cir. 1993).

6. This Court reviews a district court's interpretation of the Sentencing Guidelines *de novo*, and the determination of the amount of loss for clear error. *United States v. Maxwell*, 579 F.3d 1282, 1305 (11th Cir. 2009).

7. As to a forfeiture money judgment, this Court reviews *de novo* the district court's legal conclusions and its findings of fact for clear error. *United States v. Hoffman-Vaile*, 568 F.3d 1335, 1340 (11th Cir. 2009). This Court reviews *de novo* the legality of an order of restitution, *United States v. Hasson*, 333 F.3d 1264, 1275 (11th Cir. 2003) (internal citation omitted), and a factual finding regarding the specific amount of restitution for clear error. *Id.*

## SUMMARY OF THE ARGUMENT

Ample evidence supports Julie's conviction for bank fraud. The Chrisleys' co-conspirator, Braddock, testified extensively about her participation in the bank fraud, emails corroborated Braddock's testimony, some of the fraudulent loans were issued to Julie's company, and the financial analysis showed that Julie had access to the fraudulently obtained funds. The evidence of materiality was also sufficient as to three counts of bank fraud, as Braddock testified about the importance of the false statements, emails confirmed the conspirators knew the lies were important, and other bankers testified about the importance of similar lies.

The jury also had ample evidence to convict the Chrisleys of willfully evading payment of the $500,000 that Todd owed on his 2009 taxes. Knowing that Todd owed over $500,000 for the 2009 tax year and earning millions of dollars from their reality television show, the Chrisleys hid their earnings in a nominee bank account, transferred ownership of that account to Todd's mother to thwart IRS collection efforts, and used their co-conspirator Tarantino to lie to the IRS to evade collection.

The district court did not abuse its discretion by denying the Defendants' *Giglio* claim without an evidentiary hearing because their allegations of prosecutorial misconduct were speculative. There was

20

no evidence the government encouraged Officer Carter to testify falsely about whether the Chrisleys had outstanding tax liabilities for certain years at the time of trial. On the contrary, the record establishes that Officer Carter did not knowingly testify falsely, but rather testified to the best of her recollection on cross-examination when asked about the status of the Chrisleys' unpaid taxes. Regardless, their *Giglio* claim fails because even if Officer Carter did testify falsely—which the government does not concede—there is no evidence the government knew of or failed to correct any alleged false testimony, and there is no reasonable likelihood that any alleged false testimony could have affected the verdict. This claim separately fails because the Chrisleys were aware during trial of the alleged false testimony but failed to impeach the witness, recall the witness, or alert the district court.

The district court did not abuse its discretion by denying the Chrisleys' motion to suppress the electronic evidence as untimely, where they filed it more than a week after the motion *in limine* deadline passed. The Chrisleys did not question that the government had an independent basis for the challenged evidence and cannot demonstrate they had "good cause" for filing the untimely suppression motion—no matter how styled—just before trial, months after the motions to suppress deadline, and after the window to file motions *in*

21

*limine* had closed. The Chrisleys could not have believed they had successfully excluded the email evidence under the fruit of the poisonous doctrine when they never raised, briefed, or argued the issue, and had even received a ruling denying their motion to suppress the email evidence on other grounds.

The district court did not abuse its discretion by denying Tarantino's motion to sever because he could not (and cannot) demonstrate actual, compelling prejudice from being tried jointly with the Chrisleys where: (1) there was substantial evidence demonstrating his personal involvement in the crimes for which he was convicted; (2) the district court instructed the jury to consider the evidence independently as to each defendant; and (3) the record demonstrates that the jury carefully weighed the evidence by asking several questions and deliberating for nearly three days before returning guilty verdicts. Tarantino cannot meet his heavy burden by offering—as he did below—nothing beyond conclusory allegations of spillover prejudice.

The district court did not clearly err in holding Julie Chrisley accountable for the entire $17.1 million loss attributable to the bank fraud conspiracy. The record established by a preponderance of the evidence that Julie was involved in the bank fraud conspiracy from its outset in 2007 based on Braddock's testimony, email records, loans

22

issued to her company, and access to the fraudulently obtained funds. Accordingly, the district court did not clearly err in attributing the entirety of the loss amount to her for purposes of determining the loss amount, the restitution amount, and the forfeiture money judgment.

ARGUMENT AND CITATIONS OF AUTHORITY

**1. Sufficient evidence supports Julie's involvement in the bank fraud and the materiality of the false statements made to the banks.**

The Chrisleys do not challenge their convictions for conspiracy to commit bank fraud. (JC Br. at 22-32).[3] Instead, they argue that there was insufficient evidence to convict Julie of the substantive bank fraud counts (Counts Two through Six) and insufficient evidence to convict either of them on Counts Three, Five, and Six because the government allegedly failed to prove any material misrepresentations to the banks.[4] (*Id.*).

This Court will "not overturn a jury's verdict if there is 'any reasonable construction of the evidence [that] would have allowed the jury to find the defendant guilty beyond a reasonable doubt.'" *United States v. Martin*, 803 F.3d 581 581, 587 (11th Cir. 2015) (quoting *United States v. Friske*, 640 F.3d at 1288, 1291) (11th Cir. 2011)). To prove bank fraud, the evidence must show: (1) a scheme existed to obtain money, funds, or credit in the custody of a federally insured financial institution; (2) the defendant participated in the scheme by

---

[3] Citations to Tarantino's brief are "PT Br.," to Todd's brief are "TC Br.," and to Julie's brief are "JC Br."

[4] Todd does not challenge his convictions on Counts Two or Four.

means of materially false pretenses, representations, or promises; and (3) the defendant acted knowingly. *United States v. Dennis*, 237 F.3d 1295, 1303 (11th Cir. 2001) (citation omitted).

"Under well-established Eleventh Circuit precedent conspirators are liable for *all of the acts and foreseeable consequences* of the conspiracy." *United States v. Silvestri*, 409 F.3d 1311, 1335 (11th Cir. 2005) (citation omitted) (emphasis in original). "Hence, a court need not assess individual culpability of a particular conspirator provided that the 'substantive crime was a reasonably foreseeable consequence of the conspiracy.'" *United States v. Mothersill*, 87 F.3d 1214, 1218 (11th Cir. 1996) (quoting *United States v. Alvarez*, 755 F.2d 830, 849–50 (11th Cir. 1985)). The government is not required to prove that a defendant personally participated in every charged substantive offense; rather, the government must prove that the defendant intentionally participated in the conspiracy and that the substantive offenses were a reasonably foreseeable consequence of the conspiracy. *United States v. Shabazz,* 887 F.3d 1204, 1219-20 (11th Cir. 2018). As with any fraud crime, circumstantial evidence may prove a defendant's knowledge. *See United States v. Williams*, 390 F.3d 1319, 1325 (11th Cir. 2004)

**A. Sufficient evidence supports that Julie Chrisley knowingly and intentionally participated in the bank fraud conspiracy from 2007 and is thus criminally liable for each of the substantive bank fraud charges, which were reasonably foreseeable consequences of the conspiracy.**

Julie concedes there was evidence of her participation in the overarching bank fraud conspiracy and that the jury could convict her of the substantive bank fraud charges even though she did not personally participate in them. (JC Br. at 21) (citing *United States v. Tilton*, 610 F.2d 302, 309 (5th Cir. 1980) (citing, among other authorities, *Pinkerton v. United States*, 328 U.S. 640 (1946)).[5] She does not claim that the district court's instruction to that effect was somehow inaccurate. (Doc.284-35-36).

Julie takes the narrow position that the government failed to prove she was a member of the conspiracy by 2009 and 2010, when the substantive bank fraud charges were committed, but she ignores Braddock's testimony on this point. (Doc.277-133). When asked by the prosecutor, "did you commit fraud from 2007 onward just on your own? In other words, was it just you committing fraud," Braddock succinctly answered, "No. Mr. and Mrs. Chrisley and myself were all three involved." (*Id.*). The Chrisleys disagree with Braddock's

---

[5] In *Bonner v. City of Prichard*, 661 F.2d 1206, 1209 (11th Cir. 1981) (*en banc*), this court adopted as binding precedent all decisions of the former Fifth Circuit handed down prior to October 1, 1981.

testimony about her role in the conspiracy and claim it is "vague," (JC Br. at 24), but the Court must view his testimony "in the light most favorable to the government, with all reasonable inferences and credibility choices made in the government's favor." *United States v. Calderon*, 127 F.3d 1314, 1324 (11th Cir. 1997). Corroborating Braddock's testimony, financial records proved that in 2007 and 2008—before the substantive bank fraud counts occurred—two of the fraudulent loans were issued to Julie's own company, Select Real Estate Holdings. (Doc.280-28-33; Gov't Ex.1220).

The evidence showing Julie's continued involvement further corroborates her active participation in the conspiracy from its inception. Throughout the conspiracy, Julie was aware of the sheer volume of loans the conspirators were taking out; so much so that she earned the nickname "asses on fire" for driving around the Atlanta area dropping off past-due loan amounts. (Doc.277-203-04). And while she was driving around Atlanta paying past-due loans and bills, the fraudulent loans went to accounts under the control of both Chrisleys. *See United States v. Machado*, 886 F.3d 1070, 1083 (11th Cir. 2018) ("Evidence that the defendant profited from a fraud may also provide circumstantial evidence of the intent to participate in that fraud."); *United States v. Knowles*, 66 F.3d 1146, 1157 (11th Cir. 1995) (considering evidence that defendant had profited from his

27

association with conspiracy in determining that sufficient evidence supported conspiracy conviction). For instance, the conspirators deposited a fraudulent loan in the amount of $231,832.84 into a Chrisley Asset Management (CAM) account on April 24, 2007. (Gov't Ex.1223). That same day, $35,000 was transferred to a bank account under the control of both Julie and Todd. (*Id.*). Similarly, on May 11, 2007, the conspirators deposited $986,456.02, which was obtained from a fraudulent loan, into the CAM account. (Gov't Ex.1224). By May 25th, $43,000 had been transferred to a bank account under the joint control of Julie and Todd. (*Id.*). Throughout May 2007, the fraudulent loan proceeds were used on the Chrisley family's personal expenses, including pool maintenance and cosmetic surgeries and repaying past-due loans. (*Id.*). Later emails confirm Julie's participation in the bank fraud; during a loan application process in 2012, Julie emailed a scanned image of a check and bank statement to Todd and Braddock, explaining that the "post date is the only thing that needed to be changed." (Doc.277-202-77; Gov't Ex.890).

And Julie continued sending fabricated documents that like those charged in the challenged substantive offenses years later. Her wire fraud conviction was based on sending a fabricated credit report and banking documents to a leasing agent in July 2014 when applying to rent a luxury home. (Doc.130, Count Seven). In 2016, years after

28

parting ways with Braddock, Julie submitted a personal financial statement to Bank of America showing that the family purportedly had $4 million in cash and marketable securities. (Doc.274-240-47; Gov't Ex.669). This was the exact amount of money the conspirators repeatedly falsely listed in documents sent to banks during the bank fraud scheme from at least as early as 2007. (*See, e.g.,* Gov't Ex.808). Additionally, in 2014 and 2015, Julie submitted fabricated invoices to her production company for reimbursement, which mirror the scrapbooked documents created and submitted to banks during the challenged substantive bank fraud offenses. (Docs.277-82-89, 279-265-75; Gov't Exs.809, 890, 931, 934-45).

Given the weight of the evidence demonstrating Julie's involvement in the bank fraud conspiracy in Count One (which she does not challenge) and this Court's repeated holdings that "all reasonable inferences and credibility choices" should be made in the government's favor, the jury was entitled to infer that Julie's involvement in the bank fraud conspiracy began as early as 2007, and her substantive bank fraud convictions should be affirmed.

### B. Sufficient evidence establishes the materiality of misrepresentations in Counts Three, Five, and Six.

"[T]he false representation in a bank fraud case has to be 'material.'" *United States v. Gregg*, 179 F.3d 1312, 1314 (11th Cir.

29

1999). "A false statement is material if it has 'a natural tendency to influence, or [is] capable of influencing, the decision of the decision making body to which it was addressed.'" *United States v. Neder*, 197 F.3d 1122, 1128 (11th Cir. 1999) (citing *Neder v. United States*, 527 U.S. 1, 15 (1999)). But actual "reliance is not necessary to make the false statement material." *Id.* "In other words, the statement need not have exerted actual influence, so long as it was intended to do so and had the capacity do so." *Id*. The government may also prove materiality with evidence that "the defendant knows or should know that the victim is likely to regard the misrepresented facts as important." *United States v. Svete*, 556 F.3d 1157, 1165 (11th Cir. 2009) (*en banc*). One can be convicted of fraud "even if his targeted victim never encountered the deception—or, if he encountered it, was not deceived." *Id.* at 1166 (citation omitted).

Here, Braddock testified that the conspirators submitted documents with false information about the Chrisleys' income and assets to each bank they defrauded or attempted to defraud. (Doc.277-137-38). He specifically confirmed that false information, namely, that Todd had $3.6 million in marketable securities (Counts 3 and 6) and a fraudulent audit statement for CAM (Count 5), were sent directly to each bank identified in the substantive bank fraud counts. (Doc.277-272; Gov't Exs.802, 802B, 803, 804, 805, 806).

Emails between Braddock and Todd corroborated his testimony, where they discuss the false information provided to the banks with the understanding that it would impact their decision whether to lend. (*See, e.g.*, Doc.277-178-79; Gov't Ex.833 (Todd commending Braddock for a scrapbooked bank statement that was to be sent to a bank: "you are a fucking genious [sic], just make it show $4 million or more."); Gov't Ex.839 (Todd instructing Braddock "stop telling me this shit, create them like you always have, if I don't get her these then they want [sic] renew the loans."). Braddock also testified that he and Julie "discussed the fact that we just had to keep showing [to the banks] the picture being good so that we could keep getting loans, otherwise, the world would kind of come crashing down." (Doc.277-163). In short, Braddock's testimony (and the corroborating emails) provides direct evidence of materiality as the false statements because they had "a natural tendency to influence, or [were] capable of influencing, the decision of the decisionmaking body to which [they were] addressed.'" *Neder*, 197 F.3d at 1128 (citing *Neder*, 527 U.S. at 15).

Testimony from other financial institutions confirmed that these types of false statements were material to their institution's loan making process. (*See, e.g.*, Doc.276-227-28; Gov't Ex.833). Simone Flack, a former vice president at Buckhead Community, testified that

a personal financial statement "pretty much lines up when you apply for a loan what your assets are, what your liabilities are; because a bank does rely on that to see what your debt to income ratio is. So it's very important to make a loan decision." (Doc.276-228). The jury could reasonably infer that because the fraudulent loans were material to those banks the same misrepresentations would likewise be material to other institutions. *Capers*, 708 F.3d at 1296-97 (reviewing court's task is to make "all reasonable inferences and credibility choices in the government's favor.").

The Chrisleys' arguments as to Counts Three and Six ring especially hollow as they defrauded the banks by falsely representing, as they did with dozens of other banks, that Todd had $3,658,269 in marketable securities. (Doc.277-271-72, 178-85; Gov't Exs.803, 805, ((*see also* Gov't. Ex.808) (compilation of dozens of false personal financial statements sent to banks falsely claiming Todd had anywhere from $3.6 to roughly $4 million in marketable securities)). Steve Crowell, the former President and CEO of Embassy National Bank, testified that he would have wanted to know if Todd didn't have $3,658,000 in marketable securities. (Doc.276-257-59; Gov't Ex.865). With respect to Count Five, the government proved that a false audited financial statement for CAM was sent to RBC Bank. (Doc.278-255-56; Gov't Ex.805). Braddock confirmed that they

prepared false audit reports because they "gave the appearance that the company was being audited regularly by a CPA." (Doc.278-255-56).

The Chrisleys fail to cite a single case from this Circuit or any other holding that testimony from a victim bank or about the banking industry is required to establish a material misrepresentation, particularly where a conspirator like Braddock explains what the conspirators were hoping to induce the victim banks to do by submitting these false statements. (*See* JC Br. at 28-29). *United States v. Perez-Ceballos*, 907 F.3d 863 (5th Cir. 2018), on which Chrisleys primarily rely, is readily distinguishable. In *Perez-Ceballos*, the Fifth Circuit reversed a bank fraud conviction where there was insufficient evidence that the defendant had "made false statements to Chase Bank or that she made false statements to another party while intending to obtain money from Chase Bank in a way that exposed Chase Bank to a risk of loss." *Id.* at 869. Rather, the government presented evidence that the defendant had made false statements only to other entities, and there was no evidence that Chase Bank had received any of those false statements. *Id.* at 868-69. This case is different: Braddock confirmed that false information was sent to each of the financial institutions identified in Counts Two, Five, and Six with the intent of fraudulently obtaining loans based on the false

information as confirmed by the Chrisleys' own emails. And other bankers testified about how the fraudulent scheme impacted the loan making process at their respective institutions.

No cases cited by the Chrisleys hold that testimony from individual banks or the bank industry as a whole is necessary to establish materiality. (JC Br. at 28). For instance, in *United States v. Lynsey*, the Ninth Circuit affirmed bank fraud convictions, holding that materiality "is not concerned with the statement's subjective effect on the victim but only the intrinsic capabilities of the false statement itself." 850 F.3d 1009, 1015 (9th Cir. 2017) (internal citation omitted). The Fourth Circuit reached the same conclusion in *United States v. Raza*, 876 F.3d 604, 619 (4th Cir. 2017), another case cited by the Chrisleys. The Court in *Raza* also observed that the *Universal Health* case, also cited by the Chrisleys (JC Br. at 39), was inapplicable for a number of reasons, most importantly because it was a civil *qui tam* case as opposed to a criminal fraud case. *Id.* at 617-19; *see Universal Health Servs. v. United States ex rel. Escobar*, 579 U.S. 176, 190, 194-95, (2016).

*United States v. Rigas* affirmatively undermines the Chrisleys' argument because the defendants' bank fraud conviction was affirmed without the testimony of any bank witnesses. 490 F.3d 208, 234-36 (2d Cir. 2007). Rather, the court held that a jury could determine

whether certain misrepresentations were material. *Id.* at 236. In *Rigas*, the government presented compliance documents, notes regarding the manipulation of documents, and—as here—testimony from a co-conspirator that false statements were made to banks to induce them to issue fraudulent loans.[6] *Id.* at 235-36.

Because of Braddock's testimony, corroborating emails, and evidence from other bankers, the jury had ample evidence to find that the false statements in the challenged counts were material.

**2. Sufficient evidence supports the Chrisleys convictions for the tax crimes.**

### A. Sufficient evidence supports the Chrisleys' convictions of conspiring to defraud the IRS.

To prove the Chrisleys guilty of conspiracy to defraud the IRS, the evidence must show: (1) an agreement to impede the functions of the IRS, (2) knowing and voluntary participation in the agreement, and (3) commission of an act in furtherance of the agreement. *United States v. Hough*, 803 F.3d 1181, 1187 (11th Cir. 2015). The government may prove the agreement through either direct evidence or circumstantial evidence, such as "the parties' concerted actions,

---

[6] The court reversed a separate bank fraud conviction because the government's evidence of materiality was limited to testimony from a co-conspirator opining that false statements made after he had left the conspiracy were material. *Rigas*, 490 F.3d at 231.

overt acts, relationship, and the entirety of their conduct," so long as this evidence supports the "reasonable inference" that the conspirators "had a common design with unity of purpose to impede the IRS." *Id.* (citation and quotation marks omitted).

Despite earning millions of dollars, Todd failed to pay hundreds of thousands of dollars for the 2009 tax year, and the Chrisleys did not timely file or pay their 2014, 2015, or 2016 taxes. (Docs.274-213-14, 275-79-86, 138-144; Gov't Exs.1-6, 21-42, 78-82, 93, 94, 303, 402, 407, 410, 416, 429, 432, 434, 438, 444-46, 1202).

7C's began in Julie's name, where it could not be touched because Todd's tax deficiency was part of his married-filing-separately return. (Docs.273-251-53, 274-29-36). Numerous emails confirmed that, while his name was never listed on any corporate documents, Todd controlled 7C's behind the scenes, including its finances. (Doc.275-79-95; Gov't Exs.303, 305-07, 309-11, 319, 320, 322, 326-30, 335, 336, 301, 341, 343, 344, 348, 361, 365, 366, 402, 407, 410, 416, 429, 432, 434, 438, 444-46). In fact, Todd's website— www.toddchrisley.org—contained an article entitled "Todd Chrisley Starts Film Production Company - 7Cs Production." (Gov't Ex.372). The day after the IRS requested, for the first time, accounts owned by either Chrisley, they transferred 7C's to Todd's mother, opened a new 7C's account with Todd's mother listed as the owner, and Todd

falsely told his talent agent that their original account had been "compromised." (Docs.273-116-21, 156-61, 168-78, 274-29-37; Gov't Exs.100, 101, 102A, 103, 103A, 103B, 104, 104A, 105, 108, 118, 119). The IRS was not told that new income went into this newly opened Bank of America account, which the revenue officer testified she would have wanted to know about while attempting to collect Todd's back taxes. (Doc.274-36-37).

Tarantino repeatedly lied to revenue officers throughout the collection process, including falsely telling one revenue officer that 7C's was owned by the Chrisleys' daughter and not them, and telling another revenue officer that he did not know where the Chrisleys banked; he also updated the Chrisleys on his efforts to hide information from the IRS, and at one point told them "[t]he agent also asked me specific questions about your current living arrangements, et cetera. I avoided answering them." (Doc.274-23, 129-31, 164-66; Gov't Exs.614, 615 at 27, 616, 639, 640, 668, 748). Tarantino also sent tax returns to third parties—while CC'ing the Chrisleys—to give the false impression that the Chrisleys had in fact filed and paid their taxes. (Docs.274-24-28, 208-10, 276-45-51; Gov't Ex.507, 509-11). Ample evidence supported the jury's verdict that Tarantino was not merely acting as an accountant but was working at the Chrisleys' direction to avoid paying their taxes.

**B. Sufficient evidence supports the Chrisleys' convictions for tax evasion and conspiracy to defraud the IRS.**

The prove tax evasion, the government must show: (1) willfulness; (2) a tax deficiency; and (3) an affirmative act constituting an evasion or attempted evasion of the tax. *Hesser v. United States*, 40 F.4th 1221, 1225 (11th Cir. 2022). Willfulness requires the "voluntary, intentional violation of a known legal duty." *Cheek v. United States*, 498 U.S. 192, 201 (1991). "An affirmative act of attempted evasion may consist of 'any conduct, the likely effect of which would be to mislead' the government or conceal funds to avoid payment of a valid tax deficiency." *Hesser*, 800 at 1323 (quoting *Spies v. United States*, 317 U.S. 492, 499 (1943)).

It is undisputed that there was a tax liability. Todd's outstanding 2009 tax liability was $526,881 (Gov't Ex.22), and he did not pay it in full until after the Chrisleys learned they were under criminal investigation. (Docs.274-213-14, 275-132-33; 276-18; 283-3021-22; Def. Ex.813).

The Chrisleys engaged in several affirmative acts. As previously stated, the Chrisleys hid Todd's income by depositing it into 7C's—which was first established in Julie's name to avoid tax payment and later in Todd's mother's name for the same purpose. They also knew Tarantino was providing false information to the IRS.

38

The Chrisleys acted willfully. They knew of their tax liabilities and unpaid taxes because they received repeated notices from the IRS about their tax problems throughout the conspiracy. (*See, e.g.,* Doc.274-19-20; Gov't Exs.63, 67, 76, 77). Even though his taxes remained unpaid, in a February 2017 radio interview, Todd bragged about paying $750,000 to $1,000,000 a year to the IRS, which was false, further demonstrating his knowledge that he had a legal duty to comply with the Internal Revenue laws. (Doc.275-135-36, 143-44; Gov't Ex.1123A). Both Chrisleys also sent copies of tax returns to third parties even though those returns had not been filed. (Docs.274-201-11, 276-52-59; Gov't Exs.501-04, 506). Finally, they later attempted to obstruct the grand jury's investigation by providing false evidence about the transfer of the 7C's bank account to Todd's mother, providing further evidence of their willfulness. (Docs.273-184-93, 210-17, 276-101-17; Gov't Exs.100, 104, 104A, 194-96, 199).

The argument that money paid to 7C's for Todd's services was not his income because it was directed into a company's bank account is meritless. The Supreme Court has defined income as "the gain derived from capital, from labor, or from both combined . . . ." *Eisner v. Macomber*, 252 U.S. 189, 207 (1920). And courts have uniformly interpreted "income" to include wages and salaries. *See, e.g., Connor v. Commissioner*, 770 F.2d 17, 20 (2d Cir. 1985). Likewise, Title 26

defines gross income as "all income from whatever source derived," including compensation for services. " 26 U.S.C. § 61(a)(1); *see also Commissioner v. Glenshaw Glass Co.*, 348 U.S. 426, 429-33 (1955); *Commissioner v. Smith*, 324 U.S. 177, 181 (1945). The fact that Todd was not an owner of 7C's is irrelevant as any money paid for his services was his income, regardless of where it was deposited. 26 U.S.C. § 61(a).

Todd is essentially arguing that money he earned from his reality television show was not his income simply because it was not deposited into an account bearing his name. (*See, e.g.,* Gov't Exs.218, 247) Todd's argument, if accepted, would be a welcome relief to all tax cheats who use shell companies to hide income. Using a company's bank account to receive income is legal. But using a company's bank account to *hide* income from the IRS to avoid paying taxes is quintessential tax evasion.

The district court properly rejected the Chrisleys' arguments regarding the "alternative explanations" for 7C's. (Doc.389-76-77). As the district court found, even if the jury were to believe the Chrisleys' "'alternative explanations' for the function and purpose of the bank accounts belonging to 7C's Productions . . . 'there was [still] ample evidence from which a jury could have found' that the Chrisleys used these accounts to conceal [Todd's] income so as 'to evade the payment

40

of taxes.'" (*Id.*) (citing *United States v. Hesser*, 800 F.3d 1310, 1323 (11th Cir. 2015).

The Chrisleys' argument that the government failed to prove an affirmative act of evasion also fails. "The government only need[s] to show one affirmative act of evasion for each count of tax evasion." *United States v. Hoskins*, 654 F.3d 1086, 1091 (11th Cir. 2011) (citation omitted). As detailed above, the Chrisleys used 7C's to hide money from the IRS, transferred ownership of the company to Todd's mother to further hide their money, and knew Tarantino was lying to the IRS. Courts have previously recognized such conduct as affirmative acts of evasion. *See, e.g., United States v. Beall*, 970 F.2d 343, 345-47 (7th Cir. 1992) (defendant instructed employer to pay income to a tax protest organization); *United States v. McGill*, 964 F.2d 222, 227-33 (3d Cir. 1992) (defendant concealed assets by using bank accounts in names of family members and coworkers); *United States v. Daniel*, 956 F.2d 540, 542-43 (6th Cir. 1992) (defendant used other persons' credit cards, used cash extensively, placed assets in other persons' names); *United States v. Conley*, 826 F.2d 551, 553 (7th Cir. 1987) (defendant concealed "nature, extent, and ownership of his assets by placing his assets, funds, and other property in the names of others and by transacting his personal business in cash to avoid creating a financial record").

The case cited by the Chrisleys, *Hesser*, 40 F.4th at 1221, is inapposite. In *Hesser*, the defendant purchased and hid gold bullion in his house, which the government argued was an affirmative act of tax evasion. *Id.* 1226-27. This Court disagreed for an important reason: The government had not presented evidence to prove that the gold belonged to Hesser. *Id.* Evidence showed that Hesser often invested for a family trust, and the gold could have just as plausibly belonged to the trust—not Hesser. *Id.* And of course, "hiding gold in and of itself is not tax evasion." *Id.*

Here, the evidence showed the Chrisleys concealed Todd's money in 7C's bank accounts not under his name to avoid paying past-due taxes. The IRS could impose a tax lien only on the property of a taxpayer whose payments were delinquent, (Doc.273-251-53), which—the jury could infer—is precisely why the Chrisleys sheltered Todd's income in bank accounts under Julie's—and later his mother's—control.

Finally, the Chrisleys argue the government did not prove that any false statements were made to the IRS. This argument is misplaced for two reasons. First, the government did not have to prove the Chrisleys made a false statement to the IRS to prove a violation of § 7201. *See Hesser*, 40 F.4th at 1225 (listing elements of § 7201). Second, as alleged in the superseding indictment, the government proved that

42

Taratino provided false information to the IRS about the Chrisleys' income and where they banked. (Docs.130, ¶ 53, 274-23, 127-31, 164-67; Gov't Exs.652, 658, 668). The Chrisleys understood and knew that Tarantino was doing so, as he not only enjoyed power of attorney and was their CPA, but affirmatively updated them on his actions. (Gov. Ex.748).

In all, the jury had ample evidence that the Chrisleys conspired to defraud the IRS and committed tax evasion. When viewed in the light most favorable to the government, they fail to establish that the jury's verdicts should be disturbed.

3. **The district court did not abuse its discretion in denying the Defendants' motion for an evidentiary hearing or a new trial on a purported *Giglio* violation.**

To prevail on a *Giglio* claim, a defendant must demonstrate that a government witness committed perjury, that the prosecution knew of and failed to correct the perjury, and that the perjury "may have had an effect on the outcome of the trial." *United States v. Rivera Pedin*, 861 F.2d 1522, 1529 (11th Cir. 1988). To obtain a reversal on the grounds that the government failed to correct false testimony, the defendant must establish that: (1) the contested statements were actually false, (2) the government knew the statements to be false; and (3) the statements were material. *United States v. Bailey*, 123 F.3d 1381, 1395 (11th Cir. 1997). False testimony is considered material if there

is any reasonable likelihood that it could have affected the judgment of the jury. *United States v. Alzate*, 47 F.3d 1103, 1110 (11th Cir. 1995) (citation omitted). But "[s]imply showing a memory lapse, unintentional error, or oversight by the witness is insufficient" to prevail on a *Giglio* claim. *United States v. Clarke*, 442 F. App'x 540, 543-44 (11th Cir. 2011) (citing *Bailey*, 123 F.3d at 1395). A defendant's *Giglio* claim also fails "if defense counsel is aware of" the alleged false testimony and "fails to object" to it during trial. *United States v. Stein*, 846 F.3d 1135, 1147 (11th Cir. 2017).

Defendants claim that Officer Carter testified falsely about the amount of taxes that the Chrisleys owed as of trial for tax years 2014, 2015, and 2016. (TC Br. at 35-39). They claim that the government "encouraged" her to testify falsely, that this purported false testimony may have influenced the jury's verdict because they could have argued that "the prosecutors encouraged [the witness] to mislead them," and that they did not "procedurally default" by failing to make this argument at trial. (*Id.* at 35-49).[7] The district court addressed each of these arguments in its post-trial order, finding that there was no *Giglio* violation because: (1) Officer Carter did not testify falsely, (2) the

---

[7] Though he adopts this argument, Tarantino fails to advance any argument as to why evidence concerning the Chrisleys' untimely tax payments would impact the jury's consideration of the evidence against him.

44

government did not coach the witness to lie, nor did it fail to correct false testimony, (3) any incorrect statements were not material, and (4) Defendants waived their *Giglio* claim because they knew about the information they now claim to be false yet they chose not to impeach the witness, recall the witness, or alert the district court. (Doc.389-21-36). Each of these reasons provides an independent basis for affirming the district court.

First, Officer Carter did not testify falsely about the Chrisleys' outstanding tax liabilities. With respect to the 2016 tax year, she testified accurately that the Chrisleys owed unpaid taxes. Defendants acknowledged as much in an affidavit submitted to the district court that, at the time of trial, the Chrisleys owed money for the 2016 tax year. (Doc.258-1). As for her testimony about the 2014 and 2015 tax years, the government agrees it was inaccurate, but as the district court correctly concluded, Officer Carter did not knowingly testify falsely. (Doc.389-25-29).

In summarizing Officer Carter's testimony, the court explained she was called by the government to testify about her role as an IRS revenue officer, the tax collection process, and the IRS's efforts to collect the Chrisleys' unpaid taxes; the issue of the Chrisleys' "outstanding tax balances" first arose only during her cross-examination. (Doc.389-8-20). The Chrisley investigation was one of

numerous cases Officer Carter had worked over the years, it was
randomly assigned to her, she had no financial incentive in the case,
and there is no evidence (or argument) even suggesting a motive to
testify falsely. (Doc.273-244-75; Doc.274-17-161). Officer Carter
repeatedly testified on cross examination and recross that she could
not recall the specifics about the Chrisleys' outstanding tax liabilities,
noting that she had not "memorize[d] all those numbers," and, for
example, did not recall how much Todd owed for 2010 or how much
either of the Chrisleys owed for 2011. (Doc.274, 57, 74-75, 83-84, 98-
20, 103-06, 149-83).[8] She further testified "I want to say" the Chrisleys
owed around $42,000 for the 2014 tax year but that she could not
recall how much and that she did not know the exact amount owed
for 2015 or 2016. (*Id.*-151). The unrebutted record showed that any
errors in Officer Carter's recollection were because of how payments
made in 2021 and 2022 for these past years were registered in IRS's
internal systems and not because of any negligence or willful blindness
on Officer Carter's part, much less because she intended to testify
falsely. (Doc.389-25-29) (citing Garcia affidavit, ¶¶ 3-4, 7-11). *Clarke*,

---

[8] As noted by the district court, the government did not elicit
testimony about this issue on direct and did not directly ask Officer
Carter about it on re-direct but did ask her to more fully explain what
records related to those balances she reviewed in advance of her
testimony. (Doc. 389-13) (citing Doc. 274-142).

442 F. App'x at 543-44) (citing *Bailey*, 123 F.3d at 1395) ("Simply showing a memory lapse, unintentional error, or oversight by the witness is insufficient" to prevail on a *Giglio* claim).

Second, there is no support for Defendants' allegation that the government encouraged Officer Carter to testify falsely. (TC Br. at 22-23). Defendants have cited nothing to substantiate this allegation. Indeed, if the government had intended to elicit false testimony from Officer Carter about the nature of the Chrisleys' post-indictment tax payments, it is illogical that the subject would arise during cross examination, rather than the prosecutor eliciting the supposedly false testimony on direct examination. And it would be equally illogical for the government to then not argue this point in closing or rebuttal, which never happened here.

In rejecting Defendants' assertion of government misconduct, the district court observed that there was no evidence that the government knowingly offered false testimony, failed to correct false testimony, or "coached" the witness to lie. (Doc.389-25-29). The district court noted that "to say that anybody coached anyone—coached, not looked the other way, wasn't thorough enough—but coached someone to testify falsely is a huge accusation and one, frankly, that I am surprised is being made in this particular case." (Doc.381-30-31). The district court "found there is no evidence" to

47

support Defendants' accusations, which were predicated upon "nothing more than speculation" about trial preparation meetings, and, accordingly, "decline[d] [their] invitation to hypothecate about the content of these conversations and, similarly, will not infer that serious ethical violations occurred in the absence of any supporting evidence." (Doc.389-29).

On appeal, Defendants claim they offered evidence below, in the form of affidavits submitted to the district court, that supported the "inference" that the government coached witnesses to lie. (TC Br. at 35-49). In support of these renewed arguments, they direct this Court to Docket Entry No. 304 as purported evidence of the prosecutors' efforts "to mislead the [district court]." (*Id.* at 37 (citing Doc.304-12-17)). But Docket 304 is not evidence—it is the Chrisleys own motion for reconsideration. Showing the lack of any true support in the record, the Chrisleys cite to their own speculative conspiracy theories—that the district court found specious—as purported "evidence" of serious government misconduct that they claim warranted an evidentiary hearing or a new trial. But as the district court found, "it is 'well established' in th[e Eleventh] Circuit that a district court may generally decide a motion for a new trial upon affidavits without an evidentiary hearing." (Doc.389-36) (citing *United States v. Barton*, 834 F. App'x 529, 530 (11th Cir. 2020) (quoting

48

*United States v. Hamilton*, 559 F.2d 1370, 1373 (5th Cir. 1977). The district court properly held that "the 'acumen' it 'gained...over the course of the' years-long proceedings in this case makes [it] well qualified to rule on' the Chrisley Defendants' motion for a new trial 'without a hearing.'" (Doc.389-36) (quoting *United States v. Schlei*, 122 F.3d 944, 994 (11th Cir. 1997).

Third, Defendants fail to establish that the purported false testimony could have impacted the jury's verdict. They argue the witness's supposedly intentional false testimony was material because it was relevant to the jury's consideration of the Chrisleys' intent to pay taxes, their character for untruthfulness, and the credibility of their defense. (TC Br. at 37-38). But, as the district court noted, Officer Carter testified that the Chrisleys had paid their taxes for several of the years before the start of trial, meaning the jury already heard evidence that they had made delinquent tax payments. (Doc.389-29-31). And the jury received a specific instruction regarding payments made after taxes were due. (Doc.284-37-38). The Chrisleys own witness testified that the Chrisleys had paid their taxes by the start of trial. (Doc.282-234-49; Def. Ex.813). The government did not challenge these statements on cross examination or during closing arguments and never argued that the Chrisleys were "untruthful" because they still owed money to the IRS. (Doc.283-11-38; Doc.284-

145). In fact, in rebuttal, the government explicitly acknowledged the Chrisleys' untimely tax payments and highlighted the jury instruction, arguing that "you can't rob a bank and return the money. The crime happened, and you have to be held accountable." (*Id.*). The reason the government did not elicit this testimony on direct or make an argument that the Chrisleys still had not paid their taxes is simple: this entire issue was irrelevant to the charged conduct. None of the charged offenses—tax or otherwise—concerned whether the Chrisleys made delinquent tax payments in 2021 and 2022, years after they were indicted for a tax evasion scheme that ended in 2018. As described above, overwhelming evidence supported the jury's verdicts, *see supra* pp. 42-50, and Defendants fail to establish that any of Officer Carter's allegedly false testimony could have impacted those verdicts.

Defendants also argue that the statements were material because they could have argued in closing "[i]f prosecutors were willing to trick you about the Chrisleys' current tax liability, why should you believe anything else they presented to you, much less believe it beyond a reasonable doubt?" (TC Br. at 40). The problem is there is nothing in the record supporting these insinuations and conspiracy theories.[9]

_____

[9] The Chrisleys make no argument as to how this allegedly false testimony would have impacted the jury's consideration of the bank fraud, wire fraud, or obstruction of justice charges, which had nothing to do with the IRS.

Such an attack would have been illogical during trial because there was no evidence the government committed misconduct.

Fourth, Defendants knew about certain tax payments when Officer Carter testified and failed to impeach her with the records in their possession and failed to recall her. (Doc. 389-32-34).[10] After the government rested its case-in-chief, the Chrisleys produced untimely discovery showing that they had in fact paid most of their back taxes by the start of trial. (*Id.*-16) (discussing mid-trial disclosure of this information). But as the district court correctly noted, despite possessing this information:

> defense counsel failed to object to [Officer Carter's] testimony until filing . . . post-trial motions. The [Defendants] did not, for example, recall Officer Carter to the stand further cross-examine her regarding the payments the [Chrisleys] made to the IRS, subpoena Officer Carter to reappear at trial with the records she believed supported her testimony that the [Chrisleys] owed for 2014 and 2015, or alert the Court to the fact that Officer Carter's testimony was potentially inaccurate.

(*Id.*-32-33). Because Defendants had this information all along and chose not to use it to impeach or recall the witness, the district court

---

[10] Tarantino does not argue that he was somehow left unaware of this information.

did not abuse its discretion by denying their motion for new trial or for a hearing. *See Stein*, 846 F.3d at 1147.

Defendants have not cited an Eleventh Circuit case reversing a conviction on similar facts. Instead, they rely on cases that are readily distinguishable. In *Guzman v. Sec'y, Dep't of Corr.*, for example, a convicted murderer sentenced to death was granted habeas relief where it was undisputed the state had not disclosed a payment to a key witness and the lead detective lied about this at trial. 663 F.3d 1336, 1352-53 (11th Cir. 2011). *Guzman* is inapposite. Among other things, not only was Officer Carter not the government's "key witness," she was also not the lead investigative agent. Nor had the defense in *Guzman* known of the payments during trial, whereas here, the Defendants were well aware of the late tax payments and could have cross-examined or recalled Carter if they wanted to impeach her. *Id.* at 1342. Similarly, in *United States v. Espinoza-Hernandez*, this Court held that an evidentiary hearing was warranted where a witness who had a "tremendous impact" on the conviction was later indicted for allegedly making false statements on a federal job application about his past use and sale of drugs. 918 F.2d 911, 913-14 (11th Cir. 1990). Here, and unlike in *Guzman* and *Espinoza-Hernandez*, Officer Carter was not the lead investigative agent; her testimony did not have a "tremendous impact" on the verdicts; there is no evidence that she

intentionally lied at trial; and any purported false testimony was not material to the verdicts. *See also United States v. Laines*, ___ F.4th ___, Nos. 20-12907, 21-11535 at *16 (11th Cir. June 6, 2023) (rejecting defendant's Giglio claim where "the corroborating evidence would be sufficient to support the jury's guilty verdict even if [an arresting officer] had been totally discredited.").

The district court did not abuse its discretion by rejecting the *Giglio* arguments advanced by Defendants and denying their motion for an evidentiary hearing or a new trial.

**4. The district court did not abuse its discretion in denying the Chrisleys' late filed motion to suppress the email evidence as untimely.**

This Court reviews a denial of a motion to suppress on grounds of untimeliness under an abuse of discretion standard. *Smith*, 918 F.2d at 1509 (11th Cir. 1990). A defendant who "fail[s] to file his motion within the deadlines set by the court . . . waives his right to assert [a] motion to suppress evidence." *United States v. Smith*, 918 F.2d 1501, 1509 (11th Cir. 1990); Fed. R. Crim. P. 12(b)(3)(C). The court may excuse a late-filed motion if a defendant demonstrates "good cause" for the delay, Fed. R. Crim. P. 12(c)(3), but "[n]o good cause exists if the defendant had all the information necessary to bring a Rule 12(b) motion before the date set for pretrial motions, but failed to file it by that date." *United States v. Andres*, 960 F.3d 1310, 1316 (11th Cir.

53

2020) (citation omitted) "Neither a strategic decision nor inadvertence constitutes good cause." *Id.*

The district court did not abuse its discretion by denying the Chrisleys' motion to suppress evidence as untimely. (Doc.183-3). The Chrisleys have never demonstrated they had "good cause" for filing the untimely suppression motion just before trial, months after the motions to suppress deadline, and after the time to file motions *in limine* had passed.

As detailed above, the Chrisleys timely filed two motions to suppress: one related to a warrantless search of a warehouse conducted by the Georgia DOR and a second related to electronic search warrants obtained by the government. (Docs.52, 58). The magistrate judge issued two separate R&Rs—both of which the district court adopted—which led to the suppression of the DOR physical materials but allowed the admission of the evidence obtained through the electronic search warrants. (Docs.105, 107, 127).[11]

The government represented in litigating the suppression motions that it had independently recovered through the email search warrants

---

[11] The magistrate judge's R&R, issued after a two-day evidentiary hearing, found DOR to have engaged in an impermissible warrantless search of the Chrisleys' warehouse but also held "the federal personnel handling the instant case did not participate in any violations themselves." (Doc. 107-2).

electronic versions of some of the physical, cut-and-pasted documents found among the DOR materials. (*See* Doc.98-3 n.1). In the Chrisleys' various pleadings regarding both warrants from 2019 through 2021, they neither challenged the government's representation nor claimed that their motion to suppress the DOR materials also extended to suppressing the electronic search warrants because of an alleged fruit of the poisonous tree issue. (Docs.36, 48, 52, 96, 99, 116).

On March 31, 2022, years after the assigned magistrate judge's deadline for filing motions to suppress and just over six weeks before the specially set trial was to begin, the Chrisleys filed a "Motion to Require the United States to Establish Admissibility of Suppressed Evidence" which—for the first time—claimed that the electronic evidence was fruit of the poisonous tree. (Doc.162). The district court denied that motion as untimely. (Doc.183).

At no point during the two years after the Chrisleys filed their initial motions, or during the seven months after the warehouse materials were suppressed, did the Chrisleys raise a fruit of the poisonous tree argument about the electronic evidence. Accordingly, the government never had reason to respond to that argument, and the magistrate judge never had reason to address it. (Doc.105, 107). As the district court noted in denying the Chrisleys' motion for reconsideration of its Rule 33 motion, the magistrate judge's R&R

55

concerning the warehouse evidence did not mention any electronic evidence. (Doc.389-38). *See, e.g.*, *United States v. Cooper*, 203 F.3d 1279, 1284 (11th Cir. 2000) ("A motion to suppress must in every critical respect be sufficiently definite, specific, detailed, and nonconjectural to enable the court to conclude that a substantial claim is presented.").

It is implausible that the Chrisleys believed they had successfully excluded the government's email evidence under the fruit of the poisonous doctrine when they never raised, briefed, or argued the issue to the magistrate judge, and never received a ruling that the evidence had been excluded. *Cf. Smith*, 918 F.2d at 1509 (holding that a defendant waived his *Franks* challenge as untimely because it was not expressly raised in his timely filed motion to suppress). Indeed, their argument is particularly far-fetched because it makes no sense why the magistrate judge would need to resolve their motion to suppress email evidence if those materials were excluded by granting their motion to suppress the DOR materials. And there was no reason for the Chrisleys to have filed objections to the R&R denying their motion to suppress the email evidence if the emails were already suppressed. Indeed, the superseding indictment returned in February 2022 referenced emails the government had obtained through its search warrants. (Doc.130 ¶ 30). The district court thus understood that the

Chrisleys' "Motion to Require the United States to Establish Admissibility of Suppressed Evidence"—no matter how styled—was an untimely motion to suppress. (Doc.183-3). And even if the motion *in limine* deadline was the operative date by which the Chrisleys could file their motions, the district court's decision to deny the Chrisleys' late motion on timeliness grounds was still not an abuse of discretion. *See, e.g., United States v. Fernetus*, 838 F. App'x 426, 431-32 (11th Cir. 2020) (district court did not abuse its discretion by denying motion to suppress as untimely when not filed by motion *in limine* deadline); *United States v. Salom*, 349 F. App'x 409, 411 (11th Cir. 2009) (same); *United States v. Jones*, 241 F. App'x 676, 678 (11th Cir. 2007) (affirming denial of motion to suppress as untimely where "the facts of the case are the same as those under the previous indictment, and Jones was provided open discovery. Given that all the files were available at least nine months before the trial, there is no reason Jones's counsel should not have previously discovered the basis for this motion to suppress."); *see also United States v. Echols*, 577 F.2d 308, 311 (5th Cir. 1978) (district court acted within its discretion by denying a motion to suppress that was filed "over one year after the trial court had set pretrial motions to be heard and just six days before trial").

In *United States v. Taylor*, 792 F.2d 1019, 1025 (11th Cir. 1986), this Court affirmed the district court's denial of a motion to suppress filed on the day of trial as untimely and found there was no good cause for the delay where substitute counsel noticed his appearance and took over the case three weeks earlier. This Court found that appearing in the case three weeks before trial "hardly explains his failure timely to raise the motion to suppress." *Id.* at 1025. In the Eleventh Circuit's view, "[s]urely three weeks is enough time to examine the documents that are to be used against one's client." *Id.* Here, the Chrisleys had the relevant warrants when they were provided discovery at their arraignments in August 2019, (Docs.10, 13), which was over two years before their motion to determine admissibility was filed, and knew from the government's position in July 2021 that it had an independent basis to obtain the electronic warrants. (Doc.98-3 n.2). The Chrisleys have not shown any credible justification for their long delay in filing their motion to determine admissibility—much less good cause for it. "These facts demonstrate inexcusable delay and last-minute motion filing." *Jones*, 241 F. App'x at 678 (quoting *United States v. Milian–Rodriguez*, 828 F.2d 679, 683 (11th Cir. 1987)).

The Chrisleys' argument that the government "waived" the untimeliness argument by comments made during a pretrial

conference is meritless. During a lengthy pretrial conference, which took place after the Chrisleys filed their untimely motion, the district judge mistakenly thought the email warrants had been suppressed and said as much to the government. (Doc.193-23-24). In response to the district court's comments, the government stated that "we'd certainly withdraw our arguments about the untimeliness of their motion, but we did make very explicit in our post hearing briefing before [the magistrate judge ] . . . that we did have an independent source for the documents from the email search warrant." (*Id.*-25). After taking a break, the district court judge advised the parties on the record that she had consulted with the magistrate judge, who reported that "what he recalls [is] basically similar to what [government counsel] says, that a separate motion was filed regarding the emails, and it was never argued in that motion that any emails there were a fruit of anything from the illegal warehouse search." (*Id.*-51). Accordingly, the district court denied the Chrisleys' motion as untimely. (Doc.183).

Regardless, the district court has the authority to enforce its own scheduling order.[12] Waiver is the "intentional relinquishment or abandonment of a known right or privilege." *United States v. Brown*,

---

[12] In its response brief to the Chrisleys' Rule 33 motion, the government noted "[f]or purposes of completing the record only, the [government] rescinds its comments at the pretrial conference about 'waiving' the untimeliness argument." (Doc. 292-34 n.12).

569 F.2d 236, 238 (5th Cir. 1978) (quoting *Johnson v. Zerbst*, 304 U.S. 458, 464 (1938)). Waiver requires "(1) the existence, at the time of the waiver, of a right, privilege, advantage, or benefit which may be waived; (2) the actual or constructive knowledge thereof; and (3) an intention to relinquish such right, privilege, advantage, or benefit." *United States v. Duke*, 739 F. App'x 970, 972 (11th Cir. 2018) (citation omited). The authority to enforce its own scheduling order belongs to the court—not to the parties. As the district court properly found when ruling that this argument was unpersuasive, "[n]othing about the government's conduct alters this Court's ability to enforce its own deadlines, including (as relevant here) its own deadline for motions in limine." (Doc.389-40) (citing Fed. R. Crim. P. 12(c)(1)-(3).

## 5. The district court did not abuse its discretion in denying Tarantino's severance request.

Tarantino fails to meet his heavy burden of showing that the district court abused its discretion by denying his motion for a new trial by failing to sever his trial from the Chrisleys'. *United States v. Walser*, 3 F.3d 380, 385 (11th Cir. 1993). In a thorough order, the district court rejected each of the arguments advanced by Tarantino on appeal and did not abuse its discretion by doing so. (Doc.389-42-52).

"A district court may grant a new trial when a defendant was unable to receive a fair trial and suffered actual, compelling prejudice as a result of a joint trial." *United States v. Pedrick*, 181 F.3d 1264, 1267 (11th Cir. 1999). "Compelling prejudice" requires a defendant to establish that a joint trial "would actually prejudice the defendant and that a severance is the only proper remedy for that prejudice—jury instructions or some other remedy short of severance will not work." *United States v. Lopez*, 649 F.3d 1222, 1234 (11th Cir. 2011); *see also Zafiro v. United States*, 506 U.S. 534, 537 (1993) (internal quotations omitted) (joint trials "promote efficiency and serve the interests of justice by avoiding the scandal and inequity of inconsistent verdicts"). The "exceptional circumstances justifying a deviation from the rule...are few and far between." *Lopez*, 649 F.3d at 1234.

A defendant demonstrates actual prejudice by showing that a jury was unable to make a reliable determination of guilt for each defendant because of the complex nature of the evidence. *Id.* at 1235. But "[t]he mere fact that there may be an enormous disparity in the evidence admissible against one defendant compared to the other defendants is not a sufficient basis for reversal." *United States v. Oscar*, 877 F.3d 1270, 1290 (11th Cir. 2017) (citing *United States v. Schlei*, 122 F.3d 944, 984 (11th Cir. 1997)). Thus, a defendant "does not suffer compelling prejudice, sufficient to mandate a severance, simply

because much of the evidence at trial is applicable only to co-defendants." *Id.* at 984 (quotation marks omitted).

A defendant also does not satisfy his burden by offering only conclusory allegations of spillover prejudice. *United States v. Francis*, 131 F.3d 1452, 1459 (11th Cir. 1997). This is especially so where the district court provides a limiting instruction requiring that the jury consider the evidence independently as to each defendant. Such instructions "ordinarily will mitigate the potential 'spillover effect' of evidence of a co-defendant's guilt." *United States v. Kennard*, 472 F.3d 851, 859 (11th Cir. 2006).

### A. Overwhelming evidence supported the jury's verdicts.

There was overwhelming evidence supporting the jury's conclusion that Tarantino was guilty of the three charged tax offenses. Because much of the evidence related to the Chrisleys' other fraud schemes, Tarantino contends that the district court abused its discretion by denying his motion for severance.[13] But Tarantino minimizes the weight of the evidence against him.

---

[13] As Tarantino notes, the magistrate judge initially recommended severance. (TC Br. at 17-18). But that recommendation was based on a particular concern with one email referenced in the indictment. (Doc. 103-4-5). In declining to accept this recommendation, the district court excluded that email from trial. (Doc. 183-3). Accordingly, Tarantino cannot now claim any prejudice with respect to the email described by the assigned magistrate judge.

To convict Tarantino of conspiracy to defraud the IRS, the government had to prove that (1) Tarantino had an agreement to impede the functions of the IRS, (2) Tarantino knowingly and voluntarily participation in the agreement, and (3) a conspirator committed an act in furtherance of the agreement. *See Hough*, 803 F.3d at 1187. To convict Tarantino of willfully aiding in the preparation of false tax returns, in violation of 26 U.S.C. § 7206(2), the government had to prove that Tarantino (1) willfully and knowingly aided or assisted (2) in the preparation or filing of a federal income tax return (3) that contained false material statements. *United States v. Kottwitz*, 614 F.3d 1241, 1269, *withdrawn in part on other grounds*, 627 F.3d 1383 (11th Cir. 2010).

Tarantino, a trained CPA, received multiple notices from the IRS about the agency's efforts to collect the Chrisleys' back taxes. (Doc.274-19-20; Gov't Exs.63, 67, 76, 77, 601-03). Rather than comply with the IRS's requests, Tarantino filed two tax corporate tax returns claiming that 7C's had not earned any revenue in 2015 or 2016. (Doc.276-36-40; Gov't Exs.4, 6). Tarantino knew these tax returns were false. (Doc.276-40; Gov't Exs. 644, 668). In July 2016, he emailed the Chrisleys, "Todd, Julie, I will need the 2016 bank statements [for 7C's] to put together the [year-to-date profits and loss]," and the Chrisleys thereafter provided him the login

63

information for the 7C's bank account. (Doc.276-42-44; Gov't Ex.668). This account received distributions from various production agencies during these years, which meant that Tarantino knew 7C's revenue was not zero. (Doc.276-43; Gov't Exs.644, 1202).

As stated, *supra* pp.9-11, Tarantino helped the Chrisleys hide critical information from IRS revenue officers by falsely claiming 7C's was owned by their daughter and falsely claiming he did not know where they banked. At one point, he confirmed to the Chrisleys that "[t]he agent also asked me specific questions about your current living arrangements, et cetera. I avoided answering them." (Gov't Ex.748). Tarantino's lies to the revenue officers demonstrate that his efforts to "avoid answering" their questions were part of his effort to help the Chrisleys thwart the IRS. Tarantino also repeatedly lied to third parties about the Chrisleys' tax returns. In June 2016, Tarantino sent what he called the Chrisleys' "2013 and 2014 tax filings" to a bank. (Doc.274-24-28; Gov't Ex.507). On January 18, 2018, Tarantino—copying the Chrisleys—emailed copies of their 2013, 2014, 2015, and 2016 tax returns to an automobile dealership and another bank but never advised that these were "draft" returns, meaning he led the automobile dealership and bank to believe these returns had actually been filed. (Docs.274-208-10; 276-45-51; Gov't Exs.509-11). These January 2018 draft returns were sent two weeks before the

investigating agents interviewed Tarantino. (Doc.276-47). Officer
Carter testified that she would have wanted to know that Tarantino
had sent tax returns to a bank and that Tarantino's failure to disclose
them impacted her ability to determine the full amount of what was
owed. (Doc.274-28-29).

Tarantino also ignores the significance of his recorded lies to the
investigating agents on February 2, 2018, when he falsely claimed to
not know how Todd earned his income. (Doc.276-183; Gov't
Ex.1102). But agents later learned Tarantino was lying to them. He
knew when speaking to the agents that Todd earned his income
through 7C's, as he had access to its bank account and had received
multiple emails from production companies regarding payments to
Todd through 7C's. (*See, e.g.*, Gov't Exs.614, 615 at 27, 616, 639, 640,
668).

Tarantino claims that "[t]here was not a single item of evidence or
testimony that was offered by the government that Tarantino was in
league with the Chrisleys in their quest to defeat—through fraud—the
collection of their taxes." (PT Br. at 15). But this Court has repeatedly
held that "[p]articipation in a conspiracy may be shown by direct or
circumstantial evidence." *United States v. Beale*, 921 F.2d 1412, 1430
(11th Cir. 1991) (citation omitted). Here, Tarantino's lies to the
revenue officers, lies to third parties about the Chrisleys' tax filings,

and filing false tax returns demonstrate his participation in the conspiracy.

Tarantino also fails to explain how any "prejudicial spillover" could have occurred with respect to Counts 10 and 11, which charged with him with filing the false corporate tax returns on behalf of 7C's. (Doc.130, Cts. 10, 11). As stated above, the evidence regarding these counts was straightforward: Tarantino filed two false corporate tax returns for 7C's that falsely claimed the company earned zero dollars and made no distributions for both the 2015 and 2016 tax years. (Doc.276-36-40; Gov't Exs.4, 6).

## B. The jury was able to follow the district court's instructions and make an individualized determination of guilt or innocence as to each defendant.

The district court instructed the jury that:

> Although the defendants are being tried together, you must give separate consideration to each defendant. In doing so, you must determine which evidence in the case applies to a particular defendant and disregard any evidence admitted solely against some other defendants. The fact that you may find one of the defendants guilty or not guilty should not control your verdict as to any other defendant.

(Doc.284-13). Tarantino offers only conclusory assertions speculating that the jury failed to follow the district court's instructions and never explains why that instruction was insufficient to mitigate any potential prejudice. *See Lopez*, 649

F.3d at 1237 ("We presume that juries follow the instructions given to them.") (internal citations omitted). This Court has repeatedly found no abuse of discretion where the district judge properly instructed the jury, like it did here. *See United States v. Ramirez,* 426 F.3d 1344, 1349-52 (11th Cir. 2005) (holding that any potential prejudice from admission of evidence concerning a co-defendant's prior arrest was mitigated by the judge's limiting instruction and the defendant's own testimony that he did not know the co-defendant when the arrest occurred); *United States v. Gari*, 572 F.3d 1352, 1365 (11th Cir. 2009) (holding that defendant failed to demonstrate that the jury was unable to follow the court's instructions as to making an individualized determination of guilt).

The jury carefully deliberated and weighed the evidence, as demonstrated not only by the fact that its deliberations lasted nearly three days, but by the questions it posed to the district court. At various points, the jury:

- indicated they were having difficulty locating certain evidence. (Doc.284-155).

- asked "if you had no idea a PFS, personal financial statement, and other documents were fraudulently filed, is that considered to still be conspiring?" (*Id.*).

- asked about the implications of filing an extension for a tax return. (Doc.285-3).

- sent a note advising that one juror member was "holding out" regardless of the evidence of guilt or innocence. (*Id.*).

The district court also indicated that the jurors had apparently discussed the possibility of rehearing Tarantino's tape (presumably referring to the recording of his interview). (Doc.285-12). The jury's questions confirm it considered the evidence, properly followed the district court's instructions, and ultimately returned the verdicts they concluded were supported by the evidence.

Tarantino makes the types of "conclusory allegations" about prejudicial spillover that this Court has held are insufficient to warrant a new trial. (*See* PT Br. at 35) (claiming that "Tarantino received a jury tasked with sifting through evidence covering three distinct schemes spanning a period of over 10 years."); *Id.* ("He was nonetheless tried with the Chrisleys and suffered compelling prejudice from the overwhelming evidence the Government presented against the Chrisleys."). But as the district court found when addressing these arguments following trial, "Tarantino does not identify anything that suggests that the jury was unable to 'sift through the evidence [to] make an individualized determination as to each defendant.'"

68

(Doc.389-46) (citing *United States v. Cassano*, 132 F.3d 646, 651 (11th Cir. 1998).

Tarantino argues that *Pedrick*, 181 F.3d at 1264, requires reversing his convictions, but, as the district court noted when denying Tarantino's motion for a new trial, *Pedrick* is inapposite. (Doc.389-47 n.10). In *Pedrick*, a healthcare fraud case, this Court held that "the evidence against Pedrick was minimal and not like the overwhelming and vivid evidence against [a co-defendant]." 181 F.3d at 1271. Of particular concern was that Pedrick was convicted of 89 substantive mail and wire fraud counts related to false billing even though "the evidence showed without dispute that Pedrick was not involved in [the] billing." *Id* at 1269. In contrast, Tarantino was convicted of one conspiracy to commit tax fraud and two substantive counts of tax evasion in which he was personally involved, namely, the filing of the false 7C's corporate tax returns. In *Pedrick*, the defendant's name appeared on less than 50 out of 850 pages of trial transcript (equating to approximately 5%). *United States v. Shankman*, 13 F. Supp. 2d 1358, 1368 n.11 (S.D. Ga. 1998). Even if this Court were to accept Tarantino's calculations as to what exhibits applied to him, at least 18% of the exhibits related to his conduct. (PT Br. 34).[14] And unlike

---

[14] The government disputes Tarantino's analysis. Nearly all the exhibits in the 1-77, 100-92, 200-63; 303-72, 402-46, 500-79, 601-68

69

in *Pedrick*, Tarantino was not convicted of any crimes in which there was no evidence of his personal and direct involvement. Finally, in *Pedrick*, this Court expressed a concern that the jury deliberated for a mere three hours before returning guilty verdicts on all 90 counts in which he was charged. 181 F.3d 1264, 1273 (11th Cir. 1999). Here, Tarantino was convicted of three counts out of a twelve-count superseding indictment and the jury deliberated for almost three days. (Doc.284-150-62, Doc.367-15).

None of the other cases Tarantino cites advance his argument. He concedes that *United States v. Fernandez* concerns improper joinder, which is not at issue here. (PT Br. at 25) (citing 892 F.2d 976 (11th Cir. 1989)). Similarly, Tarantino relies on *United States v. Davidson*, but there the court found that prejudicial spillover had occurred where a co-defendant was tried *in abstentia*, and the district court admitted evidence "of the unrelated tax charges against his absent co-defendant and especially the introduction of his absent co-defendant's amended tax return." 936 F.2d 856, 861 (6th Cir. 1991); *see also United States v. Tarango*, 396 F.3d 666, 674 (5th Cir. 2005) ("Our principal concern which compels us to hold that Tarango should be

_____

ranges (which have gaps), along with Exhibits 748 and 1202, concern conduct relevant to the tax conspiracy, whether Tarantino was personally on emails or not.

granted a new trial stems, in large measure, from the clear prejudice that resulted from being tried alongside essentially an 'empty chair,' . . . . Similarly, we are troubled . . . by the fact that the jury was permitted to hear a great deal of evidence that was inadmissible against Tarango."). Here, those concerns are absent, as the Chrisleys were not tried *in abstentia*.

Two cases Tarantino cites concern violence that left courts with the firm conclusion that the jurors could not compartmentalize the evidence. *See United States v. Dinome*, 954 F.2d 839, 844 (2d Cir. 1992) (prejudicial spillover where defendants were convicted of mail and wire fraud but additional charges against co-defendants concerned "vicious murders, loansharking, auto theft, pornography, and firearms trafficking"); *United States v. Cortinas*, 142 F.3d 242, 248 (5th Cir. 1998) (prejudicial spillover occurred because of "overwhelming testimony regarding the violent, criminal activities" of the co-defendants). Here, Tarantino argues that evidence concerning the Chrisleys' lavish spending, the bank fraud counts, and the Rule 404(b) evidence caused prejudicial spillover sufficient to warrant a new trial. (PT Br. at 33-36). But that evidence is markedly different than the "vicious murders" at issue in *Dinome* or the "violent, criminal activities" at issue in *Cortinas*.

71

First, regardless of whether Tarantino was jointly tried with the Chrisleys, evidence of their lavish lifestyle was admissible to prove their motive to knowingly enter the tax conspiracy. *See Hough*, 803 F.3d at 1187 (citing 18 U.S.C. § 371) (government must prove an "agreement with another to impede the functions of the IRS."). In other words, the United States would need to prove the Chrisleys knowingly entered a tax conspiracy whether they were tried jointly with Tarantino and could properly do so by admitting the same exhibits demonstrating their lavish expenditures throughout the timeframe they and Tarantino conspired to defraud the IRS.

Second, the government never argued or even suggested that Tarantino was guilty of the tax charges because of the Chrisleys' lavish spending, the bank fraud, or the Rule 404(b) evidence, and Tarantino fails to articulate how prejudicial spillover could have occurred from this evidence as it relates to his charges. Similarly, Tarantino points to the jurors' apparent negative reactions to Chrisley witnesses Lindsie Chrisley and Donna Cash. (PT Br. at 34). But other than speculating, he does not explain how any unfair prejudice impacted him; indeed, his name was not mentioned during testimony from these witnesses. (Docs.280-7-208, 281-6-144). All the charges presented to the jury concerned some version of fraud, and Tarantino cannot meet his heavy burden of demonstrating that the evidence against the Chrisleys

72

was so inflammatory that the jury could not compartmentalize it. *See United States v. Blake*, 868 F.3d 960, 969 (11th Cir. 2017) (holding that district court did not abuse its discretion in denying a motion to sever charges where defendants were charged with child sex trafficking and sex trafficking by coercion).

Tarantino fails to meet his heavy burden of demonstrating that the district court abused its discretion in denying his motion to sever where there was ample evidence of his direct and personal involvement in the charged conduct and the jury was properly instructed to independently consider the evidence as to each defendant, as they evidently did throughout their three days of deliberations on the twelve-count indictment.

### 6. The district court did not clearly err in finding the loss amount attributable to Julie Chrisley.

The district court did not clearly err when it found that Julie Chrisley's loss amount was more than $9.5 million, resulting in a 20-level enhancement under U.S.S.G. § 2B1.1(b)(1)(K).

A "district court may hold participants in a conspiracy responsible for the losses resulting from the reasonably foreseeable acts of co-conspirators in furtherance of the conspiracy." *United States v. Mateos*, 623 F.3d 1350, 1370 (11th Cir. 2010) (citing *United States v. Hunter*, 323 F.3d 1314, 1319 (11th Cir. 2003)). "Under the Guidelines, "to

determine a defendant's liability for the acts of others, the district court must first make individualized findings concerning the scope of criminal activity undertaken by a particular defendant." *Id.* But "a sentencing court's failure to make individualized findings regarding the scope of the defendant's activity is not grounds for vacating a sentence if the record support the court's determination with respect to the offense conduct, including the imputation of others' unlawful acts to the defendant." *United States v. Petrie*, 302 F.3d 1280, 1290 (11th Cir. 2002) (citation omitted). And "while the government bears the burden of proving the loss amount by a preponderance of the evidence, '[w]here the defendant presents no evidence to contradict the reasonable inference from the government's evidence on amount of loss, the district court does not err by relying on the evidence presented by the government.'" *United States v. Adetona*, 251 F. App'x 610, 615 (11th Cir. 2007) (citing *United States v. Nosrati-Shamloo*, 255 F.3d 1290, 1292 (11th Cir. 2001)).

At sentencing, the government relied upon the trial record, testimony from Special Agent Ryskoski, and additional records in support of the loss calculations. Agent Ryskoski prepared a summary chart based upon investigators' review of the loan applications detailing more than $36.2 million that the conspirators obtained from twenty-nine fraudulent loans. (Doc.363-39-41; Gov't Ex.1220). The

summary chart omitted ten other instances in which the conspirators submitted fraudulent loan applications to banks. (Doc.363-40-44). Every loan on the summary chart was issued in 2006 or later. (*Id.*; Gov't Ex.1220). The 2006 date was important: Braddock testified that every loan the conspirators obtained after 2005 was fraudulent. (Doc.363-40-44). Agent Ryskoski then narrowed the loss figure by preparing an additional summary chart that accounted for payments made on the loans. (*Id.*-55-59; Gov't Sent. Ex.3). Even where it was unclear whether payments were actually made, Agent Ryskoski gave the Chrisleys "the benefit of the doubt" and reduced the loss amount. (Doc.363-57-60). This resulted in an actual loss figure of $20,041,817.67, which Agent Ryskoski described as "conservative." (*Id.*-56-69; Gov't Sent. Ex.3). In adopting the government's loss calculations, the district court agreed with the government, noting the calculations were "supported by what the government has presented. And I agree, based on what I remember from trial, that that appears to be a conservative amount." (Doc.363-113). Later in the sentencing proceeding, the district court again noted that the government's loss calculations were conservative:

> I have to consider that also that with all that's before me, it
> doesn't even reflect all of the criminal conduct that we've
> heard about. Not all of that has even been included in the
> indictment. Not all of the loss amounts have been included
> in what the government has sought that affects our
> Guidelines.

(Doc.363-223).

Despite this conservative loss figure, Julie argues that the district court clearly erred in failing to make findings as to the specific date that she joined the conspiracy or the scope of her participation. (JC Br. at 34). At sentencing, defense counsel stated "there is no evidence whatsoever that a misrepresentation was made to get the loans other than Mark Braddock's general testimony that all loans that were received by the Chrisleys were fraud. But there is simply no documentary evidence to prove that." (Doc.363-169).

As to the supposed "lack of documentary evidence," Julie provides no authority that that the government must offer written documents to prove when a defendant joined a conspiracy. In fact, this Court has repeatedly held that "complete detailed agreement is not necessary to convict persons of conspiracy." *United States v. Elledge*, 723 F.2d 864, 868 (11th Cir. 1984).[15]

---

[15] Of note, Agent Ryskoski testified that investigators had difficulties obtaining loan information from the victim banks because many of them were community banks that shuttered during the 2008 financial crisis. (Doc. 280-27-28).

The same evidence from which the jury could infer Julie's involvement from the beginning of the fraud conspiracy supports the district court's finding at sentencing to include the entire conservative loss amount. (*See supra* pp. 26-29). This is particularly true where Julie offers no evidence suggesting she joined the conspiracy at some later date. Agent Ryskoski testified at sentencing that the investigation had revealed that Julie was involved in the conspiracy "the entire time." (Doc.363-91). Braddock testified at trial that Julie was involved throughout the conspiracy to defraud banks. (*Id.* at 133; Doc.277-133). Braddock testified that he had conversations about "scrapbooking" bank statements with Julie, and that Julie complimented him on his scrapbooking, noting that she had never been able to get her scrapbooked documents to "line up." (Doc.277-198-99). Furthermore, two fraudulent loans were issued to Julie's company, and she had full access to the fraudulently obtained loan proceeds, which were spent to benefit her, Todd, and other family members. (Doc.280-28-33; Gov't Exs.1220, 1223).

In *Adetona*, the defendant similarly argued that the government had not proven when he had joined the conspiracy and that the district court therefore erred in making its loss calculations. 251 F. App'x at 614. While that case was reviewed for plain error, this Court held that there was no error even though "there is no evidence as to

when the defendant joined the conspiracy." *Id.* at 615. In affirming the defendant's sentence, this Court noted that the defendant was the "right-hand man" to another member of the conspiracy, had knowledge of the fraudulent scheme, and directed activities when the other member of the conspiracy traveled to Nigeria. *Id.* at 616. Just as in *Adetona*, the record here supports the finding that Julie was involved throughout the bank fraud conspiracy.

Thus, the district court did not clearly err in attributing the entirety of the government's conservative loss estimate to her.

### 7. The district court did not err in imposing restitution and ordering forfeiture.

The district court did not err by "failing to explain its reasons" for imposing restitution and forfeiture. (JC Br. at 35-36). As discussed above, Agent Ryskoski testified at length about investigators' loss and restitution calculations. (Doc.363-37-69). The government relied upon a summary chart detailing the loss figure for its restitution calculations. (*Id.*; Doc.363-118-19; Gov't Sent. Ex.3). The restitution amount was $17,270,741.57. (Doc.363-36-69, 118-19; Gov't Sent. Ex.3 at 2).[16]

_____

[16] The conservative restitution figure was approximately $3 million lower than loss because of money received by the victim banks or successor institutions from third parties by selling the loans. (Sent. Ex. 3 at 2).

Following the presentation of evidence, the district court explicitly noted that it relied on the summary chart in determining restitution:

> First of all, I want to speak to restitution. Over the last break, I did have the opportunity to review Exhibit 3 that was attached to the sentencing memo again. And I am going to accept those amounts as restitution.

(Doc.363-219). The Judgment and Commitment Orders—which also included a forfeiture money judgment of $17,270,741.57—reflects the amount that was in government's Sentencing Exhibit 3. (Doc.337).

Despite this record, the Chrisleys argue that "because the court did not provide its reasons [for the forfeiture and money judgement amounts], this Court can only speculate as to them." (JC Br. at 36). But the district court explicitly stated that it relied upon the government's summary exhibit to determine the restitution and money judgment amounts. (Doc.363-219; Gov't Sent. Ex.3). The Chrisleys ignore the district court adoption of this exhibit as explaining the support for its restitution and forfeiture money judgment order.

Finally, the Chrisleys' argument that the district court indicated it would hold a later hearing misstates the record on this issue. When imposing sentence, the district court noted, "I will still allow for up to two weeks from when the J&C is signed and docketed for defense

counsel to file any motions to amend restitution that you might want me to consider. But I am going to accept that -- those amounts there." (Doc.363-220). At the request of the government, the district court delayed the forfeiture money judgment as well. (*Id*.). But after the Judgment and Commitment orders were issued, the Chrisleys did not file on the record any objections or motions to amend restitution.

## CONCLUSION

Defendants' convictions and sentences should be affirmed.

Respectfully submitted,

RYAN K. BUCHANAN
*United States Attorney*

*/s/Thomas J. Krepp*
THOMAS J. KREPP
*Assistant United States Attorney*

*/s/Annalise K. Peters*
ANNALISE K. PETERS
*Assistant United States Attorney*

*/s/Alex R. Sistla*
ALEX R. SISTLA
*Assistant United States Attorney*

## CERTIFICATE OF COMPLIANCE AND SERVICE

This brief complies with the typeface requirements of Fed. R. App. P. 32(a)(5) and the type-style requirements of Fed. R. App. P. 32(a)(6) because it has been prepared in a proportionally spaced typeface using Microsoft Word 2016 word processing software in 14-point Goudy Old Style.

I certify that, according to the word processing software, the numbered pages of this brief contain 16,911 words, excluding the parts of the brief exempted by Fed. R. App. P. 42(f). The United States has contemporaneously filed a motion for leave to file excess words.

Today, this brief was uploaded to the Court's website using the CM/ECF system, which automatically sends notification to the parties and counsel of record:

| | | |
|---|---|---|
| Donald F. Samuel, Esq | J. Alex Little | Christopher S. Anulewicz |
| Garland, Samuel & Loeb, P.C. | Zack C. Lawson | Balch & Bingham LLP |
| 3151 Maple Drive, N.E. | Burr & Forman LLP | 30 Ivan Allen, Jr. Blvd NW |
| Atlanta, Georgia 30305 | 222 2nd Ave S, #2000 | Suite 700 |
| | Nashville, Tennessee 7201 | Atlanta, Georgia 30308 |

June 13, 2023

_/s/Thomas J. Krepp_

THOMAS J. KREPP
*Assistant United States Attorney*

82